DIAMOND McCARTHY LLP
620 8th Avenue, 39th Floor
New York, NY  10018
Telephone: (212) 430-5400
Facsimile: (212) 430-5499
Sheila M. Gowan, Esq.
Co-Counsel for Mitchell Cohen

BECK & STRAUSS, P.L.L.C.
50 Charles Lindbergh Blvd., Suite 205
Uniondale, New York 11553
Telephone: (516) 228-8383
Facsimile: (516) 228-8390
Leland Stuart Beck, Esq.
Co-Counsel for Mitchell Cohen

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
UNITED STATES OF AMERICA,
                                        :
                  Plaintiff(s),    10 Civ. 9280(PKC)(AJP)
                                        :
            -against-                   ECF Case
                                        :
BUY-A-HOME, LLC; METROPOLITAN
HOUSING, LLC; GRAMERCY FUNDING          :
GROUP LTD.; MITCHELL COHEN;
CAMBRIDGE HOME CAPITAL, LLC;            :
CRAIG HYMAN; SETH LAPIDUS;
SETH KRAMER;JACQUELINE DERRELL;         :
CAMBRIDGE FUNDING GROUP, LTD.;
JAMES J. GOLDBERG, *d/b/a* JJG REAL     :
ESTATE APPRAISAL SERVICES;
PREMIER APPRAISAL SERVICE;              :
WILLIAM BUCKLEY; and ROBERT
MICHELINE, *d/b/a* P&M APPRAISALS,      :

                  Defendant(s).    :
----------------------------------X

## DEFENDANT MITCHELL COHEN'S OPPOSITION
## TO THE MOTION FOR CONTEMPT

**TABLE OF CONTENTS**

**Page**

Table of Authorities ...................................... ii

Preliminary Statement ...................................... 2

Argument .................................................. 4

THE CONTEMPT MOTION SHOULD BE DISMISSED ............... 4

A.  The Applicable Legal Standard ................ 4

B.  The Government Fails to Prove That Mr. Cohen
    Participated In Any Real Estate Transaction
    That Involved a Request or Application for
    HUD Mortgage Insurance In Violation of
    Paragraph 3 of the Order .................... 6

C.  The Government Fails to Prove that Mr. Cohen
    Solicited Business Involving the
    Origination of Any Federally-Insured Home
    Mortgage Loans in Violation of Paragraph 4
    of the Order ............................... 22

D.  Mr. Cohen Has Diligently Attempted to
    Comply with the Order ...................... 24

Conclusion ............................................... 24

## TABLE OF AUTHORITIES

**Cases**                                                      **Page**

<u>Drywall Tapers, Local 1974 v. Local 530, Operative
      Plasterers Int'l Ass'n</u>, 889 F.2d 389
      (2d Cir. 1989) ........................................ 5

<u>Hart Schaffner & Marx v. Alexander's Dep't Stores, Inc.</u>,
      341 F.2d 101 (2d cir. 1965) .......................... 5

<u>Hess v. New Jersey Transit Rail Operations, Inc.</u>,
      846 F.2d 114 (2d Cir. 1988) .......................... 5

<u>King v. Allied Vision, Ltd.</u>, 65 F.3d 1051 (2d Cir. 1995) .... 5

<u>Paramedics Electromedicina Comercial, Ltda v. GE
      Med.Sys.Info. Technologies, Inc.</u>, 369 F.3d 645
      (2d Cir. 2004) ....................................... 5

<u>Zino v. Davidoff AS v. CVS Corp.</u>, 2008 WL 1775410
      (S.D.N.Y. Apr. 17, 2008) ........................ 3,5,6

## Preliminary Statement

Defendant Mitchell Cohen respectfully submits this opposition to the government's motion for a finding of contempt for alleged violations of the preliminary injunction order entered in this case.

Having no proof that the Mr. Cohen participated in any real estate transaction involving a request or application for HUD mortgage insurance, the government contends that he violated the order, in essence, because the business models of two private investment companies, Frogman LLC and Queens Land Purchase LLC, owned either by his wife Marcia Kaufman or Ms. Kaufman and her business partner Lisa Piroozian, and the real estate broker Y Rent NY, owned by Ms. Kaufman and Ms. Piroozian, are similar to business models that Mr. Cohen has used in the past.

The government claims that Mr. Cohen "arranged" the activities of these Kaufman/Piroozian businesses so that he could participate in real estate transactions involving a request or application for HUD mortgage insurance in willful violation of the order. The government has no evidence to support its theory, let alone clear and convincing evidence. The government merely spins its tale using innuendo and conjecture basically relying on a buyer who "saw" Mr. Cohen at Y Rent NY's office, a receptionist

2

who overheard him answer the phone and talk to sale agents,
Mr. Cohen's help to his wife in filling out the signature
blocks on a few documents, his recommendation of a
telephone installer for her new business, and the fact that
some people he worked with in the past work with the
Kaufman/Piroozian businesses.  The government's contention
that Mr. Cohen "solicited" business in violation of the
order rests only on the word of a receptionist and a sales
agent, who merely say that Mr. Cohen sometimes answered
telephone calls from people calling Y Rent NY in response
to Y Rent NY's advertisements.

None of these acts, either individually or
collectively, can reasonably be said to violate the order.
At a minimum, they show there is a "fair ground of doubt as
to the[ir] wrongfulness."  See Zino v. Davidoff AS v. CVS
Corp., 2008 WL 1775410 at *5 (S.D.N.Y. Apr. 17,
2008)(internal citation omitted).  The undisputed evidence
is that Frogman, Queens Land and Y Rent NY are owned and
operated by Ms. Kaufman and Ms. Piroozian, who are the sole
decision makers.  Mr. Cohen only works with Frogrman and
Queens Land as a property finder and to scope out
renovation work; a job he created for himself that would

3

comply with the order and help him earn a living.[1]  While
Ms. Kaufman and Ms. Piroozian lent him an office in Y Rent
NY's basement, nothing Mr. Cohen did there is inconsistent
with the conduct of a husband supporting his wife in her
fledgling business[2] in a real estate sale market with which
he is familiar, or normal social interaction in an office
setting.  As such, the government fails to satisfy its
burden of proving that Mr. Cohen did not comply with the
order, and that he has not been reasonably diligent and
energetic in attempting to comply with it.

### Argument

### THE CONTEMPT MOTION SHOULD BE DISMISSED

**A.    The Applicable Legal Standard**

"A contempt order is warranted only where the [movant]
establishes by clear and convincing evidence that the
alleged contemnor violated the district court's edict."
King v. Allied Vision, Ltd., 65 F.3d 1051, 1058 (2d Cir.

---

[1]   As the government told Mr. Cohen when it drafted the
order, participation in a sale of property to a private
investor without the use of a federally insured mortgage
would not violate the order.  Cohen Declaration dated
November 8, 2011 ("Cohen Dec.") at Ex. A.  This was
confirmed by the government in its opposition to Mr.
Cohen's motion to modify the injunction.  See id. at Ex. B.

[2]   As of July 1, 2011, when Ms. Kaufman testified in this
matter, and which was after Mr. Cohen had vacated Y Rent NY
offices, Y Rent NY was a mere eight weeks old, and had
closed only one real estate transaction.  Kaufman Tr. at
196 and 212, respectively.

1995)(citing Hart Schaffner & Marx v. Alexander's Dep't Stores, Inc., 341 F.2d 101, 102 (2d cir. 1965)(*per curium*)).  The movant must establish that "(1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner."  Paramedics Electromedicina Comercial, Ltda v. GE Med.Sys.Info. Technologies, Inc., 369 F.3d 645, 655 (2d Cir. 2004).  A clear and unambiguous order is one that leaves "no uncertainty in the minds of those to whom it is addressed," Hess v. New Jersey Transit Rail Operations, Inc., 846 F.2d 114, 116 (2d Cir. 1988), who "must be able to ascertain from the four corners of the order precisely what acts are forbidden," Drywall Tapers, Local 1974 v. Local 530, Operative Plasterers Int'l Ass'n, 889 F.2d 389, 395 (2d Cir. 1989), cert. denied, 494 U.S. 1030 (1990).

"In evaluating the purported contemnor's conduct, '[t]he court is not empowered to command, any more than it can pretend for itself, performance approximating perfection.  The court is obliged, however, to require substantial performance and due diligence."  Zino, 2008 WL

1775410 at * 5 (internal citation omitted).[3]   "[I]t is well settled that 'the Court's power to hold a defendant in contempt is a potent weapon that should not be exercised where there is a fair ground of doubt as to the wrongfulness of the defendant's conduct." Id. (internal quotations and citations omitted).

**B.    The Government Fails to Prove That Mr. Cohen Participated In Any Real Estate Transaction That Involved a Request or Application for HUD Mortgage Insurance In Violation of Paragraph 3 of the Order**

The government's claim that Mr. Cohen "sought to re-launch the same 'flip sale' scheme" through businesses owned by his wife and business partner in order to "flagrantly flout[]" the terms of the order is completely unfounded.  Indeed, the evidence is, while Mr. Cohen - - through the business he set up to after entry of the order - - may have found properties for investment by Frogman and Queens Land, which are independently owned by Kaufman and Piroozian, Mr. Cohen had no involvement in the ultimate sale of the properties listed by Y Rent NY.  As Ms. Piroozian testified:

Q.    Why did you start Queens Land Purchase?

---

[3]   While "[t]he Second Circuit has not explicitly endorsed the substantial compliance standard, [] it has indicated *in dicta* that 'substantial compliance' is the appropriate standard in evaluating noncompliance in a contempt case." Zino, 2008 WL 1775410 at *5 (citations omitted).

A.   To have a holding company for [Kaumfan/Piroozian]
     investment properties.

Q.   Whose idea was it for you to have a holding company
     for your investment properties?

A.   It was my idea.

Q.   How did you come up with that idea?

A.   I mean, its not a new idea.  A lot of people have
     holding companies for their investment properties.  I
     mean, its not something new.

Piroozian Tr. at 38.

     Ms. Kaufman confirmed Ms. Piroozian's testimony:

Q.   What was your plan for the type of business that
     Queens Land Purchase would engage in?

A.   Queens Land is Lisa Piroozian and Frogman[4] can actually
     buy houses and that would be the holding company, that
     we would either sell them, list them with Y Rent. . .
     . Some properties we look to sell to maybe a buyer who
     is going to live there, and some properties we may
     look to sell to other investors who are looking for
     homes, or investments.

Kaufman Tr. at 73.

     In either early January or late December Ms. Piroozian

and Ms. Kaufman decided to start Y Rent NY:

Q.   What caused you to make that decision?

A.   I had just left my job and we both had very similar
     backgrounds in real estate.  With my background in

---

[4] Ms. Kaufman is the sole member of Frogman through which
she buy properties.  Kaufman Tr. at 46.  As she testified
generally "I'm a stand alone person, I'm Marcia Kaufman, I
have been in business for a long time and I don't want
anything to do with anybody else.  I just go to work and do
my business, go home and take care of my children.  That's
it."  Id. at 163.

entrepreneurship management, it was always a goal to
start my own business.  [Ms. Kaufman] had expressed
similar interests and we decided with our experience
and our mutual interest in creating a company we would
be good partners.

                * * *

Q.    When you made the decision to start Y Rent, what did
       you imagine the business plan to be?

A.    The business plan?  To have a full service real estate
       brokerage company, sell to the consumer, have our
       agents have the consumers come in, do a lot of
       advertising.  Marcia Kaufman would be a broker, she
       has a broker license, I would do managerial, the
       managerial end, and we would work like that.

Q.    Why did you want to start a brokerage company?

A.    To make money.

Q.    Did you have any experience in brokerage at the time?

A.    Well, as we discussed, my background is real estate,
       so in brokerage – here's the thing . . . . My father
       has been a mortgage banker for 25 years.  My
       grandparents are in residential real estate in
       Manhattan.  We discussed how my family and my uncles
       own real estate.  Real estate is basically in my
       blood.  In our community, you're in rugs or you're in
       jewelry.  I'm not in rugs and I'm not in jewelry.  I'm
       in real estate.  So you have to know your industry
       front and back . . .

                * * *

Q.    Who was involved in coming up with the business plan
       for Y Rent NY.

A.   Myself and Marcia Kaufman.

Piroozian Tr. at 26-29.

    Ms. Kaufman testified the business model for Y Rent NY

was similar to models she created for her other businesses[5]:

---

[5]  Ms. Kaufman first trained in the real estate business
more than twenty-five years ago.  Since then she been,

Q.   What was the business model or type of business you
     intended to pursue by setting up Y Rent NY?

A.   [Y] Rent, the business model I set up was very similar
     to how I set up my mortgage company, to bring in a
     certain amount of gross revenue, a certain amount of
     expenses, including fixed and variable commission,
     other fixed expenses, and then you hope to have a
     bottom line and make a profit.

Kaufman Tr. at 71-72.

     It is not surprising that Ms. Piroozian and Ms.

Kaufman discussed their plans with their husbands:

Q.   Did you ever speak with your husband [Mr. Ahdoot]
     about the business that you were planning to start?
                         * * *
A.   Sure all the time.  We discussed if it as the right
     move at the time for us, if it's the right partnership
     for us.

Q.   Did you ever speak with Mitchell Cohen about the
     business that you were planning to start?

A.   Yes.

Q.   What did you discuss with Mr. Cohen about the business
     that you were going to start?

A.   We all discussed in an informal setting about all the
     benefits and how it was a good business and how its
     very profitable.

Q.   Did Mr. Cohen have experience in the type of business
     that you envisioned Y Rent to be?

A.   I understand that Mr. Cohen was involved in owning a
     real estate brokerage company.
                         * * *

---

*inter alia*, a mortgage banker, originator of loans,
arranged financings, worked in sales, and trained others to
work with developers, attorneys and accountants.  Kaufman
Tr. at 8-42.  She married Mr. Cohen in November 2008, and
started dating him five years ago.  Id. at 58-59; 192.

Q.   Did Mr. Cohen give you any advice on how you should
     set up the company?

A.   Yes.

Q.   What kind of advice.

A.   That there should be like a glass wall in front of the
     office, that there has to be security, that Marcia is
     safe, he was always concerned about Marcia's safety,
     that we should have sales agents in the front and just
     to have a good rapport with them.

Q.   Did he give you any other advice that you recall?

A.   No.

                        *  *  *

Q.   Did you, in the planning phase of Y Rent, did you ever
     discuss your target market with Mr. Cohen?

A.   No.

Piroozian Tr. 30-36.

     Indeed, the evidence is that Mr. Cohen had <u>no</u> role in

decisionmaking at Y Rent NY.

Q.   From the time that Y Rent started operating until the
     time that you got the subpoena, did you ever have a
     conversation with Mr. Cohen about the ongoing business
     at Y Rent?

A.   Just that he was happy for us that it was going well
     and that was it.

Q.   Did you ever discuss with him any decisions that you
     were making in connection with Y Rent.

A.   No.

Q.   Did he ever give you any advice as to how to operate Y
     Rent during that time period.

A.   No, not that I could recall.

Piroozian Tr. at 93-94.

                            10

Q.   Has Mr. Cohen ever advised you or Ms. Kaufman on how
     to structure closings of properties that are bought by
     Queens Land?

A.   No, not that I am aware.

Piroozian Tr. at 130-31.

     Nor did Mr. Cohen obtain financing for Frogman or

Queens Land, hire contractors, or manipulate their business

activities so that the "same cast of characters" he

previously worked with would assist these companies.

Q.   [] J&L Funding Group provided Frogman and Queens Land
     each with a one million dollar line of credit, right?

A.   Yes.

Q.   Did you ever deal directly with J&L?

A.   Yes.

Q.   Who did you deal with at J&L?

A.   I know Tim Mayette there.  He worked from my family
     for years [] at Arbor, and the guy that owns it, I'm
     going to draw a blank on his name, Joe Fogione.

Q.   Did Mitchell Cohen ever work on obtaining the lines of
     credit for Queens Land or Frogman through J & L.

A.   Work on obtaining?

Q.   . . . Was Mr. Cohen ever involved in any capacity in
     Queens Land or Frogman's obtaining the lines of credit
     from J&L?

A.   No.  Because I knew – no.

Kaufman Tr. at 79-80.

Q.   Did Mr. Cohen ever facilitate obtaining financing by
     Queens Land Purchase?

A.    Mr. Cohen didn't facilitate any financing for us.

                            * * *

Q.    Is it your testimony that the only two individuals who
      acted on behalf of Queens Land to obtain funding for
      property purchase were Marcia Kaufman and [Jonathan
      Ahdoot]?

A.    To the best of knowledge, yes.

Piroozian Tr. at 109, 111, respectively.

Q.    Since the formation of Queens Land Purchase, has
      Mitchell Cohen ever been involved in directing the
      contractors who have renovated homes owned by Queens
      Land Purchase.

A.    No.  Mitchell Cohen does not direct any of our
      contractors.

                            * * *

Q.    And who made the decision to use these particular
      contractors on properties being renovated that are
      owned by Queens Land Purchase.

A.    Myself and Marcia Kaufman.

Piroozian Tr. at 59, 57.

Q.    Frogman has had renovations done on properties that it
      acquired this year, right?

A.    Yes.

Q.    In connection with obtaining those renovations, did
      Mr. Cohen have an involvement?

A.    I may ask my husband what he thinks.  I know all these
      guys because they came looking to me for business.
      They wanted an opportunity to build out my houses.
      Did I ask Mitch as my husband what do you think
      something would be?  That's between me and him.  But
      that would be his involvement. . .  If he is going to
      find a property for me, which he is allowed to find
      for Queens Land or Frogman, according to this and the
      legal opinion I got, he is also allowed to tell me
      what he thinks the scope of job would be in that
      regard.

Kaufman Tr. at 82-83.[6]

               * * *

Q.    Just to be clear, so your testimony is that other than
       offering you advice or opinion on the scope of
       renovations to be done for a particular property, Mr.
       Cohen had no other involvement in Frogman obtaining
       any renovations . . . .

A.    Other than giving me an idea what he thought the scope
       of renovation should be, when I bought the property,
       I'd ask his opinion on it, especially as finder as to
       the finder's scope before I purchase it.  He has
       really no involvement because I'm either going to hire
       Luc Design or Simon Bob, which is another guy based on
       what they can bring it for.  I may move somebody off
       the job, move somebody on a job.

Kaufman Tr. at 84.[7]

    Nor did Mr. Cohen "train[] sales agents on his sales

tactics."  The only evidence the government offers is the

receptionist Marie Cunningham's statement about general

non-specific conversations she overheard.  It is noteworthy

that, while the government offers a declaration by sales

agent Monique Jeffries, who has worked at Y Rent NY since

almost the beginning, Ms. Jeffries says nothing about

---

[6]  Ms. Kaufman testified that in the New York real estate
market "[e]verybody goes back a long time.  Everybody knows
everybody a long time, yes."  Kaufman Tr. at 57.  And,
because she has been "in the industry a long time," she
doesn't know whether she knew certain people prior to her
relationship with Mr. Cohen or met them later through Mr.
Cohen.  Id. at 172.

[7]  Ms. Kaufman testified it's possible that Mr. Cohen may
have contacted a contractor for her:  "Maybe I may have
said, Mitch, as his wife, can you do me a favor, can you
make a phone call, if you're going someplance, you know.
It wasn't really on behalf of [Frogman or Queens Land]."
Kaufman Tr. at 86.

"training by Mr. Cohen."  The fact that Mr. Cohen did not "train," and that his conversations with sales agents were only normal friendly conversations among people in an office is consistent with the evidence:

Q.    So is it your testimony that Mr. Cohen never provided any training or advice to the sales agents for Y Rent New York.

A.    He never provided any training.  I do all the training.

Kaufman Tr. at 100.

Q.    Is it still you recollection, is it still your position that Mr. Cohen never provided training or instruction of any type to the sales agents working for Y Rent NY about how they were supposed to interact with customers who - -

A.    Not to my knowledge.

Q.    Did you ever witness any instance where he provided training to the sales agents working for Y Rent NY?

A.    I did not witness that.

Kaufman Tr. at 213; see also Cohen Dec. at ¶2.

Q.    To your knowledge, did Mr. Cohen ever instruct the sales agents on how to do their jobs during that time period?

A.    I don't believe Mr. Cohen ever instructed sales agents to do anything.  As in any office, or real estate office, people talk about their technique. . . We talk about technique all the time with the agents, just different banter about this client or that client and just in general.

                    *  *  *

Q.    How many times did you see or hear Mr. Cohen speak with sales agents about technique at Y Rent?

A.    Mr. Cohen didn't specifically speak about technique.
      I would say that in general in the office people speak
      about technique between each other because we need to
      become better.  How many times, I'm not sure, I don't
      know if it was any times at all about techniques,
      specifically because I wasn't necessarily there.  It's
      a very busy office.

Piroozian Tr. at 79-81; see also Cohen Dec. at ¶20.

Q.    Is there anyone at Y Rent who holds meetings with
      sales agents?

A.    Marcia Kaufman.

Q.    To your knowledge, did Mr. Cohen ever attend one of
      those meetings?

A.    Definitely not.

Piroozian Tr. at 86.

Q.    Were you involved in any capacity in directing the
      work of the salespeople or sales agents at Y Rent NY?

A.    No.

Q.    Did you provide training to the employees, to the
      sales agents or sales people, at Y Rent NY shortly
      after the business opened?

A.    No, but sometimes agents would ask me for advice
      knowing that I've been in the business for a long
      time.

Q.    Let me just go back to my original question.  At any
      point in late April or May of 2011, did you provide
      any group training to the sales agents or salespeople
      at Y Rent NY?

A.    I think I might have spoken to more than one person at
      a time.
                          * * *
Q.    When you had these discussions with the - as you just
      described, with more than one person, you were
      providing advice on how to - you were providing advice

15

to salespeople or sales agents at Y Rent NY on how to - how they should conduct their sales efforts, right?

A.    No.

Q.    But you did speak to more than one person at a time on how to conduct sales, right?

A.    They would ask me questions such as bringing people in, how many people you need to bring in to do a deal in my experience.  It was general conversation.

Cohen Tr. 83-86.

As for "interviewing job-seekers," the weight of the evidence is that Mr. Cohen did not.  Again, the government solely relies on the receptionist, who says Mr. Cohen interviewed her and told her about salary and hours.  Her statement is contradicted by others:

Q.    When you opened the office, Y Rent NY, in addition to yourself and Ms. Piroozian also had a receptionist and some sales agents, right?

A.    Yes.

Q.    Who else was involved in the process of hiring these sales agents and the receptionist?

A.    Lisa Piroozian.

Q.    Did Mr. Cohen ever take part in interviewing any receptionist or sales agent for Y Rent NY?

A.    No.

Q.    So to be clear, so Mr. Cohen never took part in any interview of any sales agent or any receptionist who was going to work at Y Rent NY?

A.    Not to [my] knowledge.
                              * * *
Q.    Did Mr. Cohen take any part in the interview?

16

A.   I don't think so.  I don't recall.

Q.   You don't recall whether he was involved in that
     interview?

A.   He wasn't involved in the interview.  I did the
     hiring. . . .  So I did all the interviewing, Lisa did
     all the interviewing.  Did people chat with [Ms.
     Piroozian's husband] and Mitch?  Possible.  No, we did
     all the interviewing.

Kaufman Tr. at 94-98; see also Cohen Dec. at ¶20.

Q.   Were you involved at any point in the hiring process?

A.   No.

Q.   I just want to be clear, Mr. Cohen.  So its your
     testimony that you were never involved in the process
     of interviewing or hiring employees at Y Rent NY?

A.   No.

Cohen Tr. at 83.[8]

     Nor did Mr. Cohen "prepare[] disclosure documents that

Y Rent provided to buyers."  All he did was help his wife

double check a few documents.

Q.   In the middle of the page there is a line indicating
     or stating "This form was provided to me by."  The
     name Marcia Kaufman is written in there.  And after
     that Y Rent LLC is also written in there.  Do you see?

---

[8]   That Y Rent NY hired some former Buy-A-Home sales agents
likely has more to do with the simple fact that these
people needed jobs than anything else, and, in all events,
Mr. Cohen was not involved in their hiring.  Moreover, in
explaining why a former Buy-A-Home sales agent came to her
about a deal, Ms. Kaufman testified that "[w]ell, you know,
it's a small world, everybody knows that [she and Ms.
Piroozian] were buying property together, we were opened up
. . . [e]verybody knows everybody."  Kaufman Tr. at 155.

A.    Uh-hum.

Q.    Do you recognize that as Mr. Cohen's handwriting?

A.    It could be because there was a time when I first
      opened it, things were frenetic, I wasn't sure about
      the form.  And I might have asked him, because he was
      downstairs on the lower level, because he's a broker,
      where do I do something.  And he might have instead of
      just telling me, filled it in . . .
                         * * *
Q.    Why did Mr. Cohen write Queens Land Purchase LLC on
      this form?

A.    I'm sure no different than my previous answer, that in
      haste I probably asked him to just back up, make sure
      I was doing it right, this is where everything goes.
      No different than when I look at a new good faith
      estimate that's three pages long instead of one page.
      I sometimes am not sure and I have to ask other people
      questions, even though I had many years of training on
      that.  I just always like to be accurate.  If I'm not
      sure, I'll ask somebody who knows jus to make double
      sure.  There are a lot of forms in these businesses,
      in all these businesses.

Q.    So you took this - just to be clear, so you took this
      form to Mr. Cohen?

A.    I already said - I said previously I might have gone
      down to his office and asked a question just to make
      sure I was doing it, to ask that question. . .
      Especially in the beginning when I first opened up, I
      wanted to make sure every I was dotted and every T was
      crossed.  I didn't want to make any mistakes.

Kaufman Tr. at 109-116.

                         * * *
Q.    Have you had any role in preparing closing documents
      or sale contracts in connection with properties
      brokered by Y Rent NY?

A.    No.

Q.    What was your role in preparing this document?

18

A.    I didn't prepare the document.  That one page my wife
      wasn't sure how to fill it out so I just wrote it out
      for her.

Cohen Tr. 92-93; see also Cohen Dec. at ¶15.

Q.    Why did you write these - why did you prepare this
      form?

A.    I didn't prepare this form.  Just this page.  And I'm
      sure my wife asked me to look at it and I said, 'You
      made a mistake.  You didn't fill it out.' And I
      probably just helped her fill it out.

Cohen Tr. 108.

      Moreover, Ms. Kaufman was clear that Mr. Cohen never

dealt with buyers who received the forms, or any of the

customers who actually bought property.

Q.    Did Mr. Cohen ever interact with Ms. Gurley who is one
      of the signatories to this document?

A.    Never.

Kaufman Tr. at 117.

Q.    Did Mr. Cohen deal with Ms. Ray on behalf of Y Rent NY
      LLC?

A.    A hundred percent not.  He did not deal with Ms. Ray
      at all.

Kaufman Tr. at 124.

Q.    How do you know that?

A.    Because he does not deal with anybody on behalf of Y
      Rent New York LLC.  Its myself or Lisa Piroozian.

Kaufman Tr. at 124-125.

Q.    Just to be clear is it your testimony that Mr. Cohen
      has never dealt with Kimesha Jemison on behalf of
      either Frogman or Y Rent NY LLC?

A.   Just to be clear, correct.  He's never dealt with Kim
     Jeminson on behalf of Y Rent or Frogman.  He never met
     her, talked to her, introduced to her, nothing.

Kaufman Tr. at 128-29.

Q.   Has Mr. Cohen ever dealt with any homebuyer who was
     interested in buying homes through Y Rent New York?

A.   Never, ever.

Kaufman Tr. at 104-105; see also id. at 212-13.

     As Sandra Schanks, the First Residential loan officer

who assisted at least one potential Y Rent NY buyer said:

Q.   Ms. Schanks, has Mr. Cohen been involved in any way in
     any of the loans that you have originated since
     December 2010?

A.   No.

Schanks Tr. at 117.[9]

     Indeed, the only buyer the government offers is Gloria

Harris, who merely says she "saw" Mr. Cohen at Y Rent NY,

and that a sales agent told her she was being given a ride

in a Land Rover belonging to Mr. Cohen.[10]  Ms. Harris does

not say that she ever met the man she "saw," let alone that

---

[9]    Ms. Schanks went to Y Rent NY for a buyer lined up by
an independent sales agent, who previously worked with Mr.
Cohen, for a sale involving a Y Rent NY listing.  Kaufman
Tr. at 151-55.  Ms. Schanks said that Ms. Kaufman made
clear that Y Rent NY was her business and that Mr. Cohen
was not involved with it. Schanks Tr. at 47-48; see also
Kaufman Tr. at 160-61.

[10]   The government knows that the Land Rover belongs to
Ms. Kaufman who permits Mr. Cohen use it

he participated in her real estate transaction.   See also
Cohen Dec. at ¶19.

Finally, the government's reliance on Mr. Cohen's
recommendation that his wife use Mr. Singh – someone she
previously used in her own home - for Y Rent NY's telephone
services carries no weight.   As Ms. Kaufman testified:

Q.   Did Mr. Cohen ever contact Mr. Singh in connection
     with setting up the phone system at Y Rent NY?

A.   He might have said my wife's opening an office maybe
     he wants business.   I don't know.

Q.   Did you ever ask Mr. Cohen to contact Mr. Singh in
     connection with setting up a phone at Y Rent NY?

A.   Lisa and I discussed who we used to open up our
     offices and I'm sure everybody had somebody they
     wanted to recommend.   It's really how we would pick
     our vendors.

Q.   My question is, again, did you ever ask Mr. Cohen to
     contact Mr. Singh in connection with obtaining
     telephone services for Y Rent NY's offices?

A.   I don't recall that.

Kaufman Tr. at 93; see also Cohen Dec. at ¶14.

Nor did Mr. Cohen try to "shield" any involvement in Y
Rent real estate transactions as the government claims.
The receptionist says Mr. Cohen answered calls from job
applicants for "Ms. Deena."   "Deena" is Marcia Kaufman's
middle name.   Id. at ¶20.   Ms. Kaufman uses "Ms. Deena" for
Y Rent job listings so she can distinguish between calls in
response to job advertisements and those in response to

property advertisements.  Id.  Mr. Cohen never took a call
for "Ms. Deena."  Id.

Similarly, the government's claim that Mr. Cohen
signed a document with the name "Bob Caban" to shield
participation in Y Rent is baseless.  Mr. Cohen signed an
offer for the sale of a property unrelated to any Y Rent NY
sales transaction at the suggestion of and with the
permission of Mr. Caban.  Id. at ¶16.

Finally, Mr. Cohen did not lie in his June 2011
declaration.  He accurately described his new work in
finding and scoping properties for sale to private
investors, including at the time Queens Land, that his wife
owned Frogman and was a part owner of Queens Land, the fact
that his wife and Ms. Piroozian lent him office space in
the basement (just like they lent Ms. Piroozian's husband
space), and that he occasionally answered the telephone
when no one was available.  In sum, nothing that the
government points to undermines the truth of any of his
statements.

**C.  The Government Fails to Prove that Mr. Cohen Solicited
Business Involving the Origination of Any Federally-
Insured Home Mortgage Loans In Violation of Paragraph
4 of the Order**

The government's claim that Mr. Cohen violated
paragraph 4 of the order, which prohibits him from

"soliciting business involving the origination of any federally-insured home mortgage loans," is solely based on Monique Jeffries' and Marie Cunningham's statements. But, Ms. Jeffries merely says that when prospective buyers "in response to Y Rent's internet and newspaper advertisements," called Y Rent NY, the receptionist would transfer the calls to Mr. Cohen, who took down names and possibly other information and then assigned a Y-Rent sales agent to follow up. Ms. Jeffries does not say that Mr. Cohen solicited business, provide any specifics about the calls, or that they were from customers who wanted a federally insured mortgage. Ms. Cunningham too merely says that she heard Mr. Cohen answer telephone calls; she says nothing about the specifics of these calls.

   That nothing untoward happened when Mr. Cohen helped out by answering the telephone is consistent with Mr. Cohen's statements:

Q.   Did you speak to prospective customers on behalf of Y Rent NY and them assign them to specific agents?

A.   If I answered the phone and it was a prospective client, I would take down the information and, if no one else was available, hand it to a sales agent.

Cohen Tr. at 86; see also Cohen Dec. at ¶20.

Q.   Did you call back prospective customers who contacted Y Rent NY about possibly acquiring properties?

A.   No.

Cohen Tr. at 88.

**D.   Mr. Cohen Has Diligently Attempted to Comply with the Order**

Since the order has been entered, Mr. Cohen has had no role in the disposition of the twenty-one properties that were listed for sale by Buy-A-Home.  Cohen Dec. at ¶4.  He started a consulting business that provides services in connection with the purchase of distressed properties in an effort to meet his financial responsibilities.  Id. at ¶7.  He has advised the government of the all of the real estate transactions in which he is participating through his new business.  Id. at ¶¶6, 18.  As required by the order, he has refrained from participating in any real estate transaction that involves a request or application for a federally insured mortgage.  Id. ¶¶7, 11, 13.

In sum, nothing the government proffers shows that he has not been diligent in complying with the order, or that he has not substantially performed all of his obligations under it.

### Conclusion

For the foregoing reasons, together with those set forth in his declaration, Mr. Cohen respectfully submits that the government's motion for a finding of contempt should be dismissed.

Dated: New York, New York
       November 10, 2011

                 DIAMOND McCARTHY LLP


            By: *Sheila M. Gowan*
                Sheila M. Gowan
                620 Eighth Avenue, 39th Floor
                The New York Times Building
                New York, NY 10018
                212-430-5404 (telephone)
                212-430-5499
                sgowan@diamondmccarthy.com

                Leland Stuart Beck
                Beck & Strauss, P.L.L.C
                50 Charles Lindbergh Blvd.
                Suite 205
                Uniondale, NY 11553-9850
                bsglaw@ix.netcom.com

                *Co-counsel for defendant*
                    *Mitchell Cohen*

25

## Certificate of Service

I, SHEILA M. GOWAN, hereby certify that on the 10th of November, 2011, I caused the service of a true copy of the Opposition to Government's Motion to Compel as stated below:

Plaintiff the United States:
Via Electronic Mail and Regular Mail
AUSA Li Yu
86 Chambers Street, 3rd Floor
New York, NY 10007
li.yu@usdoj.gov
Cristine.phillips@usdoj.gov (e-mail only)

Defendant Seth Lapidus:
Via Electronic Mail
c/o Frank A. Doddato
666 Old Country Road-suite 501
Garden City, NY 11530
Fadesq49@aol.com

Defendant Jacqueline Derrell
Via Electronic Mail
c/o Arthur A. Edwards
572A Flatbush Avenue
Brooklyn, NY 11225
arthuredwardslaw@verizon.net

Defendants Premier Appraisal Services & William
Buckley:
Via Electronic Mail
c/o Kaufman Dolowich Voluck & Gonzo LLP
jisaacson@kdvglaw.com

Defendants Cambridge Home Capital, LLC, Cambridge
Funding Group, LLC, Seth Kramer and Craig Hyman:
Via Electronic Mail
c/o Jim Walden and Matthew Benjamin
jwalden@gibsondunn.com
mbenjamin@gibsondunn.com

Dated:   November 10, 2011
         New York, NY

Sheila M. Gowan