PREET BHARARA
United States Attorney
By:  LI YU
      CRISTINE IRVIN PHILLIPS
Assistant United States Attorneys
86 Chambers Street, 3rd Fl.
New York, New York 10007
Tel:  (212) 637-2734/2696
Fax: (212) 637-2686/2702
Li.Yu@usdoj.gov
Cristine.Phillips@usdoj.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x

UNITED STATES OF AMERICA,

                Plaintiff,

                   — v. —

BUY-A-HOME, LLC; METROPOLITAN HOUSING,
LLC; GRAMERCY FUNDING GROUP LTD; MITCHELL
COHEN; CAMBRIDGE HOME CAPITAL, LLC; SETH
KRAMER; CRAIG HYMAN; SETH LAPIDUS;
JACQUELINE DERRELL; CAMBRIDGE FUNDING
GROUP, LTD.; JAMES J. GOLDBERG, *d/b/a* JJG
REAL ESTATE APPRAISAL SERVICES; BUCKLEY
CONSULTING GROUP INC. *f/k/a* PREMIER
APPRAISAL SERVICES; WILLIAM BUCKLEY; and
ROBERT MICHELINE *d/b/a* P&M APPRAISALS,

                Defendants.

------------------------------------------------------------------------x

10 Civ. 9280

**AMENDED
COMPLAINT**

**JURY TRIAL
REQUESTED**

      Plaintiff, the United States of America, by its attorney, Preet Bharara,

United States Attorney for the Southern District of New York, alleges upon

information and belief as follows:

**INTRODUCTION**

1.      This is a civil action by the United States against residential property sellers, mortgage lenders, and appraisers who participated in a series of mortgage fraud schemes to orchestrate at least seventeen flip sales of homes, located in Bronx, Westchester, and other counties in the New York area, at inflated prices and to buyers who could not afford such homes.  To obtain mortgage financing for those fraudulent flip sales, defendants created false documents and inflated appraisals and submitted these false records to the United States Department of Housing and Urban Development ("HUD") and to subsidiaries of two financial institutions.  This action seeks civil penalties under the Financial Institutions Reform, Recovery and Enforcement Act, 12 U.S.C. § 1833a ("FIRREA"); treble damages and civil penalties under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-33; and injunctive relief under the Fraud Injunction Statute, 18 U.S.C. § 1345.

2.      Defendants' frauds operated by abusing the positions of trust that HUD direct endorser lenders, such as defendant Cambridge Home Capital, LLC ("Cambridge"), and HUD Roster Appraisers, such as defendant James J. Goldberg, occupied within HUD's mortgage insurance program.  It was the obligation of those lenders and appraisers to ensure that HUD would only insure mortgage loans that met HUD requirements.  Specifically, direct endorsers had the responsibility to ascertain that a mortgage loan to be insured by HUD in fact met the requirements for HUD insurance.  Similarly, it was the duty of a HUD-approved Roster Appraiser to refrain from "hitting the numbers" pre-determined by a seller or a lender. However, Cambridge and the appraiser defendants abused their positions of trust —

instead of meeting their obligations to HUD, they conspired with flip sellers to secure HUD-insured loans by creating and submitting fraudulent documents, inflated appraisals, and false certifications.

3.     Defendants' mortgage fraud scheme typically proceeded in four steps. First, defendant Mitchell Cohen, the mastermind behind the schemes, bought up properties for resale, using three entities he controlled – defendants Buy a Home, LLC ("Buy-a-Home"), Gramercy Funding Ltd. ("Gramercy"), and Metropolitan Housing, LLC ("Metropolitan"). But, instead of paying for renovations that would enhance the value of these properties, Cohen directed sales efforts at inexperienced home-buyers, convincing them to buy the properties from him at inflated prices – frequently 60% or more above what Cohen had paid just two or three months prior.

4.     Cohen relied on three means to induce the buyers to accept his inflated prices. First, Cohen misled buyers into underestimating the true costs of home ownership. For example, to sell a home on Newark Avenue in Staten Island, Cohen and Buy-a-Home told buyers that they could offset the monthly mortgage payments with $800 in rental income, when, in fact, that home was a single-family unit and did not have an apartment for rent. *See infra* at ¶¶ 118-120. Similarly, to influence inexperienced home-buyers to purchase a home on Nicholas Avenue in Staten Island, Cohen directed Buy-a-Home sales agents to understate the monthly cost of owning that property by $800. *See infra* at ¶¶ 189–191. Second, to induce buyers to purchase his properties, Cohen also paid off their personal debts or promised to make mortgage payments on their behalf. For example, in connection with selling a home on 116th Street in Queens, Buy-a-Home provided $6,500 to Cambridge to pay

off the buyers' pre-existing debts to creditors such as Cingular and Capital One.  *See infra* at ¶¶ 98–103.  Further, in connection with selling a home on Newark Avenue, Cohen promised the buyers that he would make their mortgage payments for the first five months.  *See infra* at ¶¶ 313–314.  Third, Cohen invariably induced buyers to purchase his properties at inflated prices by arranging to pay almost all of the down payment and closing costs.  In other words, buyers typically contributed nothing, or a nominal amount, to purchase properties priced at more than $300,000 or $400,000.  *See*, *e.g.*, *infra* at ¶¶ 230–231, 438–450.

5.    As step two in defendants' frauds, *i.e.*, after Cohen had duped inexperienced buyers into agreeing to purchase a home from him at an inflated price, Cambridge, a HUD-approved direct endorser, arranged financing for buyers to consummate the fraudulent flip sale.  As a HUD direct endorser, Cambridge was delegated the authority to endorse mortgage loans for HUD insurance, and it had the corresponding duty to verify whether loans met HUD requirements.  *See infra* at ¶¶ 39–58.  Cambridge, however, had a corrupt agreement with Cohen that it would abuse its direct endorser status and obtain HUD insurance for the mortgage loans to finance Cohen's flip sales – irrespective of whether they met HUD requirements.

6.    In furtherance of defendants' fraudulent schemes, Cambridge created false records to make buyers appear more credit-worthy than they were and to hide Cohen's payoffs of the buyers' personal debts from HUD and from financial institutions.  Specifically, to produce the appearance of greater credit-worthiness, Cambridge created false records to inflate buyers' incomes or to understate their

debts.  For example, to facilitate the flip sale of a home on Beach 46th Street in Far Rockaway, Cambridge falsified the occupation of one buyer – from being a "security guard" to being a "head chef" at restaurants – and falsely inflated her monthly income by 50%.  *See infra* at ¶¶ 176–177.  Similarly, to create the mirage that the buyers of a property on York Avenue in Staten Island had discharged a significant portion of their personal liabilities, Cambridge conspired with Cohen to pay off such debts using funds from Cohen, while claiming that the funds had come from the buyers' daughter.  *See infra* at ¶¶ 152–156.  Further, to hide the fact that Cohen was paying off the buyers' personal debts, Cambridge arranged for the preparation of false and misleading documents.  For example, Jacqueline Derrell, the Director of Operations at Cambridge, falsely stated in a record that the buyers for a property on 116th Street in Queens had brought $6,500 in cash to the closing to pay off their debts, whereas, in fact, Cohen had provided Cambridge with $6,500 to pay off such debts. *See infra* at ¶¶ 98–103.  Further, Cambridge invariably arranged for Cohen's payoffs of buyers' debts to be omitted from the loan closing documents, even though HUD rules required any such payment to be documented as an inducement to purchase.  *See*, *e.g.*, *infra* at ¶¶ 152–156, 222-226, 269–273.

7.     Third, Defendants' fraud also required participation by appraisers.  To obtain HUD insurance, Cambridge and Cohen had to procure appraisal reports that "hit the numbers," *i.e.*, fraudulently valued homes at or above the inflated prices set by Cohen.  Here, three appraisers – defendants Goldberg, William Buckley, and Robert Micheline (collectively, the "Appraiser Defendants") – filled that role.  To ensure that they would continue to receive appraisal business from Cohen and

Cambridge, the Appraiser Defendants conspired with Cohen and Cambridge to issue fraudulent appraisals that "hit the numbers."  For example, when Cambridge demanded that Goldberg raise the rental income estimate for a home on Newark Avenue to an obviously unjustifiable level, Goldberg simply ignored the obligation to be independent and acceded to Cambridge's demand.  *See infra* at ¶¶ 336–337. In another instance, to "hit the number" for Cambridge pursuant to their corrupt agreement, Micheline falsely reported that a home on 116th Street in Queens required no major repairs, when, in fact, that property needed the replacement of a kitchen, repairs to the roof, and refurbishment of a bathroom.  *See infra* at ¶¶ 95-97.  Finally, Buckley likewise conspired with Cohen and the lenders that worked with Cohen, including Cambridge, in order to "hit the number."  Indeed, as detailed below, *see infra* at ¶¶ 88–117, 481–514, Buckley has participated extensively in Cohen's schemes.  In furtherance of the conspiracy, Buckley repeatedly helped Cohen decide how high to inflate the prices of his properties when Cohen subsequently marketed such properties to unsophisticated buyers.  Buckley also issued, or caused appraisers affiliated with him to issue, appraisals reflecting the inflated valuations that Cohen and Buckley had set.   In addition, Buckley consistently failed to disclose his relationship with Cohen in his appraisals, which falsely claimed to have been created independently for Cambridge or other lenders, whereas Buckley, in fact, had conspired with Cohen to arrive at the inflated valuations and, since 2010, also had acted as Cohen's main contractor in performing deficient renovations on properties sold by Cohen.

8.      Finally, Cohen and Cambridge were involved in the fourth step in defendants' fraud.  Specifically, after securing the false records and inflated appraisals, Cambridge obtained HUD insurance for the mortgage loans for financing Cohen's fraudulent flip sales by submitting those false documents to HUD, along with Cambridge's false certifications regarding compliance with HUD requirements.  *See*, *e.g.*, *infra* at ¶¶ 94-105, 174–185.  Further, to ensure that buyers who received funds from Cohen would consummate their purchases of Cohen's properties, Cohen and Cambridge arranged to pay off the buyers' personal debts only after the sales had closed.  They did so by having Cambridge, rather than the buyers, send checks to the buyers' creditors, post-closing.  *See infra* at ¶¶ 98-100, 222–224.  In addition, because it had only a limited amount of capital, Cambridge replenished its capital by selling the seventeen mortgage loans used to finance Cohen's flip sales to subsidiaries of two financial institutions – Citibank, N.A. ("Citibank") and Countrywide Bank, FSB ("Countrywide Bank") – relying on the same false records and false certifications that it had submitted to HUD.

9.      Defendants' fraud generated significant profits for them – for example, from the seventeen flip sales discussed below alone, Cohen and the entities associated with him netted more than one million dollars in profits.  Not surprisingly, all seventeen mortgage loans have defaulted, most in the first six months after they closed.  Those defaults have harmed HUD, which insured these mortgages.  In fact, HUD already has received mortgage insurance claims for two of Cohen's properties, and can reasonably expect to receive insurance claims for the other fifteen.  Those existing and expected insurance claims expose HUD to more

than $7.5 million in potential losses.   Defendants' fraud also harmed the inexperienced, first-time buyers, who either have lost their homes or currently face eviction or foreclosure.   Finally, the mortgage fraud scheme affected Citibank and Countrywide Bank, to whose subsidiaries Cambridge sold these bad loans.   Those financial institutions have had to spend hundreds of thousands of dollars on interim mortgage payments on the defaulted loans.   In light of the significant harm that defendants' fraud has caused, it is appropriate to impose civil penalties on defendants under FIRREA, and to order them to pay treble damages and penalties under the FCA, for their participation in the mortgage fraud scheme.

10.   The United States also is entitled to injunctive relief because defendants can be expected to continue to engage in fraudulent conduct unless the Court stops them.   Specifically, injunctive relief as against Cohen and Buckley is absolutely necessary because they have continued to orchestrate the mortgage fraud scheme that Cohen perpetrated in connection with HUD Loans Nos. 1–17, and because, unless enjoined, they can be expected to continue to do so.   *See infra* at ¶¶ 481–514.   In addition, because Goldberg and Buckley remain FHA Roster Appraisers, and because Kramer, Hyman, Lapidus, and Derrell may continue to originate HUD-insured mortgage loans through Cambridge or other businesses, injunctive relief also is appropriate as to those defendants to prevent them from further abusing the HUD mortgage insurance program, at the expense of HUD, inexperienced home-buyers, and financial institutions.

**PARTIES**

11.     Plaintiff the United States is a sovereign, and HUD is a department of the United States.  One of HUD's statutory mandates is to create and sustain quality affordable homes for all Americans.  HUD implements this mandate through the Federal Housing Administration ("FHA"), which, among other things, provides mortgage insurance on loans made by HUD-approved lenders.

12.     Defendant Buy-a-Home is a New York limited liability company. During all relevant times, Buy-a-Home has been a real estate firm which has had its principal place of business at 87-02 Queens Boulevard in Queens, New York.

13.     Defendant Metropolitan is a New York limited liability company. During all relevant times, Metropolitan was a real estate firm which had its principal place of business 98-75 Queens Boulevard in Rego Park, New York.

14.     Defendant Gramercy is a New York corporation.  During all relevant times, Gramercy was a real estate firm which had its principal place of business 118-12 152nd Street in Queens, New York.  Gramercy, collectively with Buy-a-Home and Metropolitan, will be referred to as the "Cohen Entities".

15.     Defendant Mitchell Cohen is an individual residing in Nassau County, New York.  During all relevant times, Cohen has been the co-owner of and a principal at Buy-a-Home, Metropolitan, and Gramercy.

16.     Defendant Cambridge is a New York limited liability company which has its principal place of business at 80 Cutter Mill Road in Great Neck, New York. Cambridge is a HUD-approved direct endorser.  In the two-year period from January 1, 2007 to January 2009, Cambridge originated more than 900 mortgage

loans insured by HUD, representing more than $162 million in principal loan amounts. More than 50% of those loans subsequently defaulted.

17. Defendant Seth Kramer is an individual residing in Nassau County, New York. During all relevant times, Kramer was the President and a co-owner of Cambridge.

18. Defendant Craig Hyman is an individual residing in Nassau County, New York. During all relevant times, Hyman was a Vice President and a co-owner of Cambridge.

19. Defendant Seth Lapidus is an individual residing in Nassau County, New York. Until about September 2009, Lapidus was the Senior Loan Officer at Cambridge.

20. Defendant Jacqueline Derrell is an individual residing in Kings County, New York. Until about January 2009, Derrell was the Director of Operations at Cambridge. Derrell, collectively with Cambridge, Kramer, Hyman, and Lapidus, will be referred to as the "Cambridge Defendants".

21. Defendant Cambridge Funding Group Ltd. ("CFG") is a New York corporation and is co-owned by Kramer and Hyman. During all relevant times, CFG has been in the business of making construction loans and has its principal place of business at 80 Cutter Mill Road in Great Neck, New York.

22. Defendant Goldberg is an individual residing in Nassau County, New York. During all relevant times, Goldberg did business as JJG Real Estate Appraisal Services ("JJG"), which has its principal place of business at Suite 102, 500 Old Country Road in Garden City, New York. In 2007 and 2008, Cambridge

was one of JJG's largest customers and paid JJG to conduct several hundred real estate appraisals.  Specifically, Goldberg and another JJG appraiser, Mark Pitman, performed appraisals for a number of homes involved in Cohen's flip sales.  For each of the appraisals performed by Pitman, Goldberg personally reviewed, edited, approved, and sent the appraisal report to Cambridge.

23.    Defendant Buckley Consulting Group Inc. ("Buckley Consulting") is a New York corporation in the real estate appraisal business which, during the relevant time period, did business as Premier Appraisal Services, Inc. ("Premier"), and had its principal place of business at 181 West Main Street, Suite 202, in Babylon, New York.  In May 2011, Premier was renamed Buckley Consulting and currently maintains a principal place of business at 1111 Deer Park Avenue in North Babylon, New York.

24.    Defendant William Buckley is an individual residing in Nassau County, New York.  During all relevant times, Buckley has been a principal at Buckley Consulting Group (formerly Premier) and has performed appraisals for homes involved in Cohen's flip sales.  Buckley is also the owner of IDU Renovations, Inc., a construction business that has performed renovations for homes involved in Cohen's flip sales.  Buckley is also a principal of 10253 Realty, LLC, and One World Properties LLC, which transact business in the area of residential real estate.

25.    Defendant Robert Micheline is an individual appraiser residing in Nassau County, New York.  During all relevant times, Micheline did business as P&M Appraisals and performed appraisals for homes involved in Cohen's flip sales.

## JURISDICTION AND VENUE

26.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345.

27.    Venue is proper in the Southern District of New York under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions alleged in this Complaint occurred in connection with flip sales of homes located in Bronx and Westchester Counties, within this District.  Venue also is proper as to the named corporate defendants pursuant to 28 U.S.C.  § 1391(c) because each of those entities conducted business within this District.

## CIVIL STATUTES FOR COMBATTING MORTGAGE FRAUD

28.    In 1989, Congress enacted FIRREA as part of a comprehensive legislative plan to reform and strengthen the federal deposit insurance system. Pursuant to FIRREA, the United States can recover civil penalties, up to $1 million for each violation or up to $5 million for a continuing violation, from persons who "violate any provision of law to which this section is made applicable."  12 U.S.C. § 1833a(a)-(b).  Further, if a defendant "derives pecuniary gain from the violation, or if the violation results in pecuniary loss to a person other than the [defendant]," FIRREA authorizes the United States to recover civil penalties greater than $1 million per violation, or $5 million per a continuing violation.  *Id.* § 1833a(b)(3)(A).

29.    As relevant to this action, FIRREA authorizes the United States to recover civil penalties for violations of, or conspiracies to violate, four provisions of Title 18 of the United States Code:

- <u>18 U.S.C. § 1006</u>: which proscribes any entity or individual "connected in any capacity with . . . [HUD]" from "make[ing] any false entry in any book, report or statement of or to [HUD]" with the "intent to . . . deceive any officer, auditor, examiner or agent . . . of [a] department or agency of the United States";

- <u>18 U.S.C. § 1014</u>: which proscribes "knowingly mak[ing] any false statement or report, or willingly overvalu[ing] any land, property or security, for the purpose of influencing in any way the action of the [FHA] . . .;"

- <u>18 U.S.C. § 1341 (Mail Fraud Affecting a Financial Institution)</u>: which proscribes the use of "the Postal Service, or ... private or commercial interstate carrier" for the purpose of executing, or attempting to execute, "[a] scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . .";

- <u>18 U.S.C. § 1343 (Wire Fraud Affecting a Financial Institution)</u>: which proscribes the use of "wire . . . in interstate or foreign commerce" for the purpose of executing, or attempting to execute, "[a] scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . ."

30.    The False Claims Act authorizes the United States to seek treble damages and statutory civil penalties against, among others, any person (i) who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;" (ii) who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;" or (iii) conspires to commit such a violation of the FCA.  31 U.S.C. § 3729(a)(1)(A)–(C).

31.     Finally, the Fraud Injunction Statute authorizes the United States to commence a civil action to enjoin any "person" who is "violating or about to violate" (among other criminal statutes) 18 U.S.C. §§ 1006, 1014, 1341, and 1343, from committing further violations of those statutes.  18 U.S.C. § 1345(a)(I)(B).

## GENERAL ALLEGATIONS

### A.     HUD'S MORTGAGE INSURANCE PROGRAM

32.     Under the National Housing Act of 1934, 12 U.S.C. § 1709 *et seq.,* HUD, through FHA, provides mortgage insurance to first-time and low-income home-buyers seeking residential mortgages, as well as older home-owners seeking reverse mortgages.

33.     To qualify for HUD mortgage insurance, a mortgage loan must meet all the applicable HUD requirements.  Those requirements relate to, among other things, adequacy of the buyer's income to meet the mortgage payments and other obligations, the buyer's credit-worthiness, appropriateness of the valuation for the property subject to the mortgage, and the absence of any kickbacks or fraudulent payments made or promised in connection with the transaction.

34.     In the mortgage industry, the imprimatur of HUD mortgage insurance makes covered mortgage loans highly marketable for resale to investors — both because such loans are expected to have met HUD requirements and because they are insured by the full faith and credit of the United States.

### B.     THE SELLER'S AND THE BUYER'S OBLIGATIONS IN CONNECTION WITH OBTAINING HUD-INSURED MORTGAGE LOANS

35.     For a sale that involves a HUD-insured mortgage loan to close, the seller must execute a Settlement Statement, a standard HUD form that is

14

commonly known as the HUD-1.  In connection with executing that form, the seller is required to certify that the HUD-1 Settlement Statement accurately reflects "all receipts and disbursements" made by the seller.

36.     Specifically, the seller must ensure that the HUD-1 Settlement Statement reflects all the payments that it made to, or on behalf of, the buyer to consummate the sale, including any payment made by the seller that was not for purposes of contributing to the buyer's actual closing costs, prepaid expenses, discount points, or another financing concession.  Under HUD rules, any such payment by the seller is deemed an inducement to purchase, and it must be reflected in the Settlement Statement as a reduction to the purchase price for the purpose of HUD insurance.

37.     To properly close the sale transaction and obtain HUD mortgage insurance, the buyer must sign the Settlement Statement and certify that the Settlement Statement accurately reflects "all receipts and disbursements" made by the buyer.  The buyer also must complete a Uniform Residential Loan Application (the "URLA" or the "Loan Application") and certify to HUD that the URLA contains full and accurate information regarding his or her income, assets, and liabilities.

38.     In addition, to qualify for HUD mortgage insurance in connection with purchasing a residential property, the buyer must certify that he or she intends to use the property to be purchased as his or her primary residence and must assist the mortgage lender in verifying the information provided by the buyer pertaining to his or her income, assets and liabilities, and credit history.

C.   **CAMBRIDGE'S DUTIES AS A HUD DIRECT ENDORSER**

39.   HUD insures mortgage loans only when they are originated and underwritten by HUD-approved lenders.  The HUD-approved lenders participate in HUD's Direct Endorser Program, which delegates to the participating direct endorsers the responsibility for ensuring that mortgage loan applications meet the requirements for HUD mortgage insurance.  *See* 24 C.F.R. § 203.5(a).

40.   During all relevant times, Cambridge was a HUD-approved direct endorser and originated hundreds of mortgage loans that were insured by HUD based on Cambridge's certifications that those loans met HUD requirements and qualified for HUD insurance.  Indeed, a substantial majority of the mortgage loans originated by Cambridge from 2005 to 2008 were subject to HUD mortgage insurance.

41.   During all relevant times, Kramer, Hyman, and Derrell each possessed a personal identification code in the Computerized Homes Underwriting Management System ("CHUMS"), also known as a CHUMS ID number, which allowed them to underwrite loans and make certifications to HUD regarding the eligibility of mortgage loans for HUD insurance.  Kramer, Hyman, and Derrell had applied for and obtained their CHUMS ID numbers from HUD.

42.   As a HUD direct endorser, Cambridge was required, under HUD regulations, to exercise due diligence in underwriting mortgage loans that it approved for HUD mortgage insurance.  *See* 24 C.F.R. § 203.5(c).  Specifically, Cambridge was required, among other things, (i) to exercise due care to "obtain[] and verify[] information for a loan;" (ii) to exercise due care in ascertaining that the

16

loan application was suitable for mortgage insurance under relevant HUD requirements and, generally, under the standards for prudent underwriting; and (iii) to make certifications to HUD as to the accuracy and completeness of the information submitted to HUD and that the mortgage loan met HUD requirements and the standards for prudent underwriting. *Id.*

     i.     <u>Cambridge's Duties to Verify the Information in the Documents Submitted to HUD</u>

43.    As a direct endorser, Cambridge's endorsement of a mortgage loan for HUD insurance was required to be based on the submission of the following documentations to HUD:

    a.  URLA and Addendum, which must be signed and dated by all buyers and by Cambridge;

    b.  Mortgage Credit Analysis Worksheet ("MCAW"), in which Cambridge was required to truthfully and accurately enumerate the buyer's available assets and income, as well as the expected costs of both the mortgage and other fixed payments owed by the buyer;

    c.  Credit reports for all buyers;

    d.  Verifications of Employment for all buyers;

    e.  Verification of available funds from the buyer's bank, and the buyer's most recent bank statements;

    f.  Verifications of Rent or Payment History of Present and Previous Mortgages for all buyers; and

    g.  HUD-1 Settlement Statement, which must reflect "all receipts and disbursements" by and to the seller and the buyer, as well as any payment by the seller that is an inducement to purchase.

44.     Under HUD rules and regulations, Cambridge had a duty to verify the accuracy and completeness of all the information in the documents that it submitted to HUD, as identified in Paragraph 43.

45.     Specifically, Cambridge had the duty to verify that the HUD-1 Settlement Statement fully reflected all the payments and disbursement between the buyer and the seller, or persons affiliated with the seller, including any payment made by the seller that constituted an inducement to purchase.

46.     Likewise, Cambridge had the duty to verify that a buyer seeking a HUD-insured mortgage in a purchase transaction qualified as a first-time home-buyer under HUD rules and regulations.

47.     Moreover, Cambridge had the duty to verify each component of the buyer's total income reported in the Loan Application.  Specifically, Cambridge had a duty to reconcile and document any discrepancy between the amount of any income component as stated in the Loan Application and the amount of such income component as reported by other sources.

ii.     Cambridge's Duties as the Underwriter

48.     As a direct endorser, Cambridge had a duty to assess the adequacy of a buyer's income and available assets for meeting his or her mortgage payments and other fixed payment obligations.  Specifically, Cambridge was required to solicit information that would provide a complete picture of the buyer's overall financial situation.

49.     Among other things, Cambridge had the duty to calculate a buyer's verifiable income and determine the likelihood that such income would continue

through at least the first three years of the mortgage.  In particular, Cambridge was required to ascertain the following from a buyer:

      a.  salaries, wages, and other regular payments such as social security or retirement benefits;

      b.  any alimony, child support or maintenance income; and

      c.  any net rental income from property owned by the buyer.

50.     As a direct endorser, Cambridge also had the duty to compute, and to document on the MCAW forms, two qualifying ratios to determine whether the buyer could reasonably be expected to meet the expenses involved in home ownership, and otherwise provide for the buyer's family.  First, Cambridge had to compute the Mortgage Payment to Effective Income Total ratio (the "MP/I Ratio"), which reflects the buyer's mortgage payment (including payments into an escrow account for taxes, insurance and any other assessments) as a percentage of his or her effective, *i.e.*, gross, income.  Second, Cambridge had to compute the Total Fixed Payment to Effective Income ratio (the "FP/I Ratio", and, collectively with the MP/I Ratio, the "Qualifying Ratios"), which reflects the buyer's mortgage payments plus all other recurring obligations, as a percentage of his or her effective income.

51.     Under HUD rules and regulations, Cambridge was forbidden from approving for HUD mortgage insurance any mortgage loan for which the MP/I Ratio exceeded 31% or the FP/I Ratio exceeded 43%, unless Cambridge otherwise determined that one or more significant "compensating factors" were present to justify making the loan under prudent underwriting principles.  To approve any mortgage loan with a qualifying ratio that exceeded these HUD thresholds,

Cambridge was required to document on the MCAW form the existence of all compensating factors, which included whether a buyer had:

    a.  demonstrated the ability to pay housing expenses equal to or greater than the proposed monthly housing expense for the new mortgage over the past twelve to twenty-four months;

    b.  demonstrated an ability to accumulate savings and a conservative attitude toward the use of credit;

    c.  only a minimal increase in the housing expense; or

    d.  at least three months' documented cash reserves after closing.

52.    As a direct endorser, it was Cambridge's duty to judge the overall merit of loan applications by determining – beyond mechanically applying the HUD requirements – whether the loan transactions complied with standards of prudent underwriting.   Specifically, Cambridge was required to ascertain whether the mortgage amount was inflated because the buyer had been given any pecuniary inducements to purchase the property subject to the mortgage.

       iii.    <u>Cambridge's Duties under Its Quality Control Plans</u>

53.    As a condition for obtaining and maintaining its direct endorser status, Cambridge was required by HUD regulations to promulgate an adequate quality control plan and to comply fully with its quality control plan in deciding whether to endorse mortgage loans for HUD insurance.

54.    In 2004, in connection with the resolution of an audit of Cambridge by HUD, Cambridge also certified to HUD that it would comply fully with its quality control plan in determining whether to endorse mortgage loans for HUD insurance.

55.     During all relevant times, under its quality control plans, Cambridge had the duty to, among other things, perform the following:

   a.  Resolve and document all conflicting information or discrepancies in the application files;

   b.  Determine whether the sale transaction was a flip sale by reviewing whether a seller had acquired the mortgage property at the time of or soon before closing; and

   c.  Obtain appropriate tax returns for all self-employed buyers;

   d.  Determine whether the appraised value was established appropriately, using reasonable comparables and reasonable adjustments;

   e.  Determine whether the loan file contains pertinent documentation of the buyer's source of funds for the required initial investment;

   f.  Determine whether there are sufficient and documented compensating factors if the qualifying ratios exceeded HUD limits; and

   g.  Determine whether the HUD-1 settlement statement was accurately prepared and properly certified.

   iv.     <u>Cambridge's Certifications to HUD</u>

56.     Under HUD rules and regulations, for each mortgage loan that it originated that was insured by HUD, Cambridge was required to make a series of certifications to HUD in the HUD Addendum to Uniform Residential Loan Application and the Direct Endorsement Approval for a HUD/FHA Insured Mortgage, commonly known as the HUD 1003 Addendum, including certifications that:

a.   The loan terms furnished in the URLA and the HUD 1003 Addendum were true, accurate and complete;

b.   Each closing condition that Cambridge had enumerated in the commitment letter that Cambridge issued to the buyer had been met;

c.   The information contained in the URLA and the HUD 1003 Addendum had been obtained directly from the buyer by a Cambridge employee or its duly authorized agent and was true to the best of Cambridge's knowledge and belief;

d.   The verification of employment was requested and received by the lender without passing through the hands of any third persons and was true to the best of Cambridge's knowledge and belief;

e.   The verification of deposit was requested and received by the lender without passing through the hands of any third persons and was true to the best of Cambridge's knowledge and belief;

f.   The proposed loan to the buyer met the income and credit requirements of the governing law in Cambridge's judgment;

g.   Cambridge employees had personally reviewed any appraisal report, credit application, and all associated documents;

h.   Cambridge had used due diligence in underwriting the mortgage;

i.   Statements made by Cambridge in the application for HUD insurance were true and correct;

j.   Statements made by Cambridge in the Lender's Certificate were true and correct;

k.   Complete disbursement of the loan would be made to the buyer, or to his or her creditors for his or her account and with his or her consent;

l.   Cambridge had not paid any kickback, fee or consideration of any type, directly or indirectly, to any party in connection with the

transaction except as permitted under HUD regulations and administrative instructions;

m.  An officer at Cambridge had personally reviewed the mortgage loan documents, closing statements, application for insurance endorsement, and all accompanying documents;

n.  An officer at Cambridge had made all certifications required for the mortgage by HUD Handbook 4000.4; and

o.  Cambridge made all certifications otherwise required by HUD, including:

  i.  The buyer's monthly mortgage payments will not be in excess of his or her reasonable ability to pay, *see* 24 C.F.R. § 203.21;

  ii.  The buyer's income is and will be adequate to meet the periodic payments required to amortize the mortgage submitted for insurance, *see* 24 C.F.R. § 203.33; and

  iii.  The buyer's general credit standing is satisfactory.  *See* 24 C.F.R. § 203.34.

57.  In addition, Cambridge, as a direct endorser, had an independent duty to ensure the quality and accuracy of appraisals.  *See* 24 C.F.R. § 203.5(e)(3). Specifically, Cambridge was required to certify to HUD, in the Underwriter's Analysis of Appraisal Reports, that a mortgage property was appraised using acceptable comparable properties to determine their values and that the appraisals and related documentation satisfied HUD's appraisal requirements.

58.  Finally, and as a condition for maintaining its participation in HUD's Direct Endorser Program, Cambridge was required to submit to HUD, on an annual basis, a certification by its President or Vice President that Cambridge had conformed to all HUD regulations necessary to maintain its HUD approval as a

direct endorser, that Cambridge was responsible for all actions of its employees, and that Cambridge had complied fully with the requirements of its quality control plans.   During the relevant times, Kramer and Hyman made the annual certifications to HUD on behalf of Cambridge.

**D.    APPRAISERS' DUTIES IN APPRAISING PROPERTIES THAT WOULD BE SOLD SUBJECT TO HUD MORTGAGE INSURANCE**

59.    As a prerequisite to the approval of any mortgage loan insured by HUD under the Direct Endorsement Program, a direct endorser, such as Cambridge, is required to have the subject property appraised by an appraiser listed on HUD's FHA Appraiser Roster (an "FHA Roster Appraiser").   *See* 24 C.F.R. §§ 200.200(a); 203.5(e)(1).

60.    During all relevant times, JJG offered appraisal services by FHA Roster Appraisers, including Goldberg and another JJG appraiser, in connection with HUD-insured mortgage transactions.   Specifically, JJG issued at least seven appraisal reports in connection with Cohen's flip sales.

61.    During all relevant times, Buckley was an FHA Roster Appraiser. Through Premier, Buckley offered appraisal services in connection with HUD-insured mortgage transactions.   Specifically, as an FHA Roster Appraiser, Buckley issued at least five appraisal reports in connection with the 17 flip sales described herein, and has issued or otherwise obtained dozens of additional appraisal reports in connection with other flip sales orchestrated by Cohen between 2007 and today.

62.    During all relevant times, Micheline was an FHA Roster Appraiser. Micheline offered appraisal services in connection with HUD-insured mortgage

transactions. Specifically, as an FHA Roster Appraiser, Micheline issued at least four appraisal reports in connection with Cohen's flip sales.

63. FHA Roster Appraisers are obligated to comply with all requirements set forth in the HUD Appraiser Handbook and all other instructions and standards issued by HUD in conducting appraisals. *See* 24 C.F.R. §§ 200.206(b), (c).

64. FHA Roster Appraisers must ensure that their appraisals and related documentation satisfy HUD requirements for FHA appraisals, and they bear responsibility for the quality of their appraisals in meeting HUD requirements. *See* 24 C.F.R. § 203.5(c)(3).

65. Among other requirements imposed by HUD, an FHA Roster Appraiser must:

a. Perform all appraisal services commensurate with the standards and requirements of HUD, and with HUD as the intended user of the appraisal report along with the mortgagee;

b. Adhere to all standards set forth in the Uniform Standards of Professional Appraisal Practice ("USPAP"), including performing complete appraisals as defined by USPAP;

c. Perform appraisals with impartiality, objectivity, and independence, and without accommodation of personal interests;

d. Avoid practices that do not comply with HUD or USPAP standards, such as estimating a specified value of a mortgage property that was pre-determined by the mortgagee – a practice commonly referred to as "hitting a number";

e. Verify all market and comparable information used in the appraisal process to ensure that the information is accurate and meaningful and

provides the appraiser with a firm understanding of market motivations and trends;

f.  Adhere to HUD requirements regarding selection and use of comparable sale and rental properties;

g.  Analyze all sales of the mortgage property that occurred within the three years prior to the effective date of the appraisal;

h.  Include in the appraisal report all internal and external factors, known as "obsolescences," that are likely to detract from the value of the mortgage property;

i.  Specify an "effective date of value," which is the date when the appraiser physically inspects the mortgage property; or, if another date is specifically defined by the mortgagee, indicate the alternative date and the date on which the property was physically inspected;

j.  Clearly and accurately set forth the appraisal in a manner that will not be misleading, including sufficient information to enable the intended users of the appraisal to understand the report properly; and

k.  Sign the appraisal report, which makes the appraiser fully and wholly accountable for the information presented and for the appraisal's findings.

66.     In adherence to HUD requirements and the USPAP Ethics Rule, FHA Roster Appraisers must not use or communicate a misleading or fraudulent appraisal report or knowingly permit an employee or other person to communicate a misleading or fraudulent appraisal report.

## E.  **CAMBRIDGE'S RESALE OF MORTGAGE LOANS TO CITI-MORTGAGE, INC. AND COUNTRYWIDE HOME MORTGAGES, INC.**

67.     During all relevant times, Citi Mortgage, Inc. ("Citi") was a wholly-owned subsidiary of Citibank, a financial institution insured by the Federal Deposit

Insurance Corporation (the "FDIC").

68.     From at least May 2002 to September 2008, Citi purchased from Cambridge hundreds of mortgage loans, including loans that Cambridge had originated to finance Cohen's flip sales.

69.     During all relevant times, Citi purchased mortgage loans from Cambridge pursuant to a Loan Purchase Agreement that it had with Cambridge (the "Citi Loan Purchase Agreement").  Pursuant to that agreement, Citi relied on Cambridge's underwriting determinations in deciding whether to purchase a mortgage loan from Cambridge.  Specifically, Citi relied on Cambridge's determinations as to, among other things, whether a loan met HUD requirements for mortgage insurance, whether the transaction involved any kickback or any inducement to purchase, and whether the buyers had sufficient income and creditworthiness.

70.     Citi also relied on documents submitted by Cambridge, such as the Loan Application, the MCAW form, and the HUD-1 Settlement Statement. Cambridge transmitted those and other documents to Citi by interstate mail and by wire.  Under the Citi Loan Purchase Agreement, Cambridge warranted that none of the statements in the documents provided to Citi contained any misrepresentation, false statement, or misleading omission.

71.     Under the Citi Loan Purchase Agreement, Cambridge was permitted to sell to Citi only loans for which the buyers had made the first monthly mortgage payment.  Further, Citi had the right to demand that Cambridge repurchase any mortgage loan that defaulted within the first six months of its term.

72.    After Citi purchased HUD-insured mortgage loans from Cambridge, Citi typically sold such loans to trusts, which then issued mortgage-backed securities ("MBS") to investors, backed by guarantees from Ginnie Mae.

73.    Pursuant to the terms of its resale of mortgage loans to the MBS-issuing trusts, Citi retained the obligation to make mortgage payments for any loans that defaulted.  Thus, for each loan Citi purchased from Cambridge that defaulted, Citi suffered interim losses for a period of months – between the time of default and the time when, after a foreclosure sale, Citi would receive insurance proceeds from HUD.

74.    From in or about 2001 to in or about July 2008, Countrywide Home Loans, Inc. ("Countrywide") was a wholly-owned subsidiary of Countrywide Bank, a financial institution insured by the FDIC.

75.    From in or about at least April 2001 to 2008, Countrywide purchased from Cambridge hundreds of mortgage loans, including a number of loans that Cambridge had originated to finance Cohen's flip sales.

76.    During all relevant times, Countrywide purchased mortgage loans from Cambridge pursuant to a Loan Purchase Agreement that it had with Cambridge (the "Countrywide Loan Purchase Agreement").  Pursuant to that agreement, Countrywide relied on Cambridge's underwriting determinations in deciding whether to purchase a mortgage loan from Cambridge.  Specifically, Countrywide relied on Cambridge's determinations as to, among other things, whether a loan met HUD requirements for mortgage insurance, whether the

transaction involved any kickback or any inducement to purchase, and whether the buyers had sufficient income and creditworthiness.

77.     Countrywide also relied on documents submitted by Cambridge, such as the Loan Application, the MCAW form, and the HUD-1 Settlement Statement. Cambridge transmitted those and other documents to Countrywide by interstate mail and by wire.  Under the Countrywide Loan Purchase Agreement, Cambridge warranted that all representations made in the documents that it submitted to Countrywide were true and correct.

78.     Under the Countrywide Loan Purchase Agreement, Countrywide had the right to demand that Cambridge repurchase any mortgage loan for which the buyer failed to make the first monthly mortgage payment or for which the buyer was 90 days delinquent on any monthly mortgage payment within the first twelve months of the term of the loan.

79.     After Countrywide purchased HUD-insured mortgage loans from Cambridge, Countrywide typically sold such loans to trusts, which then issued MBS to investors, backed by guarantees from Ginnie Mae.

80.     Pursuant to the terms of its resale of mortgage loans to the MBS-issuing trusts, Countrywide retained the obligation to make mortgage payments for any loans that defaulted.  Thus, for each loan Countrywide purchased from Cambridge that defaulted, Countrywide suffered interim losses for a period of months – between the time of default and the time when, after a foreclosure sale, Countrywide would receive insurance proceeds from HUD.

## DEFENDANTS' SCHEMES TO DEFRAUD HUD AND TO COMMIT FRAUD AFFECTING FINANCIAL INSTITUTIONS

81.    Defendants profited from their mortgage fraud schemes by abusing the positions of trust that the Cambridge Defendants and the Appraiser Defendants occupied within HUD's mortgage insurance program.  Specifically, HUD delegated to Cambridge, in its role as a direct endorser, the responsibility to ascertain the appropriateness of extending HUD insurance for any mortgage loan, including the loans used to finance Cohen's flip sale transactions.  Similarly, the Appraiser Defendants, as FHA Roster Appraisers, warranted to HUD that they would perform appraisals objectively and refrain from "hitting the numbers" pre-determined by either Cambridge or Cohen.  In reality, however, both the Cambridge Defendants and the Appraiser Defendants willfully disregarded their obligations to HUD, choosing instead to conspire with Cohen and the Cohen Entities to create and submit false documents, false certifications, and inflated appraisals tailored to justify Cohen's flip sales.

82.    Defendants similarly exploited Cambridge's relationship with Citi and Countrywide in connection with their fraudulent schemes.  Specifically, despite warranting to Citi and Countrywide that it was providing true and correct information and documents in connection with the sale of each mortgage loan, Cambridge knowingly and willfully submitted to Citi and Countrywide false records, false certifications, and inflated appraisals, to induce them to purchase the mortgage loans that it had originated to finance Cohen's flip sales.

83.    In furtherance of defendants' mortgage fraud schemes, Cohen and the Cohen Entities (i) misrepresented to buyers the true costs of home-ownership; (ii) gave buyers money to induce them to purchase; (iii) conspired with Cambridge to create fraudulent records to inflate buyers' incomes or to understate their liabilities; and (iv) induced buyers to purchase by structuring the sales such that nearly all of the down payments and closing costs would be paid from the mortgage loans, rather than by the buyers.   Cohen and Cohen Entities engaged in such conduct for purposes of inducing inexperienced buyers to purchase homes at inflated prices, fraudulently obtaining HUD insurance for the mortgage loans used to finance such the flip sales, and fraudulently inducing Citi or Countrywide to purchase such mortgage loans from Cambridge.

84.    In furtherance of defendants' mortgage fraud schemes, the Cambridge Defendants (i) conspired with Cohen and the Cohen Entities to create false records to inflate buyers' incomes or to understate their liabilities; (ii) created false records, such as HUD-1 Settlement Statements and gift affidavits, to hide the fact that Cohen provided the funds for buyers to pay off their personal debts; (iii) made false certifications to HUD about whether the mortgage loans used to finance Cohen's fraudulent flip sales met requirements for HUD insurance and whether Cambridge met its duties as a direct endorser; (iv) sent payments to creditors of buyers to pay off the buyers' personal debts; and (iv) made false representations to, or withheld material information from, Citi and Countrywide.   Cambridge engaged in such conduct for purposes of fraudulently obtaining HUD insurance for the mortgage

loans that it originated to finance Cohen's flip sales and fraudulently inducing Citi and Countrywide to purchase such loans.

85.    In furtherance of defendants' mortgage fraud schemes, the Appraiser Defendants prepared false and fraudulent appraisal reports, which contained (i) inflated valuations for homes sold by Cohen, (ii) inflated estimates for rental incomes for such properties, and (iii) false certifications regarding compliance with HUD appraisal standards.    The Appraiser Defendants created the false and fraudulent reports for purposes of enabling Cohen, the Cohen Entities, and the Cambridge Defendants to obtain HUD insurance for mortgage loans used to finance Cohen's flip sales and to induce Citi or Countrywide to purchase such loans.

86.    From orchestrating the seventeen fraudulent flip sales, Cohen and the Cohen Entities received direct payments, as well as payments made indirectly to individuals and entities affiliated with them.    Specifically, Cohen arranged for numerous payments to be made through Mark Wolf, his partner at Gramercy and Buy-a-Home; Wolf & Wolf, a firm controlled by Mark Wolf; and Erin Davis, a manager at Buy-a-Home.    In total, the direct and indirect payments to Cohen and the Cohen Entities amount to more than $1.3 million.

87.    For their participation in the seventeen fraudulent flip sales, the Cambridge Defendants collectively and individually derived at least $400,000 in fees, resale proceeds, profits, kickbacks, and interest.    First, Cambridge, and Kramer and Hyman as its principals, received more than $140,000 in loan origination fees from those flip sales.    Second, Cambridge also earned more than

$180,000 from reselling such loans to Citi and Countrywide.  Third, Cambridge received more than $120,000 in proceeds from a flip sale – which Cohen orchestrated – of a property that Cambridge owned on Beach 46th Street.  Fourth, Cambridge and its principals received tens of thousands of dollars in kickbacks from Cohen.  Fifth, Kramer and Hyman also benefitted from Cohen's fraudulent flip sales because CFG, which Kramer and Hyman owned, received more than $130,000 from those sales, in repayment of high-interest loans that CFG had made to Gramercy.

88.   Lastly, the Appraiser Defendants also profited from their participation in the mortgage fraud schemes by ensuring that they would get additional appraisal business from Cambridge or Cohen.  Specifically, by agreeing to "hit the numbers" for Cambridge on eight flip sales by Cohen, Goldberg positioned JJG to receive more than 275 appraisal assignments from Cambridge in 2007 and 2008, which translated to approximately $150,000 in appraisal fees.  Similarly, by helping Cohen decide how much to inflate sales prices and by issuing or obtaining inflated appraisals that "hit the numbers" for Cohen's flip sales, Buckley ensured that he would make hundreds of thousands of dollars from his participation in Cohen's schemes.  *See infra* at ¶¶ 481–514.  Among other things, Buckley profited from dozens of referrals to Premier for appraisals in connection with Cohen's flip sales; numerous assignments for IDU Renovations, Buckley's construction business, to perform superficial renovations on properties that Cohen flipped; and Cohen's assistance in arranging flip sales of residential properties that Buckley owned through 10253 Realty or One World Properties.

89.    Described below are seventeen fraudulent sales orchestrated by the defendants as part of their scheme to fraudulently obtain HUD mortgage insurance and to commit fraud by mail and wire, affecting financial institutions.  In addition to those specific transactions, defendants, separately or in combination, likely orchestrated, or participated in, numerous other frauds on HUD and affecting financial institutions.

A.    **HUD LOAN NO. 1:  116TH STREET, RICHMOND HILL**

90.    From in or about February 2007 to in or about July 2007, Cohen, the Cohen Entities, the Cambridge Defendants, CFG, Premier, Buckley, and Micheline conspired to orchestrate the flip sale of a property located on 116th Street in the Richmond Hill neighborhood in Queens, New York (the "116th Street Property") at an inflated price to buyers who lacked the financial wherewithal to purchase the property.

91.    In furtherance of that conspiracy and pursuant to their corrupt agreement, Cohen, the Cohen Entities, the Cambridge Defendants, CFG, Premier, Buckley, and Micheline obtained HUD insurance for a mortgage loan in the amount of $360,355 used to finance the fraudulent flip sale of the 116th Street Property ("HUD Loan No. 1"), and sold HUD Loan No. 1 to Citi, by misrepresenting the true cost of home ownership, paying off the buyers' personal debts to induce them to purchase, obtaining an inflated appraisal for the 116th Street Property, creating false records to omit inducements to purchase, falsely certifying compliance with HUD requirements, and submitting false and misleading records to HUD and to Citi.

92.     In or about February 2007, Cohen bought the 116th Street Property for $275,000.  At the time of that purchase, Cohen knew that the 116th Street Property required repairs to the roof, as well as the renovation of a kitchen and a bathroom. But, instead of repairing these conditions, Cohen and Buckley worked in concert to inflate the price for the 116th Street Property.  Specifically, in February and March 2007, Buckley and Premier appraiser Peter Sarafian prepared two inflated appraisals, purporting to show that, with only minimal improvements (without repairing the roof, kitchen, or bathroom), the 116th Street Property was worth $420,000, *i.e.*, 53% more than what Cohen had just paid to purchase the home.

93.     In or about May and June 2007, *i.e.*, less than four months later, Cohen induced two inexperienced, first-time home-buyers, Buyers 1-A and 1-B, to purchase the 116th Street Property, for $371,500.  In connection with that sale, Cohen had Buckley issue, on June 14, 2007, an inflated appraisal intended for Cambridge, again valuing the property at $420,000.  In his June 2007 appraisal, Buckley falsely stated that there were "no repairs needed or physical inadequacies" at the 116th Street Property, whereas, in fact, Cohen had never repaired the roof or renovated the kitchen or bathroom.  Buckley also falsely certified that his appraisal had been conducted in accordance with HUD appraisal standards, when he actually had failed to comply with numerous HUD standards, including, among others, to select suitably comparable sales comparisons and to justify the substantial appreciation from February to June (approximately 53%) in the absence of major repairs.

94.     Cohen, through Buy-a-Home, referred Buyers 1-A and 1-B to Lapidus at Cambridge for purposes of obtaining a HUD-insured mortgage from Cambridge, based on a corrupt agreement or understanding between Cohen and the Cambridge Defendants that Cambridge would endorse an application for HUD insurance irrespective of whether Buyers 1-A and 1-B qualified for such insurance or whether the 116th Street Property was worth $371,500.

95.     On or about June 8, 2007, Micheline issued an appraisal report for the 116th Street Property, valuing the property at $372,000.   The appraisal report issued by Micheline, like Buckley's, contained an inflated valuation for the property and numerous other falsities.

96.     Specifically, Micheline significantly inflated the valuation of the 116th Street Property by stating that the property had three bedrooms, when it actually had only two bedrooms.   Micheline also inflated the valuation of the 116th Street Property by claiming in his report that "no major repairs [were] required."   In fact, that property required numerous major repairs — according to a "post-closing agreement" between Cohen and the buyers, dated June 14, 2007, the repairs needed at the 116th Street Property included, among other things, "[to] replace kitchen," [to] repair leader from roof", and "to refurbish bathroom."   A copy of that Post-Closing Agreement is attached to this Complaint as Exhibit 1.

97.     Further, Micheline falsely certified that his appraisal of the 116th Street Property had been conducted in accordance with HUD appraisal standards. In fact, Micheline's appraisal failed to comply with numerous HUD standards, including, among others, to select suitably comparable sales comparisons and to

justify the substantial appreciation during Cohen's four-month ownership (a value increase of approximately 35%), when no major repairs had been performed.

98.     On June 12, 2007, and in connection with originating HUD Loan No. 1, Cambridge issued a commitment letter to Buyers 1-A and 1-B, which required, as a condition that must be fulfilled prior to closing, that those buyers pay off certain personal debts owed to creditors such as Capital One and Cingular.

99.     On June 14, 2007, Cambridge originated and processed HUD Loan No. 1 to Buyers 1-A and 1-B.  Kramer, acting as the underwriter, certified to HUD that HUD Loan No. 1 met HUD's underwriting requirements.   Further, Derrell, certifying on behalf of Cambridge, endorsed HUD Loan No. 2 to HUD for mortgage insurance.

100.    Specifically, Cambridge certified to HUD that all closing conditions listed in the commitment letter issued by Cambridge had been met by the time of closing on June 14, 2007.  In fact, however, Cambridge knew that Buyers 1-A and 1-B had not paid off their personal debts prior to closing, because those debts would not be paid off until Cambridge issued approximately $6,500 in checks to Buyers 1-A's and 1-B's creditors, including Capital One and Cingular, on June 22, 2007. Hyman personally signed those checks issued by Cambridge.

101.    Cambridge also certified to HUD that the closing documents for HUD Loan No. 1, including the HUD-1 Settlement Statement, were true and correct.  In fact, however, Cambridge knew that the HUD-1 was false and misleading because it omitted the fact that Cohen, through Buy-a-Home, was providing $6,500 to pay off

Buyers 1-A's and 1-B's personal debts, which payment should have been reflected on the HUD-1 as an inducement to purchase.

102.    Further, to conceal the fact that Cohen was providing the funds to pay off Buyers 1-A's and 1-B's personal debts, the Cambridge Defendants conspired with Cohen and the Cohen Entities to create records to assert falsely that the funds for paying off those debts had come from Buyers 1-A's and 1-B's own funds.

103.    Specifically, Derrell created a false note stating that, at closing, Cambridge had received $6,500 in cash from Buyers 1-A and 1-B, for the purpose of paying off their personal debts.  According to Derrell's note, Buyers 1-A and 1-B had obtained $6,500 in cash by cashing their 2006 tax refund check.  Derrell's note provided Cambridge with an explanation for why Buyers 1-A's and 1-B's bank account statements did not reflect their depositing the tax refund check and then withdrawing cash to pay Cambridge.  Derrell, however, knew that her note was false because Buyers 1-A and 1-B did not give any cash to Cambridge.

104.    In connection with endorsing HUD Loan No. 1 for HUD mortgage insurance, Cambridge certified to HUD that neither it nor its principals had any financial stake in the sale of the 116th Street Property.  In fact, Cambridge's affiliate CFG held a junior mortgage against that property, in the amount of more than $100,000.  Thus, by originating a HUD-insured loan to finance Cohen's flip sale of the 116th Street Property, Cambridge's principals Kramer and Hyman stood to be paid in full on CFG's loan.  In other words, and contrary to Cambridge's certification to HUD, Kramer and Hyman each had a direct financial stake in the sale of the 116th Street Property.

105.   Further, Cambridge, through Kramer, also falsely certified HUD Loan No. 1 to HUD for mortgage insurance, despite knowing that HUD Loan No. 1 failed to comply with HUD requirements in, among others, the following respects:

    a.   HUD Loan No. 1 had Qualifying Ratios (44.16% and 54.23%) that significantly exceeded HUD thresholds (31% and 43%, respectively), and did not have any applicable compensating factor; and

    a.   Micheline's appraisal for the 116th Street Property had not been conducted in accordance with HUD requirements and contained an inflated valuation for the 116th Street Property.

106.   In connection with obtaining HUD Loan No. 1, Buyers 2-A and 2-B contributed only a minimal amount to the down payment or closing costs associated with purchasing the 116th Street Property.   Instead, Cohen, as the seller, paid $11,145 toward the down payment and $15,682.36 in closing costs, both of which were paid using disbursement from HUD Loan No. 1.   In other words, Cohen induced Buyers 1-A and 1-B to buy the property at an inflated price by effectively paying the entire upfront cost of buying that home.

107.   On July 27, 2007, Cambridge sold HUD Loan No. 1 to Countrywide, pursuant to the Countrywide Loan Purchase Agreement and received more than $11,000 from the sale of that loan.

108.   Cohen provided $6,500 to pay off Buyers 1-A's and 1-B's personal debts, and also paid for nearly all of the down payment and closing costs, to induce Buyers 1-A and 1-B to obtain HUD Loan No. 1 based on an inflated price for the 116th Street Property.   In connection with that sale, Cohen, through Buy-a-Home

and Wolf & Wolf, made more than $81,000 in profits, from the disbursement of HUD Loan No. 1.

109.   For the Cambridge Defendants' role in conspiring with Cohen and the Cohen Entities to consummate the sale of the 116th Street Property to Buyers 1-A and 1-B at an inflated price, Cambridge received more than $20,000 in fees and resale proceeds for originating HUD Loan No. 1.  Further, CFG received more than $106,000 in disbursement from HUD Loan No. 1, in repayment of the loan it had made to Gramercy.

110.   Micheline, who provided an inflated appraisal for the 116th Street Property based on a corrupt agreement or understanding with the Cambridge Defendants, not only was paid $450 for that appraisal, but also ensured that he would receive additional appraisal referrals from Cambridge.  Similarly, Buckley, through Premier, was paid $1,075 by Cohen and Cambridge for his inflated appraisals and ensured future appraisal referrals from Cohen.  In addition, by working in concert with Cohen to orchestrate the flip sale of the 116th Street Property, Buckley further cemented the corrupt and lucrative relationship between his business interests and Cohen's.  *See supra* at ¶ 88.

111.   In connection with executing their scheme to consummate a fraudulent flip sale of the 116th Street Property, Cohen, the Cohen Entities, the Cambridge Defendants, CFG, Buckley, Premier, and Micheline used interstate mail carriers and interstate wire to transmit documents that contained false and misleading information, including, among other documents, false and fraudulent gift affidavits, appraisal report, and HUD Addendum.

112.   Specifically, the Cambridge Defendants and Micheline submitted to HUD numerous false records and certifications, including the appraisal report for the 116th Street Property and the Settlement Statement and HUD Addendum for HUD Loan No. 1.  Based on those false certifications and records, Cohen, the Cohen Entities, the Cambridge Defendants, CFG, and Micheline obtained HUD mortgage insurance to HUD Loan No. 1.  Buckley and Premier also provided to Cambridge a false and fraudulent appraisal report with the intention that it be submitted to HUD, and for which Buckley and Premier received compensation.

113.   Further, the Cambridge Defendants also submitted to Countrywide, using interstate mail carrier and interstate wire, numerous false records and certifications, including Micheline's appraisal report and the Settlement Statement and HUD Addendum for HUD Loan No. 1.  Based on those false certifications and records, they caused Countrywide to purchase HUD Loan No. 1.

114.   Based on the false and fraudulent certifications and records created by Cohen, the Cohen Entities, the Cambridge Defendants, CFG, and Micheline, which certification and records had been sent to HUD using interstate mail and by wire, HUD agreed to insure HUD Loan No. 1.

115.   Further, the Cambridge Defendants also submitted to Countrywide, using interstate mail carrier and by wire, numerous false and fraudulent records, including the MCAW form, the HUD-1 Settlement Statement, and the HUD Addendum for HUD Loan No.1.  Based on those false certification and records, they caused Countrywide to purchase HUD Loan No. 1 from Cambridge.

116.   Buyers 1-A and 1-B, who never could have afforded the 116th Street Property at the inflated price Cohen set, defaulted on HUD Loan No. 1 within seven months of the closing, exposing HUD and Countrywide potentially to more than $400,000 in losses.

117.   Accordingly, Cohen, the Cohen Entities, the Cambridge Defendants, CFG, Premier, Buckley, and Micheline violated 12 U.S.C. § 1833a in connection with the origination and sale of HUD Loan No. 1 in that they engaged in a scheme to defraud HUD, in violation of 18 U.S.C. §§ 1006 and 1014, and participated in a scheme to commit mail and wire fraud affecting a financial institution, namely Countrywide Bank, in violation of 18 U.S.C. §§ 1341 and 1343.

**B.**   **HUD LOAN NO. 2:  NEWARK AVENUE PROPERTY A**

118.   From in or about February 2007 to in or about May 2007, Cohen, the Cohen Entities, and the Cambridge Defendants conspired to orchestrate the flip sale of a property located on Newark Avenue in Staten Island, Richmond County, New York ("Newark Avenue Property A") at an inflated price to buyers who lacked the financial wherewithal to purchase the property.

119.   In furtherance of that conspiracy and pursuant to their corrupt agreement, Cohen, the Cohen Entities, and the Cambridge Defendants obtained HUD insurance for a mortgage loan in the amount of $358,900 used to finance the fraudulent flip sale of Newark Avenue Property A ("HUD Loan No. 2"), and sold HUD Loan No. 2 to Citi, by misrepresenting the true cost of home ownership, paying off the buyers' personal debts to induce them to purchase, obtaining an inflated appraisal for Newark Avenue Property A, creating false records to inflate a

buyer's income and to omit inducements to purchase, falsely certifying compliance with HUD requirements, and submitting false and misleading records to HUD and to Citi.

120. Specifically, on or about February 5, 2007, Cohen, through Buy-a-Home, contracted with Pearsal Avenue Builders Corp. ("Pearsal Builders") to purchase Newark Avenue Property A for approximately $272,000. Rather than closing on that property, Cohen immediately sought to resell it to inexperienced home-buyers for $370,000. To influence prospective buyers to accept the inflated valuation, Buy-a-Home sales agents falsely told them that their mortgage payments would be offset by approximately $800 per month in rental income. But, in fact, Newark Avenue Property A was a single-family home that had no rental unit.

121. In or about March 2007, *i.e.*, less than two months after he contracted to buy Newark Avenue Property A for $272,000, Cohen, through Metropolitan and Buy-a-Home, induced two inexperienced, first-time home-buyers, Buyers 2-A and 2-B, to buy that home for $370,000. To circumvent HUD rules regarding flip sales, Cohen concealed Buy-a-Home's contract to purchase Newark Avenue Property A by identifying Pearsal Builders as the seller, without disclosing that Buy-a-Home stood to gain nearly $100,000 in gross profit from the flip sale.

122. Cohen referred Buyers 2-A and 2-B to Lapidus at Cambridge for purposes of obtaining a HUD-insured mortgage from Cambridge, based on the corrupt agreement or understanding between Cohen and the Cambridge Defendants that Cambridge would endorse an application for HUD insurance irrespective of

whether Buyers 2-A and 2-B qualified for such insurance or whether Newark Avenue Property A was worth $370,000.

123.   On or about April 4, 2007, Cambridge obtained an inflated appraisal for Newark Avenue Property A from Rapid Appraisal Services ("Rapid"), valuing the property exactly at the sale price, $370,000.  Rapid's appraisal report inflated the value of Newark Avenue Property A by failing to account for a significant external obsolescence – the fact that the property was located directly across from and faced the stanchions of an elevated highway leading to the Bayonne Bridge – that substantially decreased the value of that property.  Rapid's appraisal report also inflated the value of Newark Avenue Property A by selecting for comparison sales of properties that were not, in fact, comparable to Newark Avenue Property A. Finally, Rapid failed to conduct a "complete" appraisal, in violation of a basic HUD appraisal requirement.

124.   On April 13, 2007, and in connection with originating HUD Loan No. 2, Cambridge issued a commitment letter to Buyers 2-A and 2-B, which required, as a condition that must be fulfilled prior to closing, that Buyer 2-A pay off certain personal debts that he owed to creditors such as Macy's, Target, and Verizon.

125.   On April 18, 2007, Cambridge originated and processed HUD Loan No. 2, which Kramer, acting as the underwriter, certified as meeting HUD's requirements, and which Derrell, certifying on behalf of Cambridge, endorsed for HUD mortgage insurance.

126.   Specifically, Cambridge certified to HUD on April 18, 2007, that all closing conditions listed in the commitment letter issued by Cambridge had been

met by the time of closing.  In fact, however, Cambridge knew that Buyer 2-A had not paid off his personal debts prior to closing, because those debts would not be paid off until Cambridge issued approximately $12,400 in checks to Buyer 2-A's creditors, including Macy's, Target, Verizon, on April 30, 2007, almost two weeks after the closing date.  Hyman personally signed those checks issued by Cambridge.

127.    Cambridge also certified to HUD that the closing documents for HUD Loan No. 2, including the HUD-1 Settlement Statement, were true and correct.  In fact, however, Cambridge knew that the HUD-1 was false and misleading because it omitted the fact that Cohen had provided funds to Buyers 2-A and 2-B to pay off Buyer 2-A's personal debts, which payment should have been reflected on the HUD-1 as an inducement to purchase.

128.    Further, to conceal the fact that Cohen had provided funds to pay off Buyer 2-A's personal debts, the Cambridge Defendants conspired with Cohen and the Cohen Entities to create false and fraudulent gift affidavits, which asserted that the funds for paying off Buyer 2-A's debts had come from his father, rather than Cohen.

129.    A series of e-mails dated April 25, 2007, among Wendy Perkins, an underwriter at Cambridge; Erin Davis, a manager at Buy-a-Home; and Cohen illustrates Cambridge's involvement in facilitating Cohen's payoff of Buyer 2-A's debts and concealing Cohen's role.  A copy of that e-mail chain is attached to this Complaint as Exhibit 2.

130.    Specifically, in the opening e-mail, Perkins told Davis that, in connection with obtaining HUD Loan No. 2 for Buyers 2-A and 2-B, Cohen had sent

a "certified bank check in the amount of $3,363.00 from Northfork Bank" to Cambridge.

131.   According to Perkins, Cohen should not have sent Cambridge a check from Northfork Bank because Buyer 2-A's father, who supposedly was providing the $3,363 to Cambridge as a gift to his son, did not even have an account with Northfork Bank.  Indeed, Northfork is Buy-a-Home's and Cohen's bank.

132.   To maintain the illusion that Buyer 2-A's father was the source of those funds, Perkins advised Davis (i) to obtain a certified bank check from Washington Mutual – the bank used by Buyer 2-A's father – in the "additional [amount of] $3,363", and (ii) to "prepare a letter from [Borrower 2-A's] Dad stating that he did not realize that he needed to give his son a gift totaling $12,630 and this is why he took out an additional gift of $3,363."

133.   To ensure that Cambridge could erase any evidence of Cohen being the source of those funds, Perkins also asked Davis to tell Cohen to go to Cambridge to "retrieve the incorrect bank certified check." In response, Davis reassured Perkins that "Mitch [Cohen] would be there shortly" to pick up the check and that Buy-a-Home would work to "get this all resolved."

134.   In connection with endorsing HUD Loan No. 2 for HUD mortgage insurance, Cambridge also certified to HUD that the Loan Applications and the MCAW form for Buyers 2-A and 2-B were true and correct.  In fact, however, the Cambridge Defendants conspired with Cohen and the Cohen Entities to falsify those records to inflate Buyer 2-A's income.

135.     Specifically, on or about March 27, 2007, Buyer 2-A told Lapidus that his monthly salary was $3,333, an amount that was corroborated by the pay stubs that Cambridge obtained from Buyer 1-A's employer.  Cambridge, however, inserted $3,625 as Buyer 2-A's monthly salary into his final Loan Application and the MCAW form.  By inflating Buyer 2-A's monthly income, Cambridge fraudulently lowered the Qualifying Ratios for HUD Loan No. 2.  Relevant excerpts from the initial and final Loan Applications for Buyer 2-A are attached to this Complaint as Exhibit 3.

136.     Cambridge, specifically Kramer, also falsely certified HUD Loan No. 2 to HUD for mortgage insurance, despite knowing that this loan failed to comply with HUD requirements in, among others, the following respects:

a.   HUD Loan No. 2 had Qualifying Ratios (39.22% and 51.33%) that significantly exceeded HUD thresholds (31% and 43%, respectively) and did not have any applicable compensating factor; and

b.   Rapid's appraisal for Newark Avenue Property A contained an inflated valuation for that property and had not been conducted in accordance with HUD requirements.

137.     On or about May 9, 2007, Cambridge sold HUD Loan No. 2 to Citi, pursuant to the Citi Loan Purchase Agreement and received more than $8,500 from the sale of that loan.

138.     In connection with obtaining HUD Loan No. 2, Buyers 2-A and 2-B contributed only a nominal amount to the down payment or closing costs associated with purchasing Newark Avenue Property A.  Instead, Cohen arranged for the payment of $11,225 toward the down payment and $15,894.56 in closing costs, both

of which were paid using disbursement from HUD Loan No. 2.  In other words, Cohen also induced Buyers 2-A and 2-B to buy the property at an inflated price by effectively paying the entire upfront cost of buying that home.

139.    Cohen gave thousands of dollars to pay off Buyers 2-A's personal debts, and also arranged for the payments of nearly all of the down payment and closing costs, to induce Buyers 2-A and 2-B to obtain HUD Loan No. 2 on the basis of an inflated valuation for Newark Avenue Property A.  In connection with that sale alone, Cohen, through Buy-a-Home and Wolf & Wolf, made almost $58,000 in profits, from the disbursement of HUD Loan No. 2.

140.    For the Cambridge Defendants' role in conspiring with Cohen and the Cohen Entities to consummate the sale of Newark Avenue Property A to Buyers 2-A and 2-B at an inflated price, Cambridge received close to $14,000 in fees and resale proceeds for originating HUD Loan No. 2.

141.    In connection with executing their scheme to consummate a fraudulent flip sale of Newark Property A, Cohen, the Cohen Entities, and the Cambridge Defendants used interstate mail carriers and interstate wire to transmit documents that contained false and misleading information, including, among other documents, false and fraudulent gift affidavits, Loan Application, MCAW form, and HUD Addendum.

142.    Specifically, the Cambridge Defendants submitted to HUD numerous false records and certifications, including the Loan Application, the MCAW form, and the HUD Addendum for HUD Loan No. 2.  Based on those false certifications

and records, Cohen, the Cohen Entities, the Cambridge Defendants obtained HUD mortgage insurance for HUD Loan No. 2.

143. Further, the Cambridge Defendants also submitted to Citi, using interstate mail carrier and interstate wire, numerous false records and certifications, including the Loan Application, the MCAW form, and the HUD Addendum for HUD Loan No. 2. Based on those false certifications and records, they caused Citi to purchase HUD Loan No. 2.

144. Buyers 2-A and 2-B, whom Cohen had misled as to the true cost of owning Newark Avenue Property A, defaulted on HUD Loan No. 2 within five months of closing, exposing HUD and Citi potentially to more than $400,000 in losses.

145. Accordingly, Cohen, the Cohen Entities, and the Cambridge Defendants violated 12 U.S.C. § 1833a in connection with the origination and sale of HUD Loan No. 2 in that they engaged in a scheme to defraud HUD, in violation of 18 U.S.C. §§ 1006 and 1014, and participated in a scheme to commit mail and wire fraud affecting a financial institution, namely Citibank, in violation of 18 U.S.C. §§ 1341 and 1343.

## C.   HUD LOAN NO. 3:  YORK AVENUE, STATEN ISLAND

146. From in or about June 2007 to in or about August 2007, Cohen, the Cohen Entities, the Cambridge Defendants, Premier, and Buckley conspired to orchestrate the flip sale of a property located on York Avenue in Staten Island, Richmond County, New York (the "York Avenue Property") at an inflated price to buyers who lacked the financial wherewithal to purchase the property.

147.  In furtherance of that conspiracy and pursuant to their corrupt agreement, Cohen, the Cohen Entities, the Cambridge Defendants, Premier, and Buckley obtained HUD insurance for a mortgage loan in the amount of $447,600 used to finance the fraudulent flip sale of the York Avenue Property ("HUD Loan No. 3"), and sold HUD Loan No. 3 to Countrywide by paying off the buyers' personal debts to induce them to purchase, obtaining an inflated appraisal for the York Avenue Property, creating false records to omit inducements to purchase, falsely certifying compliance with HUD requirements, and submitting false and misleading records to HUD and to Countrywide.

148.  Specifically, in or about June, 2007, Cohen, through Gramercy, contracted with an individual named Dominic Grasso to purchase the York Avenue Property for approximately $370,500.  Rather than closing on that property, Cohen immediately sought to resell it to inexperienced home-buyers for $461,500.

149.  In or about August 2007, *i.e.*, less than two months later, Cohen induced two inexperienced, first-time home-buyers, Buyers 3-A and 3-B, to purchase the York Avenue Property, for $461,500.  To circumvent HUD rules regarding flip sales, Cohen concealed Buy-a-Home's contract to purchase the York Avenue Property by identifying Grasso as the seller, without disclosing that Buy-a-Home stood to gain more than $90,000 in gross profit from the flip sale.

150.  Cohen, through Buy-a-Home, referred Buyers 3-A and 3-B to Lapidus at Cambridge for purposes of obtaining a HUD-insured mortgage from Cambridge, based on a corrupt agreement or understanding between Cohen and the Cambridge Defendants that Cambridge would endorse an application for HUD insurance

50

irrespective of whether Buyers 3-A and 3-B qualified for such insurance or whether the York Avenue Property was worth $461,500.

151.   On or about August 4, 2007, at Cohen's direction, Buckley, through Premier, issued an inflated appraisal of the York Avenue Property for Cambridge, valuing the property at $460,000.  Buckley's appraisal report inflated the value of the York Avenue Property by selecting for comparison sales of properties that were not, in fact, comparable to the York Avenue Property.  Specifically, the sale price of a nearby property, which offered 40% more living space, was only $10,000 more than Buckley's valuation of the York Avenue Property.  Buckley also inflated his appraisal by complying with Cambridge's requests (i) to increase the expected rental income for the property from $1,250 to $1,500 and (ii) to change the term of the appraisal from being "subject to" the completion of certain repairs to "as is." Finally, Buckley did not conduct a "complete" appraisal, in violation of a basic appraisal requirement.

152.   On August 2, 2007, and in connection with originating HUD Loan No. 3, Cambridge issued a commitment letter to Buyers 3-A and 3-B, which required, as a condition that must be fulfilled prior to closing, that those buyers pay off certain judgments and other outstanding personal liabilities.

153.   On August 10, 2007, Cambridge originated and processed HUD Loan No. 3 to Buyers 3-A and 3-B.  Derrell, acting as the underwriter, certified to HUD that HUD Loan No. 3 met HUD's underwriting requirements.  Further, Kramer, certifying on behalf of Cambridge, endorsed HUD Loan No. 3 to HUD for mortgage insurance.

154.    Specifically, Cambridge certified to HUD that all closing conditions listed in the commitment letter had been met by the time of closing on August 10, 2007.  In fact, however, Cambridge knew that Buyers 3-A and 3-B had not paid off their personal debts prior to closing, because those debts would not be paid off until August 16, August 20, and September 5, 2007, when Cambridge issued approximately $11,490 in checks to Buyers 3-A's and 3-B's creditors.   Hyman personally signed those checks.

155.    Cambridge also certified to HUD that the closing documents for HUD Loan No. 3, including the HUD-1 Settlement Statement, were true and correct.  In fact, however, Cambridge knew that the HUD-1 was false and misleading because it omitted the fact that Cohen had provided several thousand dollars to Buyers 3-A and 3-B to pay off their personal debts, which payment should have been reflected on the HUD-1 as an inducement to purchase.

156.    Further, to conceal the fact that Cohen had provided funds to pay off Buyers 3-A's and 3-B's personal debts, the Cambridge Defendants conspired with Cohen and the Cohen Entities to create false and fraudulent gift affidavits, which asserted that the funds for paying off Buyers 3-A's and 3-B's debts had come from their daughter, rather than Cohen.  Specifically, to give the appearance that Buyers 3-A and 3-B received a gift from their daughter, Cohen and Seth Lapidus obtained a cashier's check from the buyers' daughter's bank, using Cohen's funds,.

157.    In addition, Cambridge, through Kramer, also falsely certified HUD Loan No. 3 to HUD for mortgage insurance, despite knowing that HUD Loan No. 3 failed to comply with HUD requirements in, among others, the following respects:

a. The MCAW form for HUD Loan No. 3 falsely understated Buyers 3-A's and 3-B's liabilities by not including the debts they owed, which Cambridge would not pay off until weeks after the closing;

b. HUD Loan No. 3 had Qualifying Ratios (53.32% and 53.65%) that significantly exceeded HUD thresholds (31% and 43%, respectively), and did not have any applicable compensating factor; and

c. Buckley's appraisal for the York Avenue Property had not been conducted in accordance with HUD requirements and contained an inflated valuation for the York Avenue Property.

158. In connection with obtaining HUD Loan No. 3, Buyers 3-A and 3-B contributed only a minimal amount to the down payment and closing costs associated with purchasing the York Avenue Property. Instead, Cohen, as the seller, paid $13,845 toward the down payment and $14,647 in closing costs, both of which were paid using disbursement from HUD Loan No. 3. In other words, Cohen induced Buyers 3-A and 3-B to buy the property at an inflated price by effectively paying the entire upfront cost of buying that home.

159. On August 24, 2007, Cambridge sold HUD Loan No. 3 to Countrywide, pursuant to the Countrywide Loan Purchase Agreement and received more than $13,000 from the sale of that loan.

160. Cohen provided thousands of dollars to pay off Buyers 3-A's and 3-B's personal debts, and also paid for nearly all of the down payment and closing costs, to induce them to obtain HUD Loan No. 3 based on an inflated price for the York Avenue Property. In connection with that sale alone, Cohen, through Buy-a-Home and Mark Wolf, made more than $46,000 in net profits, from the disbursement of HUD Loan No. 3.

161.    For the Cambridge Defendants' role in conspiring with Cohen and the Cohen Entities to consummate the sale of the York Avenue Property to Buyers 3-A and 3-B at an inflated price, Cambridge received more than $25,000 in fees and resale proceeds for originating HUD Loan No. 3.

162.    Buckley, who provided an inflated appraisal for the York Avenue Property based on a corrupt agreement or understanding with Cohen and the Cambridge Defendants, not only was paid several hundred dollars for that appraisal, but also ensured future appraisal referrals from Cohen and further cemented the corrupt and lucrative relationship between his business interests and Cohen's. *See supra* at ¶ 88.

163.    In connection with executing their scheme to consummate a fraudulent flip sale of the York Avenue Property, Cohen, the Cohen Entities, the Cambridge Defendants, Premier, and Buckley used interstate mail carriers and interstate wire to transmit documents that contained false and misleading information, including, among other documents, false and fraudulent gift affidavits, appraisal report, and HUD Addendum.

164.    Specifically, the Cambridge Defendants and Buckley submitted to HUD numerous false records and certifications, including the appraisal report for the York Avenue Property and the Settlement Statement and HUD Addendum for HUD Loan No. 3.  Based on those false certifications and records, Cohen, the Cohen Entities, and the Cambridge Defendants obtained HUD mortgage insurance to HUD Loan No. 3.

165.   Further, the Cambridge Defendants also submitted to Countrywide, using interstate mail carrier and interstate wire, numerous false records and certifications, the appraisal report for the York Avenue Property and the Settlement Statement and HUD Addendum for HUD Loan No. 3.   Based on those false certifications and records, they caused Countrywide to purchase HUD Loan No. 3.

166.   Based on the false and fraudulent certifications and records created by Cohen, the Cohen Entities, the Cambridge Defendants, Premier, and Buckley, which certification and records had been sent to HUD using interstate mail and by wire, HUD agreed to insure HUD Loan No. 3.   Further, based on those false and fraudulent records, which had been sent to Countrywide using interstate mail and by wire, Countrywide agreed to purchase HUD Loan No. 3 from Cambridge.

167.   Buyers 3-A and 3-B, who never could have afforded the York Avenue Property at the inflated price Cohen set, defaulted on HUD Loan No. 3 within 18 months of the closing, exposing HUD and Countrywide potentially to more than $500,000 in losses.

168.   Accordingly, Cohen, the Cohen Entities, the Cambridge Defendants, Premier, and Buckley violated 12 U.S.C. § 1833a in connection with the origination and sale of HUD Loan No. 3 in that they engaged in a scheme to defraud HUD, in violation of 18 U.S.C. §§ 1006 and 1014, and participated in a scheme to commit mail and wire fraud affecting a financial institution, namely Countrywide Bank, in violation of 18 U.S.C. §§ 1341 and 1343.

D.   **HUD LOAN NO. 4: BEACH 46TH STREET, FAR ROCKAWAY**

169.   From in or about January 2006 to in or about August 2007, Cohen, the Cohen Entities, the Cambridge Defendants, and Goldberg conspired to orchestrate the flip sale of a property located on Beach 46th Street in Far Rockaway, New York (the "Beach 46th Street Property"), at an inflated price to buyers who lacked the financial wherewithal to purchase the property.

170.   In furtherance of that conspiracy and pursuant to their corrupt agreement, Cohen, the Cohen Entities, the Cambridge Defendants, and Goldberg obtained HUD insurance for a mortgage loan in the amount of $454,930 used to finance the fraudulent flip sale of the Beach 46th Street Property ("HUD Loan No. 4"), and sold HUD Loan No. 4 to Citi, by paying off the buyers' personal debts to induce them to purchase, obtaining an inflated appraisal for the Beach 46th Street Property, by creating false records to inflate a buyer's income and to omit inducements to purchase, falsely certifying compliance with HUD requirements, and submitting false and misleading records to HUD and to Citi.

171.   In or about January 2006, Cambridge acquired the Beach 46th Street Property for $1,000, subject to two mortgages in the approximate amount of $380,000.

172.   In or about April 2007, Cohen induced three inexperienced, first-time home-buyers, Buyers 4-A, 4-B, and 4-C to purchase the Beach 46th Street Property for $469,000.

173.   Cohen referred Buyers 4-A, 4-B, and 4-C to Lapidus at Cambridge for purposes of obtaining a HUD-insured mortgage from Cambridge, based on the

corrupt agreement or understanding between Cohen and the Cambridge Defendants that Cambridge would endorse an application for HUD insurance irrespective of whether Buyers 4-A, 4-B, and 4-C qualified for such insurance or whether the Beach 46th Street Property was worth $469,000.

174.   On or about April 24, 2007, Cambridge obtained an inflated appraisal for the Beach 46th Street Property from Mark Pitman, a JJG appraiser, valuing the property at $470,000.  Pitman's appraisal report, which inflated the value of the Beach 46th Street Property by failing to comply with numerous HUD appraisal standards, including, among others, to conduct and report a complete appraisal, to report full and accurate data about the property including its sales history, and to appropriately value the property vis-à-vis comparable property sales.  Goldberg personally reviewed, approved, and signed the appraisal report on behalf of Pitman.

175.   On April 30, 2007, Cambridge originated and processed HUD Loan No. 4, which Derrell, acting as the underwriter, certified as meeting HUD's requirements, and which Hyman, certifying on behalf of Cambridge, endorsed for HUD mortgage insurance.

176.   In connection with endorsing HUD Loan No. 4 for HUD mortgage insurance, Cambridge also certified to HUD that the Loan Application for Buyer 4-A and the MCAW form were true and correct.  In fact, however, the Cambridge Defendants conspired with Cohen and the Cohen Entities to falsify those records to inflate Buyer 4-A's income.

177.   Specifically, on or about April 13, 2007, Buyer 4-A told Lapidus that she worked as a security guard and that her monthly salary was $1,733.

57

Cambridge, however, inserted "head chef" as Buyer 4-A's occupation and $2,600 as her monthly salary into her final Loan Application, and created false and fraudulent records to support this information.   The two versions of the Loan Applications for Buyer 4-A are attached to this Complaint as Exhibit 4.  By inflating Buyer 4-A's monthly income, Cambridge fraudulently lowered the Qualifying Ratios for HUD Loan No. 4.

178.   In connection with endorsing HUD Loan No. 4 for HUD mortgage insurance, Cambridge certified to HUD that neither it nor its principals had any financial stake in the sale of the Beach 46th Street Property.  In fact, Cambridge was the owner of the property.  Thus, by originating a HUD-insured loan to finance the flip sale of the Beach 46th Street Property, Cambridge and its principals, Kramer and Hyman, stood to make a significant profit.   In other words, and contrary to Cambridge's certification to HUD, Kramer and Hyman each had a direct financial stake in the sale of the Beach 46th Street Property.

179.   Cambridge, specifically Hyman, also falsely certified HUD Loan No. 4 to HUD for mortgage insurance, despite knowing that that loan failed to comply with HUD requirements in, among others, the following respects:

> a.  HUD Loan No. 4 had an MP/I ratio (36.18%) that significantly exceeded the HUD threshold (31%)  and did not have any applicable compensating factor; and
>
> b.  JJG's appraisal for the Beach 46th Street Property contained an inflated valuation for that property and had not been conducted in accordance with HUD requirements.

180.   On or about August 1, 2007, Cambridge sold HUD Loan No. 4 to Citi, pursuant to the Citi Loan Purchase Agreement and received more than $10,000 for that loan.

181.   In connection with obtaining HUD Loan No. 4, Buyers 4-A, 4-B, and 4-C contributed only a nominal amount to the down payment or closing costs associated with purchasing the Beach 46th Street Property.   Instead, Cohen arranged for the payment of $14,070 toward the down payment and $14,833.06 in closing costs, both of which were paid using disbursement from HUD Loan No. 4.   In other words, Cohen also induced Buyers 4-A, 4-B, and 4-C to buy the property at an inflated price by effectively paying the entire upfront cost of buying that home.

182.   Cohen arranged for the payments of nearly all of the down payment and closing costs to induce Buyers 4-A, 4-B, and 4-C to obtain HUD Loan No. 4 on the basis of an inflated valuation for the Beach 46th Street Property.   In connection with that sale alone, Cohen, through Buy-a-Home, made $25,000 in fees, from the disbursement of HUD Loan No. 4.

183.   For the Cambridge Defendants' role in conspiring with Cohen and the Cohen Entities to consummate the sale of the Beach 46th Street Property to Buyers 4-A, 4-B, and 4-C at an inflated price, Cambridge received approximately $135,000 in profits and resale proceeds.

184.   Further, in exchange for supplying Cambridge with an inflated appraisal for the Beach 46th Street Property, Goldberg, in addition to receiving $500 for issuing an inflated appraisal report, ensured that he would receive hundreds of additional appraisal assignments from Cambridge.

185.   In connection with executing their scheme to consummate a fraudulent flip sale of the Beach 46th Street Property, Cohen, the Cohen Entities, the Cambridge Defendants, and Goldberg used interstate mail carriers and interstate wire to transmit documents that contained false and misleading information, including, among other documents, false and fraudulent Loan Application, MCAW form, appraisal, and HUD Addendum.

186.   Specifically, the Cambridge Defendants and Goldberg submitted to HUD numerous false records and certifications, including the Loan Application, the MCAW form, the appraisal, and the HUD Addendum for HUD Loan No. 4.  Based on those false certifications and records, Cohen, the Cohen Entities, the Cambridge Defendants, and Goldberg obtained HUD mortgage insurance to HUD Loan No. 4. Further, the Cambridge Defendants also submitted to Citi, using interstate mail carrier and interstate wire, numerous false records and certifications, including the Loan Application, the MCAW form, and the HUD Addendum for HUD Loan No. 4. Based on those false certifications and records, they caused Citi to purchase HUD Loan No. 4.

187.   Buyers 4-A, 4-B, and 4-C, whom Cohen had misled as to the true cost of owning the Beach 46th Street Property and who never could have afforded that property at the inflated price set by Cambridge, defaulted on HUD Loan No. 4 within four months of closing, exposing HUD and Citi potentially to more than $500,000 in losses.

188.   Accordingly, Cohen, the Cohen Entities, the Cambridge Defendants, and Goldberg violated 12 U.S.C. § 1833a in connection with the origination and sale

of HUD Loan No. 4 in that they engaged in a scheme to defraud HUD, in violation of 18 U.S.C. §§ 1006 and 1014, and participated in a scheme to commit mail and wire fraud affecting a financial institution, namely Citibank, in violation of 18 U.S.C. §§ 1341 and 1343.

**E.      HUD LOAN NO. 5:  NICHOLAS AVENUE, STATEN ISLAND**

189.   From in or about February 2007 to in or about May 2007, Cohen, the Cohen Entities, the Cambridge Defendants, and Goldberg conspired to orchestrate the flip sale of a property located on Nicholas Avenue in Staten Island, Richmond County, New York (the "Nicholas Avenue Property") at an inflated price to buyers who lacked the financial wherewithal to purchase the property.

190.   In furtherance of that conspiracy and pursuant to their corrupt agreement, Cohen, the Cohen Entities, the Cambridge Defendants, and Goldberg obtained HUD insurance for a mortgage loan in the amount of $359,600 used to finance the fraudulent flip sale of the Nicholas Avenue Property ("HUD Loan No. 5"), and sold HUD Loan No. 5 to Citi, by misrepresenting the true cost of home ownership, paying off the buyers' personal debts to induce them to purchase, obtaining an inflated appraisal for the Nicholas Avenue Property, creating false records to omit inducements to purchase, falsely certifying compliance with HUD requirements, and submitting false and misleading records to HUD and to Citi.

191.   In or about February 2007, Cohen, through Metropolitan, bought the Nicholas Avenue Property for $229,500.  To influence prospective buyers to accept the inflated valuation, Buy-a-Home sales agents falsely told them that the monthly cost of owning that property, after taking into account tax deductions and rental

61

income, would be almost eight hundred dollars less than Buy-a-Home's internal estimates indicated.

192.   In or about April and May 2007, *i.e.*, less than three months later, Cohen induced two inexperienced, first-time home-buyers, Buyers 5-A and 5-B, to purchase the Nicholas Avenue Property, for $370,750.

193.   Cohen, through Buy-a-Home, referred Buyers 5-A and 5-B to Lapidus at Cambridge for purposes of obtaining a HUD-insured mortgage from Cambridge, based on a corrupt agreement or understanding between Cohen and the Cambridge Defendants that Cambridge would endorse an application for HUD insurance irrespective of whether Buyers 5-A and 5-B qualified for such insurance or whether the Nicholas Avenue Property was worth $370,750.

194.   On or about May 22, 2007, JJG issued an appraisal report for the Nicholas Avenue Property, valuing the property at $380,000.  That appraisal report, which Goldberg personally reviewed, edited, approved, and sent to Cambridge, contained an inflated valuation for the property and numerous other falsities.

195.   Specifically, JJG's appraisal report inflated the value of the Nicholas Avenue Property by falsely describing the property as having an additional useable bedroom and a partially-finished basement and by overstating the value of repairs by more than $20,000.  JJG also inflated the value of the property by falsely stating that all necessary repairs had been made by the closing date, when, in fact, repairs remained ongoing for three weeks.  Finally, the JJG appraisal report failed to adequately document these improvements as required by HUD.

196.   On May 16, 2007, and in connection with originating HUD Loan No. 5, Cambridge issued a commitment letter to Buyers 5-A and 5-B, which required, as a condition that must be fulfilled prior to closing, that those buyers pay off certain personal debts owed to creditors such as Best Buy and Sears.

197.   On May 24, 2007, Cambridge originated and processed HUD Loan No. 5 to Buyers 5-A and 5-B.  Kramer, acting as the underwriter, certified to HUD that HUD Loan No. 5 met HUD's underwriting requirement.  Further, Derrell, certifying on behalf of Cambridge, endorsed HUD Loan No. 5 to HUD for mortgage insurance.

198.   Specifically, Cambridge certified to HUD that all closing conditions listed in the commitment letter issued by Cambridge had been met by the time of closing on May 24, 2007.  In fact, however, Cambridge knew that Buyers 5-A and 5-B had not paid off their personal debts prior to closing, because some of those debts would not be paid off until May 29, 2007, when Cambridge issued checks to Buyers 5-A's and 5-B's creditors.  Hyman personally signed those checks issued by Cambridge.

199.   Cambridge also certified to HUD that the closing documents for HUD Loan No. 5, including the HUD-1 Settlement Statement, were true and correct.  In fact, however, Cambridge knew that the HUD-1 was false and misleading because it omitted the fact that Cohen, through Buy-a-Home, had given approximately $8,200 to Buyers 5-A and 5-B to pay off their personal debts, which payment should have been reflected on the HUD-1 as an inducement to purchase.

200.   Further, to conceal the fact that Cohen had given money to Buyers 5-A and 5-B to pay off their personal debts, the Cambridge Defendants conspired with

Cohen and the Cohen Entities to create records to assert falsely that the funds for paying off those debts had come from Buyers 5-B's sister.

201. Specifically, the Cambridge Defendants, Cohen, and the Cohen Entities conspired to create false gift affidavits stating that the funds used for paying off Buyers 5-A's and 5-B's personal debts came from Borrower 5-B's sister's personal funds.  In fact, however, those funds had come from Cohen, not Borrower 5-B's sister.

202. Further, Cambridge, through Kramer, falsely certified HUD Loan No. 5 to HUD for mortgage insurance, despite knowing that HUD Loan No. 5 failed to comply with HUD requirements in, among others, the following respects:

  a. The MCAW form for HUD Loan No. 5 falsely understated Buyers 5-A's and 5-B's liabilities by failing to include the personal debts they owed, which Cambridge would not pay off until several days after the closing;

  b. HUD Loan No. 5 had Qualifying Ratios (42.54% and 52.50%) that significantly exceeded HUD thresholds (31% and 43%, respectively), and did not have any applicable compensating factor; and

  b. JJG's appraisal for the Nicholas Avenue Property had not been conducted in accordance with HUD requirements and contained an inflated valuation for the Nicholas Avenue Street Property.

203. In connection with obtaining HUD Loan No. 5, Buyers 5-A and 5-B contributed only a minimal amount to the down payment or closing costs associated with purchasing the Nicholas Avenue Property.  Instead, Cohen, as the seller, paid $12,500 toward the down payment and $14,995.12 in closing costs, both of which were paid using disbursement from HUD Loan No. 5.  In other words, Cohen

induced Buyers 5-A and 5-B to buy the property at an inflated price by effectively paying the entire upfront cost of buying that home.

204.   On August 1, 2007, Cambridge sold HUD Loan No. 5 to Citi, pursuant to the Citi Loan Purchase Agreement and received approximately $8,500.

205.   Cohen gave Buyers 5-A and 5-B thousands of dollars to pay off their personal debts, and also paid for nearly all of the down payment and closing costs, to induce them to obtain HUD Loan No. 5 based on an inflated price for the Nicholas Avenue Property.   In connection with that sale, Cohen, through Buy-a-Home and Wolf & Wolf, made approximately $102,000 in profits, from the disbursement of HUD Loan No. 5.

206.   For the Cambridge Defendants' role in conspiring with Cohen and the Cohen Entities to consummate the sale of the Nicholas Avenue Property to Buyers 5-A and 5-B at an inflated price, Cambridge received close to $18,000 in fees and resale proceeds for originating HUD Loan No. 5.

207.   Further, in exchange for supplying Cambridge with an inflated appraisal for the Nicholas Avenue Property, Goldberg, in addition to receiving $700 for issuing an inflated appraisal report, ensured that he would receive hundreds of additional appraisal assignments from Cambridge.

208.   In connection with executing their scheme to consummate a fraudulent flip sale of the Nicholas Avenue Property, Cohen, the Cohen Entities, the Cambridge Defendants, and Goldberg used interstate mail carriers and interstate wire to transmit documents that contained false and misleading information,

including, among other documents, false and fraudulent gift affidavits, appraisal report, and HUD Addendum.

209.   Specifically, the Cambridge Defendants and Goldberg submitted to HUD numerous false records and certifications, including the appraisal report for the Nicholas Avenue Property and the Settlement Statement and HUD Addendum for HUD Loan No. 5.   Based on those false certifications and records, Cohen, the Cohen Entities, the Cambridge Defendants, and Goldberg obtained HUD mortgage insurance for HUD Loan No. 5.

210.   Further, the Cambridge Defendants also submitted to Citi, using interstate mail carrier and interstate wire, numerous false records and certifications, including the appraisal report for the Nicholas Avenue Property and the Settlement Statement and HUD Addendum for HUD Loan No. 5.   Based on those false certifications and records, they caused Countrywide to purchase HUD Loan No. 5.

211.   Based on the false and fraudulent certifications and records created by Cohen, the Cohen Entities, the Cambridge Defendants, and Goldberg, which certification and records had been sent to HUD using interstate mail and by wire, HUD agreed to insure HUD Loan No. 5.   Further, based on those false and fraudulent records, which had been sent to Citi using interstate mail and by wire, Citi agreed to purchase HUD Loan No. 5 from Cambridge.

212.   Buyers 5-A and 5-B, who never could have afforded the Nicholas Avenue Property at the inflated price Cohen set, defaulted on HUD Loan No. 5

within seven months of the closing, exposing HUD and Citi potentially to more than $400,000 in losses.

213.   Accordingly, Cohen, the Cohen Entities, the Cambridge Defendants, and Goldberg violated 12 U.S.C. § 1833a in connection with the origination and sale of HUD Loan No. 5 in that they engaged in a scheme to defraud HUD, in violation of 18 U.S.C. §§ 1006 and 1014, and participated in a scheme to commit mail and wire fraud affecting a financial institution, namely Citibank, in violation of 18 U.S.C. §§ 1341 and 1343.

**F.    HUD LOAN NO. 6:  ALASKA STREET, STATEN ISLAND**

214.   From in or about March 2007 to in or about July 2007, Cohen, the Cohen Entities, the Cambridge Defendants, CFG, Premier, and Buckley conspired to orchestrate the flip sale of a property located on Alaska Street in Staten Island, Richmond County, New York (the "Alaska Street Property") at an inflated price to buyers who lacked the financial wherewithal to purchase the property.

215.   In furtherance of that conspiracy and pursuant to their corrupt agreement, Cohen, the Cohen Entities, the Cambridge Defendants, CFG, Premier, and Buckley obtained HUD insurance for a mortgage loan in the amount of $460,750 used to finance the fraudulent flip sale of the Alaska Street Property ("HUD Loan No. 6"), and sold HUD Loan No. 6 to Citi, by paying off the buyers' personal debts to induce them to purchase, obtaining an inflated appraisal for the Alaska Street Property, creating false records to omit inducements to purchase, falsely certifying compliance with HUD requirements, and submitting false and misleading records to HUD and to Citi.

216.   In or about March 2007, Cohen, through Gramercy, bought the Alaska Street Property for $338,500.  In connection with that purchase, Gramercy obtained a $25,000 loan from CFG, which was secured by a junior mortgage on the Alaska Street Property.

217.   In or about July 2007, *i.e.*, less than three months later, Cohen induced two inexperienced, first-time home-buyers, Buyers 6-A and 6-B, to purchase the Alaska Street Property, for $475,000.

218.   Cohen, through Buy-a-Home, referred Buyers 6-A and 6-B to Lapidus at Cambridge for purposes of obtaining a HUD-insured mortgage from Cambridge, based on a corrupt agreement or understanding between Cohen and the Cambridge Defendants that Cambridge would endorse an application for HUD insurance irrespective of whether Buyers 6-A and 6-B qualified for such insurance or whether the Alaska Street Property was worth $475,000.

219.   On or about July 22, 2007, at Cohen's direction, Buckley, through Premier, issued an appraisal report for the Alaska Street Property, valuing the property at $480,000.  That appraisal report contained an inflated valuation for the property and numerous other falsities.

220.   Specifically, Buckley significantly inflated the valuation of the Alaska Street Property by selecting for comparison sales of properties that were not, in fact, comparable to the Alaska Street Property.  Buckley also inflated the rental income that Buyers 6-A and 6-B could expect to generate from renting out the basement studio at the Alaska Street Property by falsifying the rent for similar apartments.

221.   Further, Buckley falsely certified that his appraisal of the Alaska Street Property had been conducted in accordance with HUD appraisal standards. In fact, Buckley's appraisal failed to comply with numerous HUD standards, including, among others, to select suitably comparable sales comparisons and to justify the approximately 45% appreciation during Cohen's four-month ownership with no major repairs noted.

222.   On July 25, 2007, and in connection with originating HUD Loan No. 6, Cambridge issued a commitment letter to Buyers 6-A and 6-B, which required, as a condition that must be fulfilled prior to closing, that those buyers pay off certain personal debts owed to creditors such as Bally Total Fitness and JC Penny.

223.   On July 27, 2007, Cambridge originated and processed HUD Loan No. 6 to Buyers 6-A and 6-B.  Derrell, acting as the underwriter, certified to HUD that HUD Loan No. 6 met HUD's underwriting requirements.   Further, Hyman, certifying on behalf of Cambridge, endorsed HUD Loan No. 6 to HUD for mortgage insurance.

224.   Specifically, Cambridge certified to HUD that all closing conditions listed in the commitment letter issued by Cambridge had been met by the time of closing on July 27, 2007.  In fact, however, Cambridge knew that Buyers 6-A and 6-B had not paid off their personal debts prior to closing, because those debts would not be paid off until July 30, 2007, when Cambridge issued approximately $14,000 in checks to pay off Buyers 6-A's and 6-B's student loans and creditors, including Bally and JC Penny.  Hyman personally signed those checks issued by Cambridge.

225.    Cambridge also certified to HUD that the closing documents for HUD Loan No. 6, including the HUD-1 Settlement Statement, were true and correct.  In fact, however, Cambridge knew that the HUD-1 was false and misleading because it omitted the fact that Cohen, through Buy-a-Home, had provided Cambridge with approximately $27,000 in funds to pay off Buyers 6-A's and 6-B's personal debts, which payment should have been reflected on the HUD-1 as an inducement to purchase.

226.    Further, to conceal the fact that Cohen had given the funds to pay off Buyers 6-A's and 6-B's personal debts, the Cambridge Defendants conspired with Cohen and the Cohen Entities to create records to assert falsely that the funds for paying off those debts had come from a gift from one of Buyer 6-B's relatives.

227.    Specifically, Cambridge claimed to have obtained the funds for paying off Buyers 6-A's and 6-B's student loans and personal debts using $27,000 in funds that Buyer 6-A's brother-in-law had given to Cambridge as a gift.  In fact, however, Erin Davis, the Buy-a-Home manager, had given those funds to her then-boyfriend – who was not related to Buyer 6-A – to give to Cambridge, and had created fraudulent gift affidavits to conceal that fact.  Further, Cohen compensated Davis for that outlay at the closing of HUD Loan No. 6, directing a $14,000 payment to Davis directly from the disbursement of that loan.

228.    In connection with endorsing HUD Loan No. 6 for HUD mortgage insurance, Cambridge certified to HUD that neither it nor its principals had any financial stake in the sale of the Alaska Street Property.  In fact, Cambridge's affiliate CFG held a junior mortgage against that property, in the amount of

70

$24,000.  Thus, by originating a HUD-insured loan to finance Cohen's flip sale of the Alaska Street Property, Cambridge's principals Kramer and Hyman stood to be paid in full on CFG's loan.  In other words, and contrary to Cambridge's certification to HUD, Kramer and Hyman each had a direct financial stake in the sale of the Alaska Street Property.

229.   Further, Cambridge, through Hyman, also falsely certified HUD Loan No. 6 to HUD for mortgage insurance, despite knowing that HUD Loan No. 6 failed to comply with HUD requirements in, among others, the following respects:

    a. The MCAW form for HUD Loan No. 6  falsely understated Buyers 6-A's and 6-B's liabilities by failing to include the personal debts they owed, which Cambridge would not pay off until a week after the closing;

    b. HUD Loan No. 6 had Qualifying Ratios (39.11% and 49.47%) that significantly exceeded HUD thresholds (31% and 43%, respectively), and did not have any applicable compensating factor; and

    c. Buckley's appraisal for the Alaska Street Property had not been conducted in accordance with HUD requirements and contained an inflated valuation for the Alaska Street Property.

230.   In connection with obtaining HUD Loan No. 6, Buyers 6-A and 6-B contributed only a minimal amount to the down payment or closing costs associated with purchasing the Alaska Street Property.  Instead, Cohen, as the seller, paid $14,250 toward the down payment and $18,470 in closing costs, both of which were paid using disbursement from HUD Loan No. 6.  In other words, Cohen induced Buyers 6-A and 6-B to buy the property at an inflated price by effectively paying the entire upfront cost of buying that home.

231.    On August 29, 2007, Cambridge sold HUD Loan No. 6 to Citi, pursuant to the Citi Loan Purchase Agreement and received approximately $11,000 for that loan.

232.    Cohen gave Buyers 6-A and 6-B $14,000 to pay off their personal debts, and also paid for nearly all of the down payment and closing costs, to induce them to obtain HUD Loan No. 6 based on an inflated price for the Alaska Street Property. In connection with that sale, Cohen, through Buy-a-Home, Mark Wolf, and Erin Davis, made more than $68,000 in net profits from the disbursement of HUD Loan No. 6.

233.    For the Cambridge Defendants' role in conspiring with Cohen and the Cohen Entities to consummate the sale of the Alaska Street Property to Buyers 6-A and 6-B at an inflated price, Cambridge received approximately $22,000 in fees and resale proceeds for originating HUD Loan No. 6.  Further, CFG received more than $27,000 in disbursement from HUD Loan No. 6, in repayment of the high-interest loan that it had made to Gramercy.

234.    Buckley, who through Premier provided an inflated appraisal for the Alaska Street Property based on a corrupt agreement or understanding with Cohen and the Cambridge Defendants, not only was paid $450 for that appraisal, but also ensured future appraisal referrals from Cohen.  This included appraisals of three other adjacent properties on Alaska Avenue, all of which were sold by Cohen and all of which Buckley appraised at inflated values.  Buckley also further cemented the corrupt and lucrative relationship between his business interests and Cohen's.  *See supra* at ¶ 88.

235.   In connection with executing their scheme to consummate a fraudulent flip sale of the Alaska Street Property, Cohen, the Cohen Entities, the Cambridge Defendants, CFG, Premier, and Buckley used interstate mail carriers and interstate wire to transmit documents that contained false and misleading information, including, among other documents, false and fraudulent gift affidavits, appraisal report, and HUD Addendum.

236.   Specifically, the Cambridge Defendants and Buckley submitted to HUD numerous false records and certifications, including the appraisal report for the Alaska Street Property and the Settlement Statement and HUD Addendum for HUD Loan No. 6.  Based on those false certifications and records, Cohen, the Cohen Entities, the Cambridge Defendants, CFG, Premier, and Buckley obtained HUD mortgage insurance to HUD Loan No. 6.

237.   Further, the Cambridge Defendants also submitted to Citi, using interstate mail carrier and interstate wire, numerous false records and certifications, including Buckley's appraisal report and the Settlement Statement and HUD Addendum for HUD Loan No. 6.  Based on those false certifications and records, they caused Citi to purchase HUD Loan No. 6.

238.   Based on the false and fraudulent certifications and records created by Cohen, the Cohen Entities, the Cambridge Defendants, CFG, Premier, and Buckley, which certification and records had been sent to HUD using interstate mail and by wire, HUD agreed to insure HUD Loan No. 6.  Further, based on those false and fraudulent records, which had been sent to Citi using interstate mail and by wire, Citi agreed to purchase HUD Loan No. 6 from Cambridge.

239.   Buyers 6-A and 6-B, who never could have afforded the Alaska Street Property at the inflated price Cohen set, defaulted on HUD Loan No. 6 within 100 days of the closing, exposing HUD and Citi potentially to more than $500,000 in losses.

240.   Accordingly, Cohen, the Cohen Entities, the Cambridge Defendants, CFG, Premier, and Buckley violated 12 U.S.C. § 1833a in connection with the origination and sale of HUD Loan No. 6 in that they engaged in a scheme to defraud HUD, in violation of 18 U.S.C. §§ 1006 and 1014, and participated in a scheme to commit mail and wire fraud affecting a financial institution, namely Citibank, in violation of 18 U.S.C. §§ 1341 and 1343.

## G.   HUD LOAN NO. 7:  NEWARK AVENUE PROPERTY B

241.   From in or about February 2007 to in or about August 2007, Cohen, the Cohen Entities, the Cambridge Defendants, and Goldberg conspired to orchestrate the flip sale of a property located on Newark Avenue in Staten Island, Richmond County, New York ("Newark Avenue Property B") at an inflated price to buyers who lacked the financial wherewithal to purchase the property.

242.   In furtherance of that conspiracy and pursuant to their corrupt agreement, Cohen, the Cohen Entities, the Cambridge Defendants, and Goldberg obtained HUD insurance for a mortgage loan in the amount of $358,900 used to finance the fraudulent flip sale of Newark Avenue Property B ("HUD Loan No. 7"), and sold HUD Loan No. 7 to Citi, by misrepresenting the true cost of home ownership, paying off the buyers' personal debts to induce them to purchase, obtaining an inflated appraisal for Newark Avenue Property B, creating false

74

records to omit inducements to purchase, falsely certifying compliance with HUD requirements, and submitting false and misleading records to HUD and to Citi.

243.   Specifically, on or about February 5, 2007, Cohen, through Buy-a-Home, contracted with Pearsal Builders to purchase Newark Avenue Property B for approximately $272,000.  Rather than closing on that property, Cohen immediately sought to resell it to inexperienced home-buyers for $370,000.

244.   In or about July 2007, *i.e.*, approximately five months after he contracted to buy Newark Avenue Property B for $272,000, Cohen, through Metropolitan and Buy-a-Home, induced two inexperienced, first-time home-buyers, Buyers 7-A and 7-B, to buy that home for $370,000.  To influence the prospective buyers to accept the inflated valuation, Buy-a-Home sales agents falsely told them that their mortgage payments would be offset by several hundred dollars in tax credits. Cohen also concealed Buy-a-Home's contract to purchase Newark Avenue Property B by identifying Pearsal Builders as the seller, without disclosing that Buy-a-Home stood to gain nearly $100,000 in gross profit from the flip sale.

245.   Cohen referred Buyers 7-A and 7-B to Lapidus at Cambridge for purposes of obtaining a HUD-insured mortgage from Cambridge, based on the corrupt agreement or understanding between Cohen and the Cambridge Defendants that Cambridge would endorse an application for HUD insurance irrespective of whether Buyers 7-A and 7-B qualified for such insurance or whether Newark Avenue Property B was worth $370,000.

246.   On or about August 1, 2007, Cambridge obtained an inflated appraisal for Newark Avenue Property B from JJG, valuing the property exactly at the sale

price, $370,000. JJG's appraisal report, which Goldberg personally reviewed, edited, approved, and sent to Cambridge, inflated the value of Newark Avenue Property B by failing to account for a significant external obsolescence – the fact that the property was located directly across from and faced the stanchions of an elevated highway leading to the Bayonne Bridge – that substantially decreased the value of that property. JJG's appraisal report also inflated the value of Newark Avenue Property B by selecting for comparison sales of properties that were not, in fact, comparable to Newark Avenue Property B.

247. On August 21, 2007, and in connection with originating HUD Loan No. 7, Cambridge issued a commitment letter to Buyers 7-A and 7-B, which required, as a condition that must be fulfilled prior to closing, that Buyer 7-A pay off certain personal debts that she owed to creditors such as Wells Fargo and AT&T.

248. On August 30, 2007, Cambridge originated and processed HUD Loan No. 7, which Kramer, acting as the underwriter, certified as meeting HUD's requirements, and which Hyman, certifying on behalf of Cambridge, endorsed for HUD mortgage insurance.

249. Specifically, Cambridge certified to HUD on August 30, 2007, that all closing conditions listed in the commitment letter had been met by the time of closing. In fact, however, Cambridge knew that Buyer 7-A had not paid off her personal debts prior to closing, because those debts would not be paid off until August 31, 2007, and September 17, 2007, when Cambridge issued approximately $15,000 in checks to Buyer 7-A's creditors, including Wells Fargo and AT&T. Hyman personally signed those checks.

250.     Cambridge also certified to HUD that the closing documents for HUD Loan No. 7, including the HUD-1 Settlement Statement, were true and correct.  In fact, however, Cambridge knew that the HUD-1 was false and misleading because it omitted the fact that Cohen had provided funds to Buyers 7-A and 7-B to pay off Buyer 7-A's personal debts, which payment should have been reflected on the HUD-1 as an inducement to purchase.

251.     Further, to conceal the fact that Cohen had provided funds to pay off Buyer 7-A's personal debts, the Cambridge Defendants conspired with Cohen and the Cohen Entities to create false and fraudulent gift affidavits, which asserted that the funds for paying off Buyer 7-A's debts had come from two of her relatives, rather than Cohen.  Cohen gave Buyers 7-A and 7-B the false impression that these funds had come from a grant from AmeriDream, a not-for-profit organization.

252.     Cambridge, specifically Kramer, also falsely certified HUD Loan No. 7 to HUD for mortgage insurance, despite knowing that that loan failed to comply with HUD requirements in, among others, the following respects:

      a.  The MCAW form for HUD Loan No. 7 falsely understated Buyers 7-A's and 7-B's liabilities by not including the debts they owed, which Cambridge would not pay off until weeks after the closing;

      b.  HUD Loan No. 7 had Qualifying Ratios (43.63% and 45.94%) that significantly exceeded HUD thresholds (31% and 43%, respectively) and did not have any applicable compensating factor; and

      c.  JJG's appraisal for Newark Avenue Property B contained an inflated valuation for that property and had not been conducted in accordance with HUD requirements.

253.    In connection with obtaining HUD Loan No. 7, Buyers 7-A and 7-B contributed only a nominal amount to the down payment or closing costs associated with purchasing Newark Avenue Property B.   Instead, Cohen arranged for the payment of $14,700 toward the down payment and $12,864.30 in closing costs, both of which were paid using disbursement from HUD Loan No. 7.   In other words, Cohen also induced Buyers 7-A and 7-B to buy the property at an inflated price by effectively paying the entire upfront cost of buying that home.

254.    On or about September 10, 2007, Cambridge sold HUD Loan No. 7 to Citi, pursuant to the Citi Loan Purchase Agreement and received more than $8,500 for that loan.

255.    Cohen gave thousands of dollars to pay off Buyer 7-A's personal debts, and also arranged for the payments of nearly all of the down payment and closing costs, to induce Buyers 7-A and 7-B to obtain HUD Loan No. 7 on the basis of an inflated valuation for Newark Avenue Property B.   In connection with that sale alone, Cohen, through Buy-a-Home and Mark Wolf, made more than $54,000 in profits, from the disbursement of HUD Loan No. 7.

256.    For the Cambridge Defendants' role in conspiring with Cohen and the Cohen Entities to consummate the sale of Newark Avenue Property B to Buyers 7-A and 7-B at an inflated price, Cambridge received more than $16,000 in fees and resale proceeds for originating HUD Loan No. 7.

257.    Goldberg, who provided an inflated appraisal for Newark Avenue Property B based on a corrupt agreement or understanding with Cohen and the Cambridge Defendants, not only was paid $650 for that appraisal, but also ensured

that he would receive additional appraisal referrals from Cohen and the Cohen Entities.

258.    In connection with executing their scheme to consummate a fraudulent flip sale of Newark Property B, Cohen, the Cohen Entities, the Cambridge Defendants, and Goldberg used interstate mail carriers and interstate wire to transmit documents that contained false and misleading information, including, among other documents, false and fraudulent gift affidavits and HUD Addendum.

259.    Specifically, the Cambridge Defendants and Goldberg submitted to HUD numerous false records and certifications, including the appraisal report for Newark Avenue Property B and the HUD Addendum for HUD Loan No. 7.  Based on those false certifications and records, Cohen, the Cohen Entities, the Cambridge Defendants, and Goldberg obtained HUD mortgage insurance for HUD Loan No. 7.

260.    Further, the Cambridge Defendants also submitted to Citi, using interstate mail carrier and interstate wire, numerous false records and certifications, including JJG's appraisal report and the Settlement Statement and HUD Addendum for HUD Loan No. 7.  Based on those false certifications and records, they caused Citi to purchase HUD Loan No. 7.

261.    Buyers 7-A and 7-B, who never could have afforded Newark Avenue Property B at the inflated price set by Cohen, defaulted on HUD Loan No. 7 within five months of closing, exposing HUD and Citi potentially to more than $400,000 in losses.

262.    Accordingly, Cohen, the Cohen Entities, the Cambridge Defendants, and Goldberg violated 12 U.S.C. § 1833a in connection with the origination and sale

of HUD Loan No. 7 in that they engaged in a scheme to defraud HUD, in violation of 18 U.S.C. §§ 1006 and 1014, and participated in a scheme to commit mail and wire fraud affecting a financial institution, namely Citibank, in violation of 18 U.S.C. §§ 1341 and 1343.

## H.    HUD LOAN NO. 8:  NEWARK AVENUE PROPERTY C

263.    From in or about February 2007 to in or about June 2007, Cohen, the Cohen Entities, the Cambridge Defendants, Premier, and Buckley conspired to orchestrate the flip sale of a property located on Newark Avenue in Staten Island, Richmond County, New York ("Newark Avenue Property C") at an inflated price to buyers who lacked the financial wherewithal to purchase the property.

264.    In furtherance of that conspiracy and pursuant to their corrupt agreement, Cohen, the Cohen Entities, the Cambridge Defendants, Premier, and Buckley obtained HUD insurance for a mortgage loan in the amount of $436,500 used to finance the fraudulent flip sale of Newark Avenue Property C ("HUD Loan No. 8"), and sold HUD Loan No. 8 to Citi, by paying off the buyers' personal debts to induce them to purchase, obtaining an inflated appraisal for Newark Avenue Property C, creating false records to omit inducements to purchase, falsely certifying compliance with HUD requirements, and submitting false and misleading records to HUD and to Citi.

265.    Specifically, on or about February 5, 2007, Cohen, through Buy-a-Home, contracted with Pearsal Builders to purchase Newark Avenue Property C for approximately $345,000.  Rather than closing on that property, Cohen immediately sought to resell it to inexperienced home-buyers for $450,000.

266.   In or about June 2007, *i.e.*, approximately four months after he contracted to buy Newark Avenue Property C for $345,000, Cohen, through Metropolitan and Buy-a-Home, induced two inexperienced, first-time home-buyers, Buyers 8-A and 8-B, to buy that home for $450,000.  Cohen concealed Buy-a-Home's contract to purchase Newark Avenue Property C by identifying Pearsal Builders as the seller, without disclosing that Buy-a-Home stood to gain more than $100,000 in gross profit from the flip sale.

267.   Cohen referred Buyers 8-A and 8-B to Lapidus at Cambridge for purposes of obtaining a HUD-insured mortgage from Cambridge, based on the corrupt agreement or understanding between Cohen and the Cambridge Defendants that Cambridge would endorse an application for HUD insurance irrespective of whether Buyers 8-A and 8-B qualified for such insurance or whether Newark Avenue Property C was worth $450,000.

268.   On or about June 18, 2007, at Cohen's direction, Buckley, through Premier, issued an inflated appraisal of Newark Avenue Property C for Cambridge, valuing the property exactly at the sale price, $450,000.  Buckley's appraisal report inflated the value of Newark Avenue Property C by failing to account for a significant external obsolescence – the fact that the property was located directly across from and faced the stanchions of an elevated highway leading to the Bayonne Bridge – that substantially decreased the value of that property.   Buckley's appraisal report also inflated the value of Newark Avenue Property C by using as sales comparisons two other properties that Cohen had sold in earlier flip sales, in violation of a basic appraisal standard.

269.    On June 20, 2007, and in connection with originating HUD Loan No. 8, Cambridge issued a commitment letter to Buyers 8-A and 8-B, which required, as a condition that must be fulfilled prior to closing, that Buyers 8-A and 8-B pay off certain personal debts that they owed to creditors such as AT&T and Plaza Associates.

270.    On June 21, 2007, Cambridge originated and processed HUD Loan No. 8, which Kramer, acting as the underwriter, certified as meeting HUD's requirements, and which Hyman, certifying on behalf of Cambridge, endorsed for HUD mortgage insurance.

271.    Specifically, Cambridge certified to HUD on June 21, 2007, that all closing conditions listed in the commitment letter had been met by the time of closing.  In fact, however, Cambridge knew that Buyers 8-A and 8-B had not paid off their personal debts prior to closing, because those debts would not be paid off until June 22, 2007, when Cambridge issued approximately $1,780 in checks to Buyers 8-A's and 8-B's creditors, including AT&T and Plaza Associates.  Hyman personally signed those checks.

272.    Cambridge also certified to HUD that the closing documents for HUD Loan No. 8, including the HUD-1 Settlement Statement, were true and correct.  In fact, however, Cambridge knew that the HUD-1 was false and misleading because it omitted the fact that Cohen had provided the funds for paying off Buyers 8-A's and 8-B's personal debts, which payment should have been reflected on the HUD-1 as an inducement to purchase.

273.   Further, to conceal the fact that Cohen had provided the funds for paying off Buyers 8-A's and 8-B's personal debts, the Cambridge Defendants conspired with Cohen and the Cohen Entities to create records to assert falsely that the funds for paying off those debts had come from Buyers 8-A and 8-B.

274.   Cambridge, specifically Kramer, also falsely certified HUD Loan No. 8 to HUD for mortgage insurance, despite knowing that that loan failed to comply with HUD requirements in, among others, the following respects:

    a.   The MCAW form for HUD Loan No. 8 falsely understated Buyers 8-A's and 8-B's liabilities by not including the debts they owed, which Cambridge would not pay off until weeks after the closing;

    b.   HUD Loan No. 8 had Qualifying Ratios (44.16% and 47.87%) that significantly exceeded HUD thresholds (31% and 43%, respectively) and did not have any applicable compensating factor; and

    c.   Buckley's appraisal for Newark Avenue Property C contained an inflated valuation for that property and had not been conducted in accordance with HUD requirements.

275.   In connection with obtaining HUD Loan No. 8, Buyers 8-A and 8-B contributed only a nominal amount to the down payment or closing costs associated with purchasing Newark Avenue Property C.   Instead, Cohen arranged for the payment of $14,000 toward the down payment and $19,024.50 in closing costs, both of which were paid using disbursement from HUD Loan No. 8.   In other words, Cohen also induced Buyers 8-A and 8-B to buy the property at an inflated price by effectively paying the entire upfront cost of buying that home.

276.   On or about July 16, 2007, Cambridge sold HUD Loan No. 8 to Citi, pursuant to the Citi Loan Purchase Agreement and received more than $10,000 for that loan.

277.   Cohen gave Cambridge thousands of dollars to pay off Buyers 8-A and 8-B's personal debts, and also arranged for the payments of nearly all of the down payment and closing costs, to induce Buyers 8-A and 8-B to obtain HUD Loan No. 8 on the basis of an inflated valuation for Newark Avenue Property C.  In connection with that sale alone, Cohen, through Buy-a-Home and Wolf & Wolf, made more than $48,000 in profits, from the disbursement of HUD Loan No. 8.

278.   For the Cambridge Defendants' role in conspiring with Cohen and the Cohen Entities to consummate the sale of Newark Avenue Property C to Buyers 8-A and 8-B at an inflated price, Cambridge received more than $21,000 in fees and resale proceeds for originating HUD Loan No. 8.

279.   Buckley, who provided an inflated appraisal for Newark Avenue Property C based on a corrupt agreement or understanding with Cohen and the Cambridge Defendants, not only was paid $450 for that appraisal, but also ensured future appraisal referrals from Cohen.  This included appraisals of two other adjacent properties on Newark Avenue, both of which were sold by Cohen and both of which Buckley appraised at inflated values.  Buckley also further cemented the corrupt and lucrative relationship between his business interests and Cohen's.  *See supra* at ¶ 88.

280.   In connection with executing their scheme to consummate a fraudulent flip sale of Newark Property C, Cohen, the Cohen Entities, the Cambridge

Defendants, Premier, and Buckley used interstate mail carriers and interstate wire to transmit documents that contained false and misleading information, including, among other documents, false and fraudulent appraisal report and HUD Addendum.

281.    Specifically, the Cambridge Defendants and Buckley submitted to HUD numerous false records and certifications, including the appraisal report for Newark Avenue Property C and the HUD Addendum for HUD Loan No. 8.  Based on those false certifications and records, Cohen, the Cohen Entities, the Cambridge Defendants, Premier, and Buckley obtained HUD mortgage insurance for HUD Loan No. 8.

282.    Further, the Cambridge Defendants also submitted to Citi, using interstate mail carrier and interstate wire, numerous false records and certifications, including the HUD Addendum for HUD Loan No. 8.  Based on those false certifications and records, they caused Citi to purchase HUD Loan No. 8.

283.    Buyers 8-A and 8-B, who never could have afforded Newark Avenue Property C at the inflated price Cohen set, defaulted on HUD Loan No. 8 within 100 days of closing, exposing HUD and Citi potentially to more than $500,000 in losses.

284.    Accordingly, Cohen, the Cohen Entities, the Cambridge Defendants, Premier, and Buckley violated 12 U.S.C. § 1833a in connection with the origination and sale of HUD Loan No. 8 in that they engaged in a scheme to defraud HUD, in violation of 18 U.S.C. §§ 1006 and 1014, and participated in a scheme to commit mail and wire fraud affecting a financial institution, namely Citibank, in violation of 18 U.S.C. §§ 1341 and 1343.

## I.     HUD LOAN NO. 9:  EAST TREMONT AVENUE, THE BRONX

285.   From in or about May 2007 to in or about September 2007, Cohen, the Cohen Entities, the Cambridge Defendants, and Goldberg conspired to orchestrate the flip sale of a property located on East Tremont Avenue in Bronx County, New York (the "East Tremont Avenue Property") at an inflated price to buyers who lacked the financial wherewithal to purchase the property.

286.   In furtherance of that conspiracy and pursuant to their corrupt agreement, Cohen, the Cohen Entities, the Cambridge Defendants, and Goldberg obtained HUD insurance for a mortgage loan in the amount of $459,700 used to finance the fraudulent flip sale of the East Tremont Avenue Property ("HUD Loan No. 9"), and sold HUD Loan No. 9 to Countrywide by paying off the buyers' personal debts to induce them to purchase, obtaining an inflated appraisal for the East Tremont Avenue Property, creating false records to inflate a buyer's income and omit inducements to purchase, falsely certifying compliance with HUD requirements, and submitting false and misleading records to HUD and to Countrywide.

287.   In or about May 2007, Cohen, through Gramercy, bought the East Tremont Avenue Property for $312,700.

288.   In or about August and September 2007, *i.e.*, less than four months later, Cohen induced two inexperienced, first-time home-buyers, Buyers 9-A and 9-B, to purchase the East Tremont Avenue Property, for $474,000.

289.   Cohen, through Buy-a-Home, referred Buyers 9-A and 9-B to Lapidus at Cambridge for purposes of obtaining a HUD-insured mortgage from Cambridge,

based on a corrupt agreement or understanding between Cohen and the Cambridge Defendants that Cambridge would endorse an application for HUD insurance irrespective of whether Buyers 9-A and 9-B qualified for such insurance or whether the East Tremont Avenue Property was worth $474,000.

290.   On or about August 30, 2007, JJG issued an appraisal report for the East Tremont Avenue Property, valuing the property at $475,000 and the rental income that Buyers 9-A and 9-B could expect to earn at $1,500 per month.   That appraisal report, which Goldberg personally reviewed, edited, approved, and sent to Cambridge, contained an inflated valuation for the property and rental income, and numerous other falsities.

291.   Specifically, JJG relied on sales and rental comparisons that were not truly comparable to the East Tremont Avenue Property.   JJG's appraisal report also inflated the value of the property by significantly overstating the costs of the renovations that had been made.

292.   On August 27, 2007, and in connection with originating HUD Loan No. 9, Cambridge issued a commitment letter to Buyers 9-A and 9-B, which required, as a condition that must be fulfilled prior to closing, that those buyers pay off certain personal debts, such as child support arrears and state court judgments.

293.   On September 6, 2007, Cambridge originated and processed HUD Loan No. 9 to Buyers 9-A and 9-B.   Kramer, acting as the underwriter, certified to HUD that HUD Loan No. 9 met HUD's underwriting requirements.   Further, Derrell, certifying on behalf of Cambridge, endorsed HUD Loan No. 9 to HUD for mortgage insurance.

294.   Specifically, Cambridge certified to HUD on September 6, 2007, that all closing conditions listed in the commitment letter had been met by the time of closing.  In fact, however, Cambridge knew that Buyers 9-A and 9-B had not paid off their personal debts prior to closing, because those debts would not be paid off until September 7 and September 19, 2007, when Cambridge issued approximately $4,350 in checks to Buyers 9-A's and 9-B's creditors, including child support arrears and state court judgments.  Hyman personally signed those checks.

295.   Cambridge also certified to HUD that the closing documents for HUD Loan No. 9, including the HUD-1 Settlement Statement, were true and correct.  In fact, however, Cambridge knew that the HUD-1 was false and misleading because it omitted the fact that Cohen had promised Buyers 9-A and 9-B that he would make the first mortgage payment for them – a promise that should have been reflected in the HUD-1 as an inducement to purchase.

296.   In connection with endorsing HUD Loan No. 9 for HUD mortgage insurance, Cambridge also certified to HUD that the Loan Applications and the MCAW form for Buyers 9-A and 9-B were true and correct.  In fact, however, the Cambridge Defendants conspired with Cohen and the Cohen Entities to falsify those records to inflate Buyer 9-B's income.

297.   Specifically, Buyer 9-B told Lapidus that his monthly salary was $3,250.  Cambridge, however, inserted $4,160 as Buyer 9-B's monthly salary into his final Loan Application and the MCAW form.  By inflating Buyer 9-B's monthly income, Cambridge fraudulently lowered the Qualifying Ratios for HUD Loan No. 9.

298.   Further, Cambridge, through Derrell, also falsely certified HUD Loan No. 9 to HUD for mortgage insurance, despite knowing that HUD Loan No. 9 failed to comply with HUD requirements in, among others, the following respects:

a. The MCAW form for HUD Loan No. 9 falsely overstated Buyer 9-B's monthly income and also falsely understated the total liabilities for him and Buyer 9-A by not including the personal debts that Cambridge would not pay off until days after the closing;

b. HUD Loan No. 9 had Qualifying Ratios (47.54% and 49.24%) that significantly exceeded HUD thresholds (31% and 43%, respectively), and did not have any applicable compensating factor; and

d. JJG's appraisal for the East Tremont Avenue Property had not been conducted in accordance with HUD requirements and contained an inflated valuation for the East Tremont Avenue Property.

299.   In connection with obtaining HUD Loan No. 9, Buyers 9-A and 9-B contributed only a minimal amount to the down payment or closing costs associated with purchasing the East Tremont Avenue Property.  Instead, Cohen, as the seller, paid $18,140 toward the down payment and $16,468.12 in closing costs, both of which were paid using disbursement from HUD Loan No. 9.  In other words, Cohen induced Buyers 9-A and 9-B to buy the property at an inflated price by effectively paying the entire upfront cost of buying that home.

300.   On July 27, 2007, Cambridge sold HUD Loan No. 9 to Countrywide, pursuant to the Countrywide Loan Purchase Agreement and received more than $14,000 for that loan.

301. Cohen promised to make a mortgage payment for Buyers 9-A and 9-B, and also paid for nearly all of the down payment and closing costs, to induce them to obtain HUD Loan No. 9 based on an inflated price for the East Tremont Avenue Property. In connection with that sale alone, Cohen, through Buy-a-Home and Mark Wolf, made more than $101,000 in net profits, from the disbursement of HUD Loan No. 9.

302. For the Cambridge Defendants' role in conspiring with Cohen and the Cohen Entities to consummate the sale of the East Tremont Avenue Property to Buyers 9-A and 9-B at an inflated price, Cambridge received close to $28,000 in fees and resale proceeds for originating HUD Loan No. 9.

303. Goldberg, who provided an inflated appraisal for the East Tremont Avenue Property based on a corrupt agreement or understanding with Cohen and the Cambridge Defendants, not only was paid $600 for that appraisal, but also ensured that he would receive additional appraisal referrals from Cambridge.

304. In connection with executing their scheme to consummate a fraudulent flip sale of the East Tremont Avenue Property, Cohen, the Cohen Entities, the Cambridge Defendants, and Goldberg used interstate mail carriers and interstate wire to transmit documents that contained false and misleading information, including, among other documents, false and fraudulent loan applications, appraisal report, MCAW form, and HUD Addendum.

305. Specifically, the Cambridge Defendants and Goldberg submitted to HUD numerous false records and certifications, including the appraisal report for the East Tremont Avenue Property and the Settlement Statement and HUD

Addendum for HUD Loan No. 9.  Based on those false certifications and records, Cohen, the Cohen Entities, the Cambridge Defendants, and Goldberg obtained HUD mortgage insurance to HUD Loan No. 9.

306.   Further, the Cambridge Defendants also submitted to Countrywide, using interstate mail carrier and interstate wire, numerous false records and certifications, including JJG's appraisal report and the Settlement Statement and HUD Addendum for HUD Loan No. 9.  Based on those false certifications and records, they caused Countrywide to purchase HUD Loan No. 9.

307.   Based on the false and fraudulent certifications and records created by Cohen, the Cohen Entities, the Cambridge Defendants, and Goldberg, which certification and records had been sent to HUD using interstate mail and by wire, HUD agreed to insure HUD Loan No. 9.  Further, based on those false and fraudulent records, which had been sent to Countrywide using interstate mail and by wire, Countrywide agreed to purchase HUD Loan No. 9 from Cambridge.

308.   Buyers 9-A and 9-B, who never could have afforded the East Tremont Avenue Property at the inflated price Cohen set, defaulted on HUD Loan No. 9 within five months of the closing, exposing HUD and Countrywide potentially to more than $500,000 in losses.

309.   Accordingly, Cohen, the Cohen Entities, the Cambridge Defendants, and Goldberg violated 12 U.S.C. § 1833a in connection with the origination and sale of HUD Loan No. 9 in that they engaged in a scheme to defraud HUD, in violation of 18 U.S.C. §§ 1006 and 1014, and participated in a scheme to commit mail and

wire fraud affecting a financial institution, namely Countrywide Bank, in violation of 18 U.S.C. §§ 1341 and 1343.

**J.      HUD LOAN NO. 10:  BARKLEY AVENUE, BRONX**

310.   From in or about April 2007 to in or about May 2007, Cohen, the Cohen Entities, and the Cambridge Defendants conspired to orchestrate the flip sale of a property located on Barkley Avenue in the Bronx, New York (the "Barkley Avenue Property") at an inflated price to inexperienced home-buyers who lacked the financial wherewithal to purchase the property.

311.   In furtherance of that conspiracy and pursuant to their corrupt agreement, Cohen, the Cohen Entities, and the Cambridge Defendants obtained HUD insurance for a mortgage loan in the amount of $315,250 used to finance the fraudulent flip sale of the Barkley Avenue Property ("HUD Loan No. 10"), and sold HUD Loan No. 10 to Citi, by paying off the buyers' personal debts and promising to make mortgage payments on the buyers' behalves to induce them to purchase, obtaining an inflated appraisal for the Barkley Avenue Property, creating false records to conceal inducements to purchase, falsely certifying compliance with HUD requirements, and submitting false and misleading records to HUD and to Citi.

312.   Specifically, in or about October 2005, Cohen, through Gramercy, acquired the Barkley Avenue Property for $140,000.  In or about March 2006, and to conceal the extent to which he was inflating the price of the Barkley Avenue Property for a subsequent resale, Cohen arranged for Gramercy to transfer that home to him at the inflated amount of $340,000.

313.   In or about April and May 2007, Cohen, through Metropolitan and Buy-a-Home, induced two inexperienced, first-time home-buyers, Buyers 10-A and 10-B, to buy the Barkley Avenue Property from him for $325,000, *i.e.*, 130% more than what Gramercy had paid for that home a year and half earlier.

314.   To induce Buyers 10-A and 10-B to purchase the home, Cohen initially promised to give them $10,000 immediately after the closing.  Subsequently, Cohen promised those buyers that, instead of giving them cash, he would make five monthly mortgage payments for them and pay off their personal debts.

315.   On or about May 3, 2007, Cohen referred Buyers 10-A and 10-B to Lapidus at Cambridge for purposes of obtaining a HUD-insured mortgage – on a "Super Super Rush" basis – from Cambridge, based on the corrupt agreement or understanding between Cohen and the Cambridge Defendants that Cambridge would endorse an application for HUD insurance irrespective of whether Buyers 10-A and 10-B qualified for such insurance or whether the Barkley Avenue Property was worth $325,000.

316.   On or about April 4, 2007, Cambridge obtained an inflated appraisal for the Barkley Avenue Property from Rapid, valuing the property exactly at the price Cohen set, $325,000.  Specifically, the Rapid appraisal ignored salient differences between the Barkley Avenue Property and the properties that Rapid used as "comparable sales."  For example, one of those comparable sales had approximately 30% more living space than the Barkley Avenue Property.  Rapid, however, only attributed $7,680 in value, or less than 3% of the sales price, to that significant difference.

93

317.   On May 10, 2007, Cambridge originated and processed HUD Loan No. 10.   Desiree Madison, acting as the underwriter, certified HUD Loan No. 10 as meeting HUD's requirements; further, Derrell, certifying on behalf of Cambridge, endorsed that loan for HUD mortgage insurance.

318.   Specifically, Cambridge certified to HUD that the closing documents, including the HUD-1 Settlement Statement, for HUD Loan No. 10 were true and correct.   In fact, however, Cambridge knew that the HUD-1 was false and misleading because it omitted (i) the fact that Cohen had promised Buyers 10-A and 10-B to make mortgage payments, worth thousands of dollars, on their behalves and (ii) the fact that Cohen also gave Buyer 10-A several hundred dollars to give to Cambridge, for purposes of paying off his personal debts.   Both the funds that Cohen gave to the buyers and promised to expend on their behalves should have been reflected on the HUD-1 as inducements to purchase.

319.   On or about May 15, 2007, Cambridge obtained approximately $600 in money orders and sent those money orders to Buyers 10-A's creditors, such as Verizon, to pay off his personal debts.

320.   To conceal the fact that Cohen had given funds to Buyers 10-A to pay off his personal debts, the Cambridge Defendants conspired with Cohen and the Cohen Entities to create false and fraudulent records.   Specifically, Derrell inserted a note into Cambridge's loan file for HUD Loan No. 10, claiming that the funds for the money orders had come from Buyers 10-A and 10-B.   In fact, however, Cohen was the source of those funds.

321.   In connection with originating HUD Loan No. 10, Cambridge also falsely certified that loan to HUD for mortgage insurance, despite knowing that that loan failed to comply with HUD requirements in, among others, the following respects:

      a.  The MCAW form for HUD Loan No. 10 falsely stated that Buy 10-A had no personal liabilities at closing, whereas he in fact still owed several hundred dollars in personal debts;

      b.  HUD Loan No. 10 had Qualifying Ratios (49.23% and 49.23%) that significantly exceeded HUD thresholds (31% and 43%, respectively) and did not have any applicable compensating factor; and

      c.  Rapid's appraisal for the Barkley Avenue Property contained an inflated valuation for that property and had not been conducted in accordance with HUD requirements.

322.   On or about May 25, 2007, Cambridge sold HUD Loan No. 10 to Citi, pursuant to the Citi Loan Purchase Agreement and received more than $7,500 for that loan.  After Citi purchased HUD Loan No. 10 from Cambridge, Cohen made several mortgage payments on behalf of Buyers 10-A and 10-B.

323.   In connection with obtaining HUD Loan No. 10, Buyers 10-A and 10-B contributed only a nominal amount to the down payment or closing costs associated with purchasing the Barkley Avenue Property.  Instead, Cohen arranged for the payment of $9,750 toward the down payment and $13,040.18 in closing costs, both of which were paid using disbursement from HUD Loan No. 10.  In other words, Cohen also induced Buyers 10-A and 10-B to buy the property at an inflated price by effectively paying the entire upfront cost of buying that home.

324.   Cohen gave funds to Buyers 10-A to pay off his personal debts, arranged for the payments of nearly all of the down payment and closing costs, and made mortgage payments on behalf of Buyers 10-A and 10-B, to induce those inexperienced home-buyers to obtain HUD Loan No. 10 on the basis of an inflated valuation for the Barkley Avenue Property.  In connection with that sale alone, Cohen received more than $25,000 from the disbursement of HUD Loan No. 10.

325.   For the Cambridge Defendants' role in conspiring with Cohen and the Cohen Entities to consummate the sale of the Barkley Avenue Property to Buyers 10-A and 10-B at an inflated price, Cambridge received more than $15,700 in fees and resale proceeds for originating HUD Loan No. 10.

326.   In connection with executing their scheme to consummate a fraudulent flip sale of the Barkley Avenue Property, Cohen, the Cohen Entities, and the Cambridge Defendants used interstate mail carriers and interstate wire to transmit documents that contained false and misleading information, including, among other documents, the HUD-1 Settlement Statement and the HUD Addendum.

327.   Specifically, the Cambridge Defendants submitted to HUD numerous false records and certifications, including the HUD-1 Settlement Statement and the HUD Addendum for HUD Loan No. 10.   Based on those false records and certifications, Cohen, the Cohen Entities, and the Cambridge Defendants obtained HUD mortgage insurance to HUD Loan No. 10.

328.   Further, the Cambridge Defendants also submitted to Citi, using interstate mail carrier and interstate wire, numerous false records and certifications, including the HUD-1 Settlement Statement and the HUD Addendum

for HUD Loan No. 10.  Based on those false certifications and records, they caused Citi to purchase HUD Loan No. 10.

329.  Buyers 10-A and 10-B, who never could have afforded the Barkley Avenue Property at the inflated price Cohen set, defaulted on HUD Loan No. 10 within five months of closing, exposing HUD and Citi potentially to more than $350,000 in losses.

330.  Accordingly, Cohen, the Cohen Entities, and the Cambridge Defendants violated 12 U.S.C. § 1833a in connection with the origination and sale of HUD Loan No. 10 in that they engaged in a scheme to defraud HUD, in violation of 18 U.S.C. §§ 1006 and 1014, and participated in a scheme to commit mail and wire fraud affecting a financial institution, namely Citibank, in violation of 18 U.S.C. §§ 1341 and 1343.

## K.    HUD LOAN NO. 11:  NEWARK AVENUE PROPERTY D

331.  From in or about February 2007 to in or about May 2007, Cohen, the Cohen Entities, the Cambridge Defendants, and Goldberg conspired to orchestrate the flip sale of a property located on Newark Avenue in Staten Island, Richmond County, New York ("Newark Avenue Property D") at an inflated price to buyers who lacked the financial wherewithal to purchase the property.

332.  In furtherance of that conspiracy and pursuant to their corrupt agreement, Cohen, the Cohen Entities, the Cambridge Defendants, and Goldberg obtained HUD insurance for a mortgage loan in the amount of $436,500 used to finance the fraudulent flip sale of Newark Avenue Property D ("HUD Loan No. 11"), and sold HUD Loan No. 11 to Citi, by paying off the buyers' personal debts to

induce them to purchase, obtaining an inflated appraisal for Newark Avenue Property D, creating false records to omit inducements to purchase, falsely certifying compliance with HUD requirements, and submitting false and misleading records to HUD and to Citi.

333.   Specifically, on or about February 5, 2007, Cohen, through Buy-a-Home, contracted with Pearsal Builders to purchase Newark Avenue Property D for approximately $345,000.  Rather than closing on that property, Cohen immediately sought to resell it to inexperienced home-buyers for $450,000.

334.   In or about May 2007, *i.e.*, less than four months after he contracted to buy Newark Avenue Property D for $345,000, Cohen, through Metropolitan and Buy-a-Home, induced two inexperienced, first-time home-buyers, Buyers 11-A and 11-B, to buy that home for $450,000.  To circumvent HUD rules regarding flip sales, Cohen concealed Buy-a-Home's contract to purchase Newark Avenue Property D by identifying Pearsal Builders as the seller, without disclosing that Buy-a-Home stood to gain more than $100,000 in gross profit from the flip sale.

335.   Cohen referred Buyers 11-A and 11-B to Lapidus at Cambridge for purposes of obtaining a HUD-insured mortgage from Cambridge, based on the corrupt agreement or understanding between Cohen and the Cambridge Defendants that Cambridge would endorse an application for HUD insurance irrespective of whether Buyers 11-A and 11-B qualified for such insurance or whether Newark Avenue Property D was worth $450,000.

336.   On or about May 15, 2007, Cambridge obtained an inflated appraisal for Newark Avenue Property D from JJG, valuing the property exactly at the sale

price, $450,000.   The JJG report, which Goldberg personally reviewed, edited, approved, and sent to Cambridge, inflated the value of Newark Avenue Property D by failing to account for a significant external obsolescence – the fact that the property was located directly across from and faced the stanchions of an elevated highway leading to the Bayonne Bridge – that substantially decreased the value of that property.   It also inflated the value of Newark Avenue Property D by using as comparable sales other properties that Cohen had sold in flip sales and inflating the monthly rental income that could be generated by Newark Avenue Property D.

337.   Further, and in contravention of a basic tenet of HUD appraisal standards, JJG complied with Cambridge's demand to "hit the number" on Newark Avenue Property D.   Specifically, in a fax dated May 24, 2007, Derrell requested that Goldberg email a "correct[ed]" version of his appraisal report for that property to her. Derrell's corrections included changing the estimated rental income from $800 per month to $900 per month. JJG, without any justification and in contravention of HUD rules, incorporated Derrell's changes into his final appraisal report.   Relevant excerpts from Derrell's May 24, 2007 fax are attached to this Complaint as Exhibit 5.

338.   On May 24, 2007, Cambridge issued checks, totaling approximately $6,800, to creditors such as Capital One Auto and NCO Financial to pay off debts owed by Borrower 11-B, which were wholly unrelated to his purchase of Newark Avenue Property D.

339.   On May 24, 2007, Cambridge also originated and processed HUD Loan No. 11. Derrell, acting as the underwriter, certified as meeting HUD's

requirements.   Further, Hyman, certifying on behalf of Cambridge, endorsed for HUD mortgage insurance.

340.   Specifically, Cambridge certified to HUD that the closing documents for HUD Loan No. 11, including the HUD-1 Settlement Statement, were true and correct.   In fact, however, Cambridge knew that the HUD-1 was false and misleading because it omitted the fact that Cohen had provided approximately $7,000 to Buyers 11-A and 11-B to pay off Buyer 11-A's personal debts, which payment should have been reflected on the HUD-1 as an inducement to purchase.

341.   Further, to conceal the fact that Cohen had provided funds to pay off Buyer 11-A's personal debts, the Cambridge Defendants created false records for HUD Loan No. 11.   Specifically, Derrell, on behalf of Cambridge, inserted a note into Cambridge's mortgage loan file, claiming that Buyers 11-A and 11-B had brought funds to the closing to pay off Buyer 11-A's debts.   In fact, Cambridge knew that Cohen had provided $7,000 to Buyers 11-A and 11-B to give to Cambridge because a Cambridge employee had facilitated the transfer of the funds from Cohen to the buyers.

342.   Cambridge, specifically Derrell, also falsely certified HUD Loan No. 11 to HUD for mortgage insurance, despite knowing that that loan failed to comply with HUD requirements in, among others, the following respects:

> a. The MCAW form for HUD Loan No. 11 falsely understated Buyers 11-A's and 11-B's liabilities by not including thousands of dollars of debts they owed, which Cambridge would not pay off until weeks after the closing;

    b.   HUD Loan No. 11 had Qualifying Ratios (36.24% and 49.19%) that significantly exceeded HUD thresholds (31% and 43%, respectively) and did not have any applicable compensating factor; and

    c.   JJG's appraisal for Newark Avenue Property D inflated the value of that property and had not been conducted in accordance with HUD requirements.

343.   In or about July 2007, Cambridge sold HUD Loan No. 11 to Citi, pursuant to the Citi Loan Purchase Agreement and received more than $10,000 for the loan.

344.   In connection with obtaining HUD Loan No. 11, Buyers 11-A and 11-B contributed only a nominal amount to the down payment or closing costs associated with purchasing Newark Avenue Property D.   Instead, Cohen arranged for the payment of $13,500 toward the down payment and $17,735.48 in closing costs, both of which were paid using disbursement from HUD Loan No. 11.   In other words, Cohen also induced Buyers 11-A and 11-B to buy the property at an inflated price by effectively paying the entire upfront cost of buying that home.

345.   Cohen provided $7,000 to pay off Buyers 11-A's personal debts, and also arranged for the payments of nearly all of the down payment and closing costs, to induce Buyers 11-A and 11-B to obtain HUD Loan No. 11 on the basis of an inflated valuation for Newark Avenue Property D.   In connection with that sale alone, Cohen, through Buy-a-Home and Wolf & Wolf, made more than $80,000 in profits from the disbursement of HUD Loan No. 11.

346.   For the Cambridge Defendants' role in conspiring with Cohen and the Cohen Entities to consummate the sale of Newark Avenue Property D to Buyers 11-

A and 11-B at an inflated price, Cambridge received more than $22,000 in fees and resale proceeds for originating HUD Loan No. 11.

347.   Goldberg conspired with the Cambridge Defendants to facilitate Cohen's flip sale of Newark Avenue Property D by inflating the valuation of that property and by issuing an appraisal report that failed to comply with HUD appraisal standards.   In addition to being paid several hundred dollars for that appraisal, Goldberg also ensured that JJG would receive hundreds of additional appraisal assignments from Cambridge.

348.   In connection with executing their scheme to consummate a fraudulent flip sale of Newark Property D, Cohen, the Cohen Entities, the Cambridge Defendants, and Goldberg used interstate mail carriers and interstate wire to transmit documents that contained false and misleading information, including, among other documents, false and fraudulent appraisal report, HUD-1 Settlement Statement, and HUD Addendum.

349.   Specifically, the Cambridge Defendants and Goldberg submitted to HUD numerous false records and certifications, including the appraisal report, the HUD-1 Settlement Statement, and the HUD Addendum for HUD Loan No. 11. Based on those false certifications and records, Cohen, the Cohen Entities, the Cambridge Defendants, and Goldberg obtained HUD mortgage insurance to HUD Loan No. 11.

350.   Further, the Cambridge Defendants also submitted to Citi, using interstate mail carrier and interstate wire, numerous false records and certifications, including JJG's appraisal report, the HUD-1 Settlement Statement,

and the HUD Addendum for HUD Loan No. 11.  Based on those false certifications and records, they caused Citi to purchase HUD Loan No. 11.

351.   Buyers 11-A and 11-B, who never could have afforded Newark Avenue Property D at the inflated price Cohen set, defaulted on HUD Loan No. 11 within one and half years of closing, exposing HUD and Citi potentially to more than $450,000 in losses.

352.   Accordingly, Cohen, the Cohen Entities, the Cambridge Defendants, and Goldberg violated 12 U.S.C. § 1833a in connection with the origination and sale of HUD Loan No. 1 in that they engaged in a scheme to defraud HUD, in violation of 18 U.S.C. §§ 1006 and 1014, and participated in a scheme to commit mail and wire fraud affecting a financial institution, namely Citibank, in violation of 18 U.S.C. §§ 1341 and 1343.

## L.    HUD LOAN NO. 12:  SOUTH 3RD AVENUE, MOUNT VERNON

353.   From in or about March 2007 to in or about July 2007, Cohen, the Cohen Entities, the Cambridge Defendants, and Goldberg conspired to orchestrate the flip sale of a property located on South 3rd Avenue in Mount Vernon (the "South 3rd Avenue Property") at an inflated price to inexperienced home-buyers who lacked the financial wherewithal to purchase the property.

354.   In furtherance of that conspiracy and pursuant to their corrupt agreement, Cohen, the Cohen Entities, the Cambridge Defendants, and Goldberg obtained HUD insurance for a mortgage loan in the amount of $460,750 used to finance the fraudulent flip sale of the South 3rd Avenue Property ("HUD Loan No. 12"), and sold HUD Loan No. 12 to Citi, by misrepresenting the true cost of home

ownership, paying off the buyers' personal debts to induce them to purchase, obtaining an inflated appraisal for the South 3rd Avenue Property, creating false records to omit inducements to purchase, falsely certifying compliance with HUD requirements, and submitting false and misleading records to HUD and to Citi.

355.   Specifically, on or about March 15, 2007, Cohen, through Gramercy, contracted to acquire the South 3rd Avenue Property from an individual, Jonathan King, for $357,000.  Rather than closing on the property, Cohen immediately sought to resell it through Metropolitan and Buy-a-Home to inexperienced home-buyers.

356.   Less than three months after he contracted to buy the South 3rd Avenue Property, Cohen induced two inexperienced, first-time home-buyers, Buyers 12-A and 12-B, to buy that home in June 2007 for $475,000, *i.e.*, approximately $120,000 more than what Cohen had contracted to pay.  To circumvent HUD rules regarding flip sales, Cohen concealed Gramercy's contract to buy the South 3rd Avenue Property by identifying King as the seller, without disclosing that Gramercy stood to gain nearly $120,000 in gross profit from the flip sale.

357.   Cohen, through Buy-a-Home, referred Buyers 12-A and 12-B to Lapidus at Cambridge for purposes of obtaining a HUD-insured mortgage from Cambridge, based on a corrupt agreement or understanding between Cohen and the Cambridge Defendants that Cambridge would endorse an application for HUD insurance irrespective of whether Buyers 12-A and 12-B qualified for such insurance or whether the South 3rd Avenue Property was worth $475,000.

358.   On June 27, 2007, Cambridge issued a commitment letter to Buyers 12-A and 12-B, which required, as a condition that must be fulfilled prior to closing,

that those buyers pay off several thousand dollars in personal debts they owed to creditors such as Bally Total Fitness and Capital One Bank.

359.  On or about April 25, 2007, and again on or about June 28, 2007, Goldberg issued an appraisal report for the South 3rd Avenue Property.  Goldberg inflated the value of that property by valuing it – "as is" – at the exact price set by Cohen, $475,000.  Specifically, Goldberg inflated the value of the South 3rd Avenue Property by (i) claiming that no major repairs were needed, when in fact the South 3rd Avenue Property required, among other things, replacement of both the bathroom and the kitchen in the studio unit; (ii) ignoring the sale of the most similar property in the neighborhood for $350,000, and instead selecting "comparable sales" that were not actually comparable to the South 3rd Avenue Property; and (iii) basing the expected rental income for the studio unit at the South 3rd Avenue Property on the rent charged for one-bedroom apartments in the neighborhood.

360.  On June 28, 2007, Cambridge originated and processed HUD Loan No. 12 for Buyers 12-A and 12-B to purchase the South 3rd Avenue Property.  Derrell, acting as the underwriter, certified to HUD that HUD Loan No. 12 met HUD's underwriting requirements.  Further, Hyman, certifying on behalf of Cambridge, endorsed HUD Loan No. 12 to HUD for mortgage insurance.

361.  Specifically, Cambridge certified to HUD that all closing conditions listed in the commitment letter issued by Cambridge had been met by the time of closing on June 28, 2007.  In fact, however, Cambridge knew that Buyers 12-A and 12-B had not paid off their personal debts prior to closing, because those debts

would not be paid off until July 3, 2007, when Cambridge issued approximately $3,100 in checks to Buyers 12-A's and 12-B's creditors, including Bally Total Fitness and Capital One Bank.  Hyman personally signed those checks.

362.    Cambridge also certified to HUD that the closing documents, including the HUD-1 Settlement Statement, for HUD Loan No. 12 were true and correct.  In fact, Cambridge knew that the HUD-1 was false and misleading because it omitted the fact that Cohen, through Buy-a-Home, had provided approximately $6,000 in funds to pay off Buyers 12-A's and 12-B's personal debts, which payment should have been reflected on the HUD-1 as an inducement to purchase.

363.    Further, to conceal the fact that Cohen had provided the funds to pay off Buyers 12-A's and 12-B's personal debts, the Cambridge Defendants conspired with Cohen and the Cohen Entities to create records to assert falsely that the funds for paying off those debts had come from Buyers 12-A and 12-B.

364.    Specifically, Derrell created a false note stating that, at closing, Cambridge had received $6,000 in cash from Buyers 12-A and 12-B.  According to Derrell's note, Buyers 12-A and 12-B had obtained $6,000 by cashing their 2006 tax refund check.   Derrell's note provided Cambridge with an explanation for why Buyers 12-A's and 12-B's bank account statements did not reflect their depositing the tax refund check and then withdrawing cash to pay Cambridge.   Derrell, however, knew that her note was false because Buyers 12-A and 12-B did not give any cash to Cambridge.  In fact, one of Cohen's employees and Lapidus specifically promised Buyers 12-A and 12-B that they could purchase the South 3rd Avenue Property without contributing any funds upfront.

365.    Further, Cambridge, through Hyman, also falsely certified HUD Loan No. 12 to HUD for mortgage insurance, despite knowing that HUD Loan No. 12 failed to comply with HUD requirements in, among others, the following respects:

    a.   The MCAW form for HUD Loan No. 12 falsely understated the amount of personal liabilities for Buyers 12-A and 12-B, by leaving out thousands of dollars of debts that they still owed at closing to Bally Total Fitness, Capital One Bank, and other creditors;

    b.   HUD Loan No. 12 had Qualifying Ratios (38.15% and 47.48%) that significantly exceeded HUD thresholds (31% and 43%, respectively), and did not have any applicable compensating factor; and

    c.   Goldberg's appraisal significantly inflated the value for the South 3rd Avenue Property and had not been conducted in accordance with HUD requirements.

366.    On July 27, 2007, Cambridge sold HUD Loan No. 12 to Countrywide, pursuant to the Countrywide Loan Purchase Agreement and received approximately $11,000 for that loan.

367.    In connection with obtaining HUD Loan No. 12, Buyers 12-A and 12-B contributed only a minimal amount to the down payment or closing costs associated with purchasing the South 3rd Avenue Property.  Instead, Cohen, as the seller, paid $14,250 toward the down payment and approximately $15,017.62 in closing costs, both of which were paid using disbursement from HUD Loan No. 12.   In other words, Cohen induced Buyers 12-A and 12-B to buy the property at an inflated price by effectively paying the entire upfront cost of buying that home.

368.    Cohen provided thousands of dollars to pay off Buyers 12-A's and 12-B's their personal debts, and also paid for nearly all of the down payment and

closing costs, to induce those buyers to obtain HUD Loan No. 12 based on an inflated price for the South 3rd Avenue Property.   In connection with that sale alone, Cohen made more than $110,000 in profits, which flowed directly from the disbursement of HUD Loan No. 12.

369.   For the Cambridge Defendants' role in conspiring with Cohen and the Cohen Entities to consummate the sale of the South 3rd Avenue Property to Buyers 12-A and 12-B at an inflated price, Cambridge received approximately $17,500 in fees and resale proceeds for originating HUD Loan No. 12.

370.   Goldberg, who provided an inflated appraisal for the South 3rd Avenue Property based on a corrupt agreement or understanding with the Cambridge Defendants and Cohen, not only was paid $550 for that appraisal, but also ensured that he would receive additional appraisal assignments from Cambridge.

371.   In connection with executing their scheme to consummate a fraudulent flip sale of the South 3rd Avenue Property, Cohen, the Cohen Entities, the Cambridge Defendants, and Goldberg used interstate mail carriers and interstate wire to transmit documents that contained false and misleading information, including, among other documents, the MCAW form, the appraisal report, the HUD-1 Settlement Statement, and the HUD Addendum.

372.   Specifically, the Cambridge Defendants and Goldberg submitted to HUD numerous false records and certifications, including the appraisal report for the South 3rd Avenue Property and the Settlement Statement and HUD Addendum for HUD Loan No. 12.   Based on those false certifications and records, Cohen, the

Cohen Entities, the Cambridge Defendants, and Goldberg obtained HUD mortgage insurance to HUD Loan No. 12.

373. Further, the Cambridge Defendants also submitted to Countrywide, using interstate mail carrier and interstate wire, numerous false records and certifications, including Goldberg's appraisal report and the Settlement Statement and HUD Addendum for HUD Loan No. 12. Based on those false certifications and records, they caused Countrywide to purchase HUD Loan No. 12.

374. Buyers 12-A and 12-B, who never could have afforded the South 3rd Avenue Property at the inflated price Cohen set, defaulted on HUD Loan No. 12 within three months of the closing, exposing HUD and Countrywide potentially to more than $450,000 in losses.

375. Accordingly, Cohen, the Cohen Entities, the Cambridge Defendants, and Goldberg violated 12 U.S.C. § 1833a in connection with the origination and sale of HUD Loan No. 12 in that they engaged in a scheme to defraud HUD, in violation of 18 U.S.C. §§ 1006 and 1014, and participated in a scheme to commit mail and wire fraud affecting a financial institution, namely Countrywide Bank, in violation of 18 U.S.C. §§ 1341 and 1343.

**M.    HUD LOAN NO. 13:  NEBRASKA AVENUE, BAY SHORE**

376. From in or about April 2007 to in or about August 2007, Cohen, the Cohen Entities, the Cambridge Defendants, and Micheline conspired to orchestrate the flip sale of a property located on Nebraska Avenue in Bay Shore, Suffolk County, New York (the "Nebraska Avenue Property") at an inflated price to buyers who lacked the financial wherewithal to purchase the property.

109

377.   In furtherance of that conspiracy and pursuant to their corrupt agreement, Cohen, the Cohen Entities, the Cambridge Defendants, and Micheline obtained HUD insurance for a mortgage loan in the amount of $357,445 used to finance the fraudulent flip sale of the Nebraska Avenue Property ("HUD Loan No. 13"), and sold HUD Loan No. 13 to Countrywide, paying off the buyers' personal debts to induce them to purchase, obtaining an inflated appraisal for the Nebraska Avenue Property, creating false records to inflate a buyer's income and to omit inducements to purchase, falsely certifying compliance with HUD requirements, and submitting false and misleading records to HUD and to Countrywide.

378.   Specifically, in or about April 2007, Valed Investors Group, Inc. ("Valed") acquired the Nebraska Avenue Property for $260,000.   Valed then retained Cohen and the Cohen Entities to arrange for a flip sale of that property at an inflated price.

379.   In or about August 2007, *i.e.*, approximately four months after Valed purchased the Nebraska Avenue Property, Cohen, through Metropolitan and Buy-a-Home, induced three inexperienced, first-time home-buyers, Buyers 13-A, 13-B and 13-C, to buy that property for $368,500, *i.e.*, approximately $110,000 more than what Valed had paid four months earlier.

380.   Cohen referred Buyers 13-A, 13-B and 13-C to Lapidus at Cambridge for purposes of obtaining a HUD-insured mortgage from Cambridge, based on the corrupt agreement or understanding between Cohen and the Cambridge Defendants that Cambridge would endorse an application for HUD insurance irrespective of

whether Buyers 13-A, 13-B and 13-C qualified for such insurance or whether the Nebraska Avenue Property was worth $368,500.

381.   On or about August 6, 2007, Micheline issued an appraisal report for Nebraska Avenue Property, valuing the property at $370,000.   That appraisal report contained an inflated valuation for the property and numerous other falsities.

382.   Specifically, Micheline significantly inflated the value of the Nebraska Avenue Property because he failed to reduce the value of the property based on the existence of a significant external obsolescence – the fact that the Nebraska Avenue Property was adjacent to commercial property and a parking lot.   Micheline also inflated the value of the appraisal by selecting for sales comparisons properties that were not truly comparable to the Nebraska Avenue Property.   Further, Micheline falsely certified that his appraisal of the Nebraska Avenue Property had been conducted in accordance with HUD appraisal standards.   In fact, Micheline's appraisal failed to comply with numerous HUD standards, including, among others, to select suitably comparable sales comparisons and to justify the purported 40% appreciation during Valed's three-month ownership.

383.   On August 7, 2007, and in connection with originating HUD Loan No. 13, Cambridge issued a commitment letter to Buyers 13-A, 13-B and 13-C, which required, as a condition that must be fulfilled prior to closing, that those buyers pay off or pay down certain student loans and personal debts owed to creditors such as Dish Network.

384. On August 13, 2007, Cambridge originated and processed HUD Loan No. 13, which Derrell, acting as the underwriter, certified as meeting HUD's requirements, and which Kramer, certifying on behalf of Cambridge, endorsed for HUD mortgage insurance.

385. Specifically, Cambridge certified to HUD that all closing conditions listed in the commitment letter had been met by the time of closing on August 13, 2007. In fact, however, Cambridge knew that the buyers had not paid off their personal debts prior to closing, because those debts would not be paid off until August 14, 2007, when Cambridge issued approximately $4,000 in checks to the United States Department of Education and other creditors of Buyers 13-A, 13-B, and 13-C. Hyman personally signed those checks.

386. Cambridge also certified to HUD that the closing documents for HUD Loan No. 13, including the HUD-1 Settlement Statement, were true and correct. In fact, however, Cambridge knew that the HUD-1 was false and misleading because it omitted the fact that Cohen had provided funds to Buyers 13-A, 13-B and 13-C to pay off Borrower's personal debts, which payment should have been reflected on the HUD-1 as an inducement to purchase.

387. In connection with endorsing HUD Loan No. 13 for HUD mortgage insurance, Cambridge also certified to HUD that the Loan Applications and the MCAW form for Buyers 13-A and 13-B were true and correct. In fact, however, the Cambridge Defendants conspired with Cohen and the Cohen Entities to falsify those records to inflate Buyer 13-A's income.

388.    Specifically, Buyer 13-A told Lapidus that, as a seasonal employee, her average monthly salary was $833, an amount that was corroborated by pay stubs and a verification of employment that Cambridge obtained from Buyer 13-A's employer.   Cambridge, however, inserted $2,392 as Buyer 13-A's monthly salary into her final Loan Application and the MCAW form.   By inflating Buyer 13-A's monthly income, Cambridge fraudulently lowered the Qualifying Ratios for HUD Loan No. 13.

389.    Cambridge, through Kramer, also falsely certified HUD Loan No. 13 to HUD for mortgage insurance, despite knowing that that loan failed to comply with HUD requirements in, among others, the following respects:

      a.  HUD Loan No. 13 had an MP/I ratio (36.24%) that significantly exceeded HUD thresholds (31%) and did not have any applicable compensating factor; and

      b.  Micheline's appraisal for the Nebraska Avenue Property contained an inflated valuation for that property and had not been conducted in accordance with HUD requirements.

390.    In connection with obtaining HUD Loan No. 13, Buyers 13-A, 13-B, and 13-C contributed only a nominal amount to the down payment or closing costs associated with purchasing the Nebraska Avenue Property.   Instead, Cohen arranged for the payment of $11,055 toward the down payment and $12,586.77 in closing costs, both of which were paid using disbursement from HUD Loan No. 13. In other words, Cohen also induced Buyers 13-A, 13-B and 13-C to buy the property at an inflated price by effectively paying the entire upfront cost of buying that home.

391.   On or about August 28, 2007, Cambridge sold HUD Loan No. 13 to Countrywide, pursuant to the Countrywide Loan Purchase Agreement and received approximately $11,000 for that loan.

392.   Cohen gave thousands of dollars to pay off Buyers 13A's, 13-B's and 13-C's personal debts, and also arranged for the payments of nearly all of the down payment and closing costs, to induce Buyers 13-A, 13-B and 13-C to obtain HUD Loan No. 13 on the basis of an inflated valuation for the Nebraska Avenue Property. In connection with that sale alone, Cohen, through Buy-a-Home, made almost $22,000 in fees, from the disbursement of HUD Loan No. 13.

393.   For the Cambridge Defendants' role in conspiring with Cohen and the Cohen Entities to consummate the sale of the Nebraska Avenue Property to Buyers 13-A, 13-B and 13-C at an inflated price, Cambridge received approximately $20,000 in fees and resale proceeds for originating HUD Loan No. 13.

394.   Micheline, who provided an inflated appraisal for the Nebraska Avenue Property based on a corrupt agreement or understanding with the Cambridge Defendants, not only was paid a fee for that appraisal, but also ensured that he would receive additional appraisal referrals from Cambridge.

395.   In connection with executing their scheme to consummate a fraudulent flip sale of the Nebraska Avenue Property, Cohen, the Cohen Entities, the Cambridge Defendants, and Micheline used interstate mail carriers and interstate wire to transmit documents that contained false and misleading information, including, among other documents, false and fraudulent gift affidavits, Loan Application, MCAW form, and HUD Addendum.

114

396.   Specifically, the Cambridge Defendants submitted to HUD numerous false records and certifications, including the Loan Application, the MCAW form, and the HUD Addendum for HUD Loan No. 13.  Based on those false certifications and records, Cohen, the Cohen Entities, the Cambridge Defendants, and Micheline obtained HUD mortgage insurance to HUD Loan No. 13.

397.   Further, the Cambridge Defendants also submitted to Countrywide, using interstate mail carrier and interstate wire, numerous false records and certifications, including the Loan Application, the MCAW form, and the HUD Addendum for HUD Loan No. 13.  Based on those false certifications and records, they caused Countrywide to purchase HUD Loan No. 13.

398.   Buyers 13-A, 13-B and 13-C, who never could have afforded the Nebraska Avenue Property at the inflated price Cohen set, defaulted on HUD Loan No. 13 within five months of closing, exposing HUD and Countrywide potentially to more than $400,000 in losses.

399.   Accordingly, Cohen, the Cohen Entities, the Cambridge Defendants, and Micheline violated 12 U.S.C. § 1833a in connection with the origination and sale of HUD Loan No. 13 in that they engaged in a scheme to defraud HUD, in violation of 18 U.S.C. §§ 1006 and 1014, and participated in a scheme to commit mail and wire fraud, affecting a financial institution, namely Countrywide, in violation of 18 U.S.C. §§ 1341 and 1343.

N.   **HUD LOAN NO. 14:  SOUTH 8TH AVENUE, MOUNT VERNON**

400.   From in or about February 2007 to in or about May 2007, Cohen, the Cohen Entities, the Cambridge Defendants, and Goldberg conspired to orchestrate

the flip sale of a property located on South 8th Avenue in Mount Vernon, Westchester County, New York ("the South 8th Avenue Property") at an inflated price to buyers who lacked the financial wherewithal to purchase the property.

401.   In furtherance of that conspiracy and pursuant to their corrupt agreement, Cohen, the Cohen Entities, the Cambridge Defendants, and Goldberg obtained HUD insurance for a mortgage loan in the amount of $460,750 used to finance the fraudulent flip sale of the South 8th Avenue Property ("HUD Loan No. 14"), and sold HUD Loan No. 14 to Citi, by paying off the buyers' personal debts to induce them to purchase, obtaining an inflated appraisal for the South 8th Avenue Property, creating false records to omit inducements to purchase, falsely certifying compliance with HUD requirements, and submitting false and misleading records to HUD and to Citi.

402.   In or about February 2007, Cohen, through Treuhold Capital Group LLC (an entity that Cohen controlled in 2007), acquired the South 8th Avenue Property for $227,500.

403.   Less than a month later, Cohen, through Metropolitan and Buy-a-Home, induced four inexperienced, first-time home-buyers – Buyers 14-A, 14-B, 14-C, and 14-D – to purchase the South 8th Avenue Property for $475,000.

404.   In March 2007, Cohen referred Buyers 14-A, 14-B, 14-C, and 14-D to Lapidus at Cambridge for purposes of obtaining a HUD-insured mortgage from Cambridge, based on the corrupt agreement or understanding between Cohen and the Cambridge defendants that Cambridge would endorse an application for HUD

insurance irrespective of whether Buyers 14-A, 14-B, 14-C, and 14-D qualified for such insurance or whether the South 8th Avenue Property was worth $475,000.

405.   On March 1, 2007, and in connection with originating HUD Loan No. 14, Cambridge issued a commitment letter to Buyers 14-A, 14-B, 14-C, and 14-D, which required, as a condition that must be fulfilled prior to closing, that Borrower 14-A and 14-B pay off personal debts owed to creditors such as DirecTV and Verizon.

406.   On or about April 30, 2007, Cambridge originated and processed a mortgage loan in the amount of $460,750 to Buyers 14-A, 14-B, 14-C, and 14-D, which Kramer, certifying on behalf of Cambridge, endorsed for HUD mortgage insurance ("HUD Loan No. 14").

407.   Specifically, Cambridge certified to HUD that it had obtained an appraisal report valuing the South 8th Avenue Property at or above the contracted sale price and that the appraisal report had been conducted in accordance with HUD appraisal rules.  In fact, however, Goldberg did not issue an appraisal report for the South 8th Avenue Property until May 1, 2007.  Further, Goldberg's report inflated the value of the South 8th Avenue Property by failing to account for several significant external obsolescence, including the property's proximity to railroad tracks and being adjacent to parking lots and commercial properties, which substantially decreased its value.  Goldberg also inflated the value of the South 8th Avenue Property by selecting for comparison sales of properties that were not, in fact, comparable.   Finally, Goldberg falsely certified compliance with numerous HUD appraisal standards, such as stating that he personally conducted the

appraisal, whereas the appraisal had, in fact, been conducted by Mark Pitman, another JJG appraiser.

408.   Cambridge also certified that all closing conditions listed in the commitment letter had been met by the time of closing.   In fact, however, Cambridge knew that Buyers 14-A and 14-B had not paid off their personal debts prior to closing, because those debts would not be paid off until May 4, 2007, when Cambridge issued checks totaling approximately $1,790 to DirecTV, Verizon, and other creditors, to pay off debts owed by Buyers 14-A and 14-B.

409.   Cambridge, specifically Kramer, also falsely certified HUD Loan No. 14 to HUD for mortgage insurance, despite knowing that that loan failed to comply with HUD requirements in, among others, the following respects:

> a.   The MCAW form for HUD Loan No. 14 falsely understated the liabilities of the buyers, including the personal debts that Cambridge would pay off, post-closing;
>
> b.   HUD Loan No. 14 had Qualifying Ratios (33.44% and 46.18%) that exceeded HUD thresholds (31% and 43%, respectively) – and did not have any applicable compensating factor; and
>
> c.   Goldberg's appraisal for the South 8th Avenue Property was inflated and had not been conducted in accordance with HUD appraisal standards.

410.   In connection with obtaining HUD Loan No. 14, Buyers 14-A, 14-B, 14-C, and 14-D contributed only a nominal amount to the down payment or closing costs associated with purchasing the South 8th Avenue Property.   Instead, Cohen arranged for the payments of $14,300 toward down payment and $15,415.42 in closing costs, both of which were paid using disbursement from HUD Loan No. 14.

In other words, Cohen induced Buyers 14-A, 14-B, 14-C, and 14-D to buy the property at an inflated price by effectively paying the entire upfront cost of buying that home.

411.   On or about May 17, 2007, Cambridge sold HUD Loan No. 14 to Citi, pursuant to the Citi Loan Purchase Agreement and received approximately $11,000 for that loan.

412.   Cohen arranged for the payments of nearly all of the down payment and closing costs for purposes of inducing Buyers 14-A, 14-B, 14-C, and 14-D to obtain HUD Loan No. 14 based on an inflated valuation for the South 8th Avenue Property.  In connection with that sale, Cohen, through Buy-a-Home, made $95,330 in profits, which was paid directly from disbursement from HUD Loan No. 14.

413.   For the Cambridge Defendants' role in conspiring with Cohen, the Cohen Entities, and Goldberg to consummate the sale of the South 8th Avenue Property to Buyers 14-A, 14-B, 14-C, and 14-D at an inflated price, Cambridge received more than $17,000 in fees and resale proceeds for originating HUD Loan No. 14.

414.   Goldberg conspired with the Cambridge Defendants to facilitate the Cohen's flip sale of the South 8th Avenue Property by inflating the valuation of that property and by issuing an appraisal report that failed to comply with HUD appraisal standards.  In addition to being paid $650 for that appraisal, Goldberg also guaranteed that JJG would receive hundreds of additional appraisal assignments from Cambridge.

415.   In connection with executing their scheme to consummate a fraudulent flip sale of the South 8th Avenue Property, Cohen, the Cohen Entities, the Cambridge Defendants, and Goldberg used interstate mail carriers and interstate wire to transmit documents that contained false and misleading information, including, among other documents, the appraisal report and the HUD Addendum.

416.   Specifically, the Cambridge Defendants and Goldberg submitted to HUD numerous false records and certifications, including the appraisal report for the South 8th Avenue Property and the HUD Addendum for HUD Loan No. 14. Based on those false reports and records, Cohen, the Cohen Entities, the Cambridge Defendants, and Goldberg obtained HUD mortgage insurance to HUD Loan No. 14.

417.   Further, the Cambridge Defendants also submitted to Citi, using interstate mail carrier and interstate wire, numerous false records and certifications, including Goldberg's appraisal report and the HUD Addendum for HUD Loan No. 14.  Based on those false certifications and records, they caused Citi to purchase HUD Loan No. 14.

418.   Buyers 14-A, 14-B, 14-C, and 14-D, who never could have afforded the South 8th Avenue Property at the inflated price that Cohen set, defaulted on HUD Loan No. 14 within five months of closing, exposing HUD and/or Citi potentially to more than $500,000 in losses.

419.   Accordingly, Cohen, the Cohen Entities, the Cambridge Defendants, and Goldberg violated 12 U.S.C. § 1833a in connection with the origination and sale of HUD Loan No. 14 in that they engaged in a scheme to defraud HUD, in violation of 18 U.S.C. §§ 1006 and 1014, and participated in a scheme to commit mail and

120

wire fraud affecting a financial institution, namely Citibank, in violation of 18 U.S.C. §§ 1341 and 1343.

O.    **HUD LOAN NO. 15:  TOMPKINS PLACE, STATEN ISLAND**

420.   In or about June 2007, Cohen, the Cohen Entities, the Cambridge Defendants, and Micheline conspired to orchestrate the flip sale of a property located on Tompkins Place in Staten Island, Richmond County, New York (the "Tompkins Place Property") at an inflated price to buyers who lacked the financial wherewithal to purchase the property.

421.   In furtherance of that conspiracy and pursuant to their corrupt agreement, Cohen, the Cohen Entities, the Cambridge Defendants, and Micheline obtained HUD insurance for a mortgage loan in the amount of $362,200 used to finance the fraudulent flip sale of the Tompkins Place Property ("HUD Loan No. 15"), and sold HUD Loan No. 15 to Countrywide, by obtaining an inflated appraisal for the Tompkins Place Property, falsely certifying compliance with HUD requirements, and submitting false and misleading records to HUD and to Countrywide.

422.   In or about June and July 2007, Cohen, through Metropolitan and Buy-a-Home, induced two inexperienced, first-time home-buyers, Buyers 15-A and 15-B, to buy the Tompkins Place Property and an adjacent property – each for $373,500.

423.   Cohen referred Buyers 15-A and 15-B to Lapidus at Cambridge for purposes of obtaining a HUD-insured mortgage from Cambridge, based on the corrupt agreement or understanding between Cohen and the Cambridge Defendants

that Cambridge would endorse an application for HUD insurance irrespective of whether Buyers 15-A and 15-B qualified for such insurance or whether the Tompkins Place Property was worth $373,500.

424.   Cambridge obtained an inflated appraisal for the Tompkins Place Property from Micheline, valuing the property at, $378,000.  Micheline's appraisal report inflated the value of the Tompkins Place Property by selecting comparison sales of properties that were not, in fact, comparable to the Tompkins Place Property.  Micheline also failed to conduct a "complete" appraisal, in violation of a basic HUD appraisal requirement.

425.   On July 6, 2007, Cambridge originated and processed HUD Loan No. 15, which Kramer, acting as the underwriter, certified as meeting HUD's requirements, and which Hyman, certifying on behalf of Cambridge, endorsed for HUD mortgage insurance.

426.   Cambridge also certified to HUD that the closing documents, including affidavits stating that both Buyers 15-A and 15-B intended to use the Tompkins Place Property as their residence, were true and correct. In fact, however, Cambridge knew that Buyers 15-A and 15-B were purchasing two adjacent properties simultaneously and intended to reside separately in each of those properties.

427.   Cambridge, specifically Kramer, also falsely certified HUD Loan No. 15 to HUD for mortgage insurance, despite knowing that that loan failed to comply with HUD requirements in, among others, the following respects:

    a.  HUD Loan No. 15 had Qualifying Ratios (36.17% and 49.40%) that significantly exceeded HUD thresholds (31% and 43%, respectively) and did not have any applicable compensating factor; and

    b.  Micheline's appraisal for the Tompkins Place Property contained an inflated valuation for that property and had not been conducted in accordance with HUD requirements.

428.   In connection with obtaining HUD Loan No. 15, Buyers 15-A and 15-B contributed only a nominal amount to the down payment or closing costs associated with purchasing the Tompkins Place Property.  Instead, Cohen arranged for the payment of $11,205 toward the down payment and $16,191.48 in closing costs, both of which were paid using disbursement from HUD Loan No. 15.  In other words, Cohen also induced Buyers 15-A and 15-B to buy the property at an inflated price by effectively paying the entire upfront cost of buying that home.

429.   In or about August 2007, Cambridge sold HUD Loan No. 15 to Countrywide, pursuant to the Countrywide Loan Purchase Agreement, and received more than $11,000 for that loan.

430.   Cohen arranged for the payments of nearly all of the down payment and closing costs to induce Buyers 15-A and 15-B to obtain HUD Loan No. 15 on the basis of an inflated valuation for the Tompkins Place Property.  In connection with that sale alone, Cohen, personally and through Buy-a-Home and Mark Wolf, received more than $22,000 in fees, from the disbursement of HUD Loan No. 15.

431.   For the Cambridge Defendants' role in conspiring with Cohen and the Cohen Entities to consummate the sale of the Tompkins Place Property to Buyers

15-A and 15-B at an inflated price, Cambridge received more than $20,000 in fees and resale proceeds for originating HUD Loan No. 15.

432.   Micheline, who provided an inflated appraisal for the Tompkins Place Property based on a corrupt agreement or understanding with the Cambridge Defendants, not only was paid a fee for that appraisal, but also ensured that he would receive additional appraisal referrals from Cambridge

433.   In connection with executing their scheme to consummate a fraudulent flip sale of the Tompkins Place Property, Cohen, the Cohen Entities, the Cambridge Defendants, and Micheline used interstate mail carriers and interstate wire to transmit documents that contained false and misleading information.

434.   Specifically, the Cambridge Defendants and Micheline submitted to HUD numerous false records and certifications, including the appraisal report for the Tompkins Place Property and the HUD Addendum for HUD Loan No. 15. Based on those false certifications and records, Cohen, the Cohen Entities, and the Cambridge Defendants obtained HUD mortgage insurance for HUD Loan No. 15.

435.   Further, the Cambridge Defendants also submitted to Countrywide, using interstate mail carrier and interstate wire, numerous false records and certifications, including the HUD Addendum for HUD Loan No. 15.  Based on those false certifications and records, they caused Countrywide to purchase HUD Loan No. 15.

436.   Buyers 15-A and 15-B, who never could have afforded the Tompkins Place Property at the inflated price Cohen set, defaulted on HUD Loan No. 15

within 90 days of closing, exposing HUD and Countrywide potentially to more than $400,000 in losses.

437.   Accordingly, Cohen, the Cohen Entities, the Cambridge Defendants, and Micheline violated 12 U.S.C. § 1833a in connection with the origination and sale of HUD Loan No. 15 in that they engaged in a scheme to defraud HUD, in violation of 18 U.S.C. §§ 1006 and 1014, and participated in a scheme to commit mail and wire fraud affecting a financial institution, namely Countrywide Bank, in violation of 18 U.S.C. §§ 1341 and 1343.

**P.    HUD LOAN NO. 16:  155TH STREET, JAMAICA**

438.   From in or about April 2007 to August 2007, Cohen, the Cohen Entities, the Cambridge Defendants, and Micheline conspired to orchestrate the flip sale of a property located on 155th Street in Jamaica, New York (the "155th Street Property") at an inflated price to an inexperienced home-buyer who lacked the financial wherewithal to purchase the property.

439.   In furtherance of that conspiracy and pursuant to their corrupt agreement, Cohen, the Cohen Entities, the Cambridge Defendants, and Micheline obtained HUD insurance for a mortgage loan in the amount of $365,750 used to finance the fraudulent flip sale of the 155th Street Property ("HUD Loan No. 16"), and sold HUD Loan No. 16 to Countrywide, by misrepresenting the true cost of home ownership, paying off the buyer's personal debts to induce them to purchase, obtaining an inflated appraisal for the 155th Street Property, creating false records to omit inducements to purchase, falsely certifying compliance with HUD

requirements, and submitting false and misleading records to HUD and to Countrywide.

440.  Specifically, in or about July 2006, KR Management LLC, a business affiliate of Cohen's, acquired the 155th Street Property for $225,000.  After arranging for only limited renovations, KR Management retained Cohen and the Cohen Entities in 2007 to arrange a flip sale of the 155th Street Property at a significantly inflated price.

441.  In June 2007, Cohen, through Metropolitan and Buy-a-Home, induced Buyer 16, an inexperienced, first-time home-buyer, to buy the 155th Street Property for $375,000, *i.e.*, $150,000 more than what KR Management had paid less than a year earlier.  Specifically, sales agents at Buy-a-Home told Buyer 16 that her monthly payments for purchasing the home would be less than $2,100, when in fact the true cost of owning the property was approximately $2,950 per month.  Further, Cohen, through Buy-a-Home, also promised to pay off Buyer 16's personal debts.

442.  On or about June 20, 2007, Cohen and the Cohen Entities referred Buyer 16 to Lapidus at Cambridge for purposes of obtaining a HUD-insured mortgage from Cambridge, based on a corrupt agreement or understanding between Cohen and the Cambridge Defendants that Cambridge would endorse an application for HUD insurance irrespective of whether Buyer 16 qualified for such insurance or whether the 155th Street Property was worth $375,000.

443.  On or about July 23, 2007, Cambridge obtained an inflated appraisal report for the 155th Street Property from Micheline, valuing it at the exact price Cohen set, $375,000.  Specifically, Micheline inflated the value of that home by

selecting as "comparable sales" properties that were not actually comparable to the 155th Street Property, and by ignoring the fact that KR Management did not pay for the amount of renovations that would have warranted a $150,000 increase in the value of that home.

444.  On August 10, 2007, Cambridge originated and processed HUD Loan No. 16 for Buyer 16 to purchase the 155th Street Property.  Kramer, acting as the underwriter, certified to HUD that HUD Loan No. 16 met HUD's underwriting requirements.  Further, Derrell, certifying on behalf of Cambridge, endorsed HUD Loan No. 16 to HUD for mortgage insurance.

445.  Specifically, Cambridge certified to HUD that the closing documents for HUD Loan No. 16, including the HUD-1 Settlement Statement, were true and correct.  In fact, Cambridge knew that the HUD-1 was false and misleading because it omitted the fact that the Cambridge Defendants had conspired with Cohen to pay off Buyer 16's personal debts, which payment should have been reflected on the HUD-1 as an inducement to purchase.  Specifically, Cambridge sent money orders, totaling approximately $700, to Buyer 16's creditors, post-closing.

446.  Further, to conceal the fact that they had conspired with Cohen to pay off Buyer 16's personal debts to induce her to purchase, the Cambridge Defendants created records to assert falsely that the funds for paying off those debts had come from Buyers 16's own funds.

447.  Specifically, Cambridge inserted a note into its file for HUD Loan No. 16, falsely claiming that, at closing, Buyers 16 had given Cambridge approximately

$700 in cash to pay off her debts.  In fact, Buyer 16 did not give Cambridge any money in connection with purchasing the 155th Street Property.

448.    Further, Cambridge, through Derrell, also falsely certified HUD Loan No. 16 to HUD for mortgage insurance, despite knowing that HUD Loan No. 16 failed to comply with HUD requirements in, among others, the following respects:

   a. The MCAW form for HUD Loan No. 16 falsely understated the amount of personal liabilities for Buyer 16, by leaving out the debts that she still owed at closing;

   b. HUD Loan No. 16 had Qualifying Ratios (37.92% and 43.32%) that significantly exceeded HUD thresholds (31% and 43%, respectively), and did not have any applicable compensating factor; and

   c. Micheline's appraisal significantly inflated the value for the 155th Street Property and had not been conducted in accordance with HUD requirements.

449.    On August 27, 2007, Cambridge sold HUD Loan No. 16 to Countrywide, pursuant to the Countrywide Loan Purchase Agreement and received approximately $11,000 for that loan.

450.    In connection with obtaining HUD Loan No. 16, Buyer 16 did not contribute anything to the down payment or closing costs associated with purchasing the 155th Street Property.  Instead, Cohen arranged for payment of all down payment and closing costs, which were paid using disbursement from HUD Loan No. 16.  In other words, Cohen also induced Buyer 16 to buy the 155th Street Property at an inflated price by effectively paying the entire upfront cost of buying that home.

451.   Cohen conspired with the Cambridge Defendants to pay off Buyer 16's personal debts, and also arranged for payment of all the down payment and closing costs, to induce Buyer 16 to obtain HUD Loan No. 16 based on an inflated price for the 155th Street Property.  In connection with that sale alone, Cohen received, through Buy-a-Home, more than $17,500 in fees from the disbursement of HUD Loan No. 16.

452.   For the Cambridge Defendants' role in conspiring with Cohen and the Cohen Entities to consummate the sale of the 155th Street Property to Buyer 16 at an inflated price, Cambridge received approximately $5,300 in fees for originating HUD Loan No. 16.

453.   Micheline, who provided an inflated appraisal for the 155th Street Property based on a corrupt agreement or understanding with the Cambridge Defendants, not only was paid $450 for that appraisal, but also ensured that he would receive additional appraisal referrals from Cambridge.

454.   In connection with executing their scheme to consummate a fraudulent flip sale of the 155th Street Property, Cohen, the Cohen Entities, the Cambridge Defendants, and Micheline used interstate mail carriers and interstate wire to transmit documents that contained false and misleading information, including, among other documents, the MCAW form, the appraisal report, the HUD-1 Settlement Statement, and the HUD Addendum.

455.   Specifically, the Cambridge Defendants and Micheline submitted to HUD numerous false records and certifications, including the appraisal report for the 155th Street Property and the Settlement Statement and HUD Addendum for

HUD Loan No. 16. Based on those false certifications and records, Cohen, the Cohen Entities, the Cambridge Defendants, and Micheline obtained HUD mortgage insurance to HUD Loan No. 16.

456. Further, the Cambridge Defendants also submitted to Countrywide, using interstate mail carrier and interstate wire, numerous false records and certifications, including Micheline's appraisal report and the Settlement Statement and HUD Addendum for HUD Loan No. 16. Based on those false certifications and records, they caused Countrywide to purchase HUD Loan No. 16.

457. Buyer 16, who never could have afforded the 155th Street Property at the inflated price Cohen set, defaulted on HUD Loan No. 16 within four months of the closing. As result of that default and the subsequent foreclosure on and conveyance of the 155th Street Property, HUD paid out $262,101 in mortgage insurance on HUD Loan No. 16.

458. Accordingly, Cohen, the Cohen Entities, the Cambridge Defendants, and Micheline violated the FCA, specifically 33 U.S.C. §3729(a)(1)(A)–(C), in connection with the origination of HUD Loan No. 16 in that they knowingly, or with reckless disregard for the truth, (i) caused a false claim for mortgage insurance to be presented to, and paid by, HUD; (ii) caused false records and false statements to be used or made in connection with the presentation of a claim for mortgage insurance to HUD; and (iii) conspired to cause a false mortgage insurance claim for be presented to HUD and to cause false records and false statements to be used or made in connection with the presentation of a mortgage insurance claim to HUD.

**Q.   HUD LOAN NO. 17:  BEACH 88TH STREET, FAR ROCKAWAY**

459.   From in or about June 2007 to September 2007, Cohen, the Cohen Entities, the Cambridge Defendants, Premier and Buckley conspired to orchestrate the sale of a property located on Beach 88th Street in Far Rockaway, New York (the "Beach 88th Street Property") at an inflated price to inexperienced home-buyers who lacked the financial wherewithal to purchase the property.

460.   In furtherance of that conspiracy and pursuant to their corrupt agreement, Cohen, the Cohen Entities, the Cambridge Defendants, Premier and Buckley obtained HUD insurance for a mortgage loan in the amount of $421,950 used to finance the fraudulent sale of the Beach 88th Street Property ("HUD Loan No. 17"), and sold HUD Loan No. 17 to Countrywide, by paying off the buyers' personal debts to induce them to purchase, obtaining an inflated appraisal for the Beach 88th Street Property, creating false records to omit inducements to purchase, falsely certifying compliance with HUD requirements, and submitting false and misleading records to HUD and to Countrywide.

461.   Specifically, in or about June 2007, Cohen and the Cohen Entities were retained by a business associate of Cohen's to arrange a sale of the Beach 88th Street Property at a significantly inflated price.

462.   On or about August 13, 2007, Cohen, through Buy-a-Home, induced inexperienced, first-time home-buyers, Buyers 17-A, 17-B, and 17-C, to buy the Beach 88th Street Property for $435,000.

463.   On or about June 20, 2007, Cohen and the Cohen Entities referred Buyers 17-A, 17-B and 17-C to Lapidus at Cambridge for purposes of obtaining a

131

HUD-insured mortgage from Cambridge, based on a corrupt agreement or understanding between Cohen and the Cambridge Defendants that Cambridge would endorse an application for HUD insurance irrespective of whether Buyers 17-A, 17-B, and 17-C qualified for such insurance or whether the Beach 88th Street Property was worth $435,000.

464.    On or about July 23, 2007, at Cohen's direction, Buckley, through Premier, issued an inflated appraisal report for the Beach 88th Street Property, valuing it at $435,000.  Specifically, Buckley inflated the value of that home by ignoring significant differences between the Beach 88th Street Property and the properties that Buckley had selected as "comparable sales."  For example, one of those comparable sales, a home on the same street as the Beach 88th Street Property, had twice the amount of living space, *i.e.*, 2,200 square feet vs. 1,100 square feet.  Buckley, however, only attributed $12,000 in value, or less than 3% of the sales price, to that difference.  Buckley also issued multiple other appraisals for the Beach 88th Street Property, each with the same value inflation and each at the direction of Cohen.

465.    On August 22, 2007, Cambridge issued a commitment letter to Buyers 17-A, 17-B, and 17-C, which required, as a condition that must be fulfilled prior to closing, that those buyers pay off several thousand dollars in child support arrears and debts they owed to creditors such as Con Edison and the Dish Network.

466.    On August 24, 2007, Cambridge originated and processed HUD Loan No. 17 for Buyers 17-A, 17-B, and 17-C to purchase the Beach 88th Street Property. Derrell, acting as the underwriter, certified to HUD that HUD Loan No. 17 met

HUD's underwriting requirements.   Further, Kramer, certifying on behalf of Cambridge, endorsed HUD Loan No. 17 to HUD for mortgage insurance.

467.   Specifically, Kramer, on behalf of Cambridge, certified to HUD that all closing conditions listed in the commitment letter issued by Cambridge had been met by the time of closing on August 24, 2007.  In fact, however, Cambridge knew that Buyers 17-A, 17-B, and 17-C had not paid off their personal debts prior to closing, because those debts would not be paid off until September 17, 2007, when Cambridge issued approximately $4,300 in checks to pay off the buyers' child support arrears and other debts.  Hyman personally signed those checks.

468.   Cambridge also certified to HUD that the closing documents for HUD Loan No. 17, including the HUD-1 Settlement Statement, were true and correct.  In fact, Cambridge knew that the HUD-1 was false and misleading because it omitted the fact that Cohen, through Buy-a-Home, had provided funds to Buyers 17-A, 17-B, and 17-C to pay off their personal debts, which payment should have been reflected on the HUD-1 as an inducement to purchase.

469.   Further, to conceal the fact that Cohen had given $5,000 to Buyers 17-A, 17-B, and 17-C to induce them to purchase, the Cambridge Defendants created fraudulent gift affidavits to assert falsely that the funds for paying off the buyers' personal debts had come from their relatives.

470.   In addition, Cambridge falsely certified HUD Loan No. 17 to HUD for mortgage insurance.  In fact, the underwriter at Cambridge initially assigned to underwrite HUD Loan No. 17 refused to approve that mortgage loan because it did not meet HUD requirements.  Instead of ensuring compliance with HUD rules and

regulations, Kramer simply reassigned the loan to Derrell, with specific direction to approve it for HUD mortgage insurance, even though that loan did not meet HUD requirements in, among others, the following respects:

a. The MCAW form for HUD Loan No. 17 falsely understated the amount of personal liabilities for Buyers 17-A, 17-B and 17-C, by leaving out the debts that she still owed at closing;

b. HUD Loan No. 17 had Qualifying Ratios (52.34% and 52.34%) that significantly exceeded HUD thresholds (31% and 43%, respectively), and did not have any applicable compensating factor; and

c. The Premier appraisal issued by Buckley significantly inflated the value for the Beach 88th Street Property and had not been conducted in accordance with HUD requirements.

471.   On or about September 20, 2007, Cambridge sold HUD Loan No. 17 to Countrywide, pursuant to the Countrywide Loan Purchase Agreement and received more than $14,000 for that loan.

472.   In connection with obtaining HUD Loan No. 17, Buyers 17-A, 17-B and 17-C contributed only a minimal amount to the down payment or closing costs associated with buying the Beach 88th Street Property.  Instead, Cohen arranged for payment of $12,900 in down payment and approximately $13,000 in closing costs, which were paid using disbursement from HUD Loan No. 17.  In other words, Cohen also induced Buyers 17-A, 17-B and 17-C to buy the Beach 88th Street Property at an inflated price by arranging for the payment of nearly the entirety of the upfront cost of buying that home.

473.   Cohen provided funds to Buyers 17-A, 17-B and 17-C, and also arranged for payment of all the down payment and closing costs, to induce those

buyers to obtain HUD Loan No. 17 based on an inflated price for the Beach 88th Street Property.  In connection with that sale alone, Cohen received, through Buy-a-Home and his partner Mark Wolf, more than $24,000 in fees from the disbursement of HUD Loan No. 17.

474.   For the Cambridge Defendants' role in conspiring with Cohen and the Cohen Entities to consummate the sale of the Beach 88th Street Property to Buyers 17-A, 17-B and 17-C at an inflated price, Cambridge received more than $28,000 in fees and resale proceeds for originating HUD Loan No. 17.

475.   Buckley, who, through Premier, provided an inflated appraisal for the Beach 88th Street Property, based on a corrupt agreement or understanding with Cohen and the Cambridge Defendants, not only was paid $450 for that appraisal, but also ensured future appraisal referrals from Cohen and further cemented the corrupt and lucrative relationship between his business interests and Cohen's.  *See supra* at ¶ 88.

476.   In connection with executing their scheme to consummate a fraudulent flip sale of the Beach 88th Street Property, Cohen, the Cohen Entities, the Cambridge Defendants, Premier, and Buckley used interstate mail carriers and interstate wire to transmit documents that contained false and misleading information, including, among other documents, the MCAW form, the appraisal report, the HUD-1 Settlement Statement, and the HUD Addendum.

477.   Specifically, the Cambridge Defendants, Premier, and Buckley submitted to HUD numerous false records and certifications, including the appraisal report for the Beach 88th Street Property and the Settlement Statement

and HUD Addendum for HUD Loan No. 17.  Based on those false certifications and records, Cohen, the Cohen Entities, the Cambridge Defendants, Premier, and Buckley obtained HUD mortgage insurance to HUD Loan No. 17.

478.   Further, the Cambridge Defendants also submitted to Countrywide, using interstate mail carrier and interstate wire, numerous false records and certifications, including Buckley's appraisal report and the Settlement Statement and HUD Addendum for HUD Loan No. 17.  Based on those false certifications and records, they caused Countrywide to purchase HUD Loan No. 17.

479.   Buyers 17-A, 17-B and 17-C, who never could have afforded the Beach 88th Street Property at the inflated price Cohen set, defaulted on HUD Loan No. 17 within three months of the closing.  As result of that default and the subsequent foreclosure on and conveyance of the Beach 88th Street Property, HUD has been presented with a claim for mortgage insurance on HUD Loan No. 17 in the amount of $482,470.

480.   Accordingly, Cohen, the Cohen Entities, the Cambridge Defendants, Premier, and Buckley violated the FCA, specifically 33 U.S.C. §3729(a)(1)(A)–(C), in connection with the origination of HUD Loan No. 17 in that they knowingly, or with reckless disregard for the truth, (i) caused a false claim for mortgage insurance to be presented to HUD; (ii) caused false records and false statements to be used or made in connection with the presentation of a claim for mortgage insurance to HUD; and (iii) conspired to cause a false mortgage insurance claim for be presented to HUD and to cause false records and false statements to be used or made in connection with the presentation of a mortgage insurance claim to HUD.

### AFTER 2007, COHEN, BUY-A-HOME, AND BUCKLEY CONTINUED TO ORCHESTRATE FRAUDULENT FLIP SALES USING HUD-INSURED LOANS

481.   In late 2007, Cambridge ceased to originate mortgage loans for flip sales arranged by Cohen and Buy-a-Home.  Cohen and Buckley, however, continued to orchestrate the mortgage fraud scheme that Cohen perpetrated in connection with HUD Loans Nos. 1–17.

482.   In 2010, for example, Cohen used two other entities that he had created – Your First Home, LLC ("YFH") and Tower Wealth Management, LLC ("Tower") – to acquire dozens of residential properties.  After he acquired these properties, Cohen had superficial renovations done on these homes by contractors, including, frequently, IDU Renovations, Inc. ("IDU Renovations"), a construction business Buckley controls.

483.   Through Buy-a-Home, Cohen sought out inexperienced, financially unsophisticated home-buyers who were eligible for HUD-insured mortgage loans. To lure these inexperienced home-buyers into agreeing to buy his properties at inflated prices, Cohen understated the true costs of home-ownership, and gave or promised a variety of inducements to purchase, including giving funds to buyers for their down payments, paying off buyers' personal debts, and promising to make mortgage payments for buyers.

484.   To obtain financing for his fraudulent flip sales, Cohen cultivated relationships with HUD direct endorsers (other than Cambridge) that would originate HUD-insured mortgage loans, including, in 2010, First Residential Mortgage Services Corp. ("First Residential").   Further, to justify the inflated prices

that Cohen set for his properties, Buckley had a Premier employee set up an appraisal management business, A+ Appraisal Management Corp. ("A Plus"), through which Cohen and Buckley obtained fraudulent appraisals.

485.   Through these fraudulent means, and as illustrated by the four sample transactions described in more detail below, Cohen conspired with Buckley and others to orchestrate more than thirty-five flip sales in 2010.

2010 Cohen Flip Sale No. 1

486.   From in or about March 2010 to in or about June 2010, Cohen, Buy-a-Home, and Buckley conspired to orchestrate the flip sale of a house on Prospect Avenue in the Bronx (the "Prospect Avenue Property") at an inflated price, by fraudulently obtaining a HUD-insured mortgage loan.

487.   In or about March 2010, Cohen, through Tower, acquired the Prospect Avenue Property for approximately $215,000.   Cohen then had IDU Renovations, Buckley's construction business, install new fixtures and appliances and make superficial repairs at that property to create the impression that it had been fully renovated.   In fact, however, Buckley failed to make certain basic repairs to the Prospect Avenue Property, including to repair or replace the chimney, which was leaning and not properly secured, and to repair the roof, sections of which were sagging and accumulating water.

488.   In May 2010, Cohen, through Buy-a-Home, found two inexperienced home buyers for the Prospect Avenue Property ("2010 Buyers 1-A and 1-B").   To convince these buyers to purchase the property from him at an inflated price, Cohen promised to make major repairs to the property before and after the closing.

Further, to induce these buyers to purchase, Cohen had his sales agent Mohammed Ibrahim, and manager Erin Davis, provide $10,000 in cash to 2010 Buyers 1-A and 1-B for their down payment.

489.    On or about June 10, 2010, Cohen sold the Prospect Avenue Property for $480,000, *i.e.*, more than twice what he had paid for the home in March 2010, to 2010 Buyers 1-A and 1-B, who obtained a HUD-insured mortgage loan from First Residential in the amount of $463,200.  At the closing, Cohen caused to be executed a false HUD-1 settlement statement indicating that no inducement to purchase had been made in connection with the sale,  whereas, in fact, Cohen had given the buyers $10,000 for down payment.

490.    Further, to obtain the HUD-insured mortgage loan, Cohen and Buckley, through A Plus, obtained an appraisal from Peter Sarafian, an appraiser who had worked for Buckley at Premier, that misstated the condition of the Prospect Avenue Property and inflated its value.  Among other things, Sarafian's appraisal falsely described the Prospect Avenue Property as being "in an above average maintained condition with no inadequacies for repairs," and falsely certified that the appraisal was based on suitably comparable sales comparisons.

491.    Through their fraudulent devices, Cohen and Buckley each earned tens of thousands of dollars in connection with the sale of the Prospect Avenue Property. 2010 Buyers 1-A and 1-B, however, were left with a home in need of numerous repairs, as well as mortgage payments that they could barely afford.

492.    In January 2011, 2010 Buyers 1-A and 1-B defaulted on their mortgage loan.  Although these buyers subsequently were able to catch up on their mortgage

payments, HUD remains exposed to the risk of substantial loss on its mortgage insurance for the Prospect Avenue Property.

2010 Cohen Flip Sale No. 2

493.   From in or about May 2010 to in or about August 2010, Cohen, Buy-a-Home, and Buckley conspired to orchestrate the flip sale of a house on 165th Street in Queens (the "165th Street Property") at an inflated price, by fraudulently obtaining a HUD-insured mortgage loan.

494.   In or about May 2010, Cohen, through YFH, acquired the 165th Street Property for approximately $126,000.  Cohen then had IDU Renovations, Buckley's construction business, install new fixtures and appliances and make superficial repairs at that property to create the impression that it had been fully renovated. In fact, however, Buckley failed to make certain fundamental repairs to the 165th Street Property, such as to address a serious termite infestation.

495.   In July 2010, Cohen, through Buy-a-Home, found two inexperienced home-buyers for the 165th Street Property ("2010 Buyers 2-A and 2-B").  To induce these buyers to purchase the home from him at an inflated price, Cohen promised to make the first two mortgage payments.  Further, to create the appearance that the buyers received a $8,500 gift from a family member for the down payment, Cohen also had his sales agents deposit, and then withdraw, $8,500 from the bank account of 2010 Buyer 2-A's brother, and then create a false gift affidavit from the brother.

496.   On or about August 26, 2010, Cohen sold the 165th Street Property for $327,500, *i.e.*, more than two and half times what he had paid for the home in May, to 2010 Buyers 2-A and 2-B, who obtained a HUD-insured mortgage loan from First

Residential in the amount of $323,147. At the closing, Cohen caused to be executed a false HUD-1 settlement statement indicating that no inducement to purchase had been made or promised in connection with the sale, whereas, in fact, Cohen had given the buyers $8,500 for down payments and also promised to make the first two mortgage payments on their behalf.

497.   Further, to obtain the HUD-insured mortgage loan, Cohen and Buckley, through A Plus, obtained from Peter Sarafian an appraisal that misstated the condition of the 165th Street Property and inflated its value. Among other things, Sarafian's appraisal ignored the costs required to cure the termite infestation at the 165th Street Property, underestimated the costs of other repairs that were needed for the property, and falsely certified that it was based on suitably comparable sales comparisons.

498.   Through their fraudulent devices, Cohen and Buckley each earned tens of thousands of dollars in connection with the sale of the 165th Street Property. 2010 Buyers 2-A and 2-B, however, were left with a home in need of urgent repairs, as well as mortgage payments that they could barely afford.

499.   In December 2010, 2010 Buyers 2-A and 2-B defaulted on their mortgage loan. Although these buyers subsequently were able to catch up on their mortgage payments, HUD remains exposed to the risk of substantial loss on its mortgage insurance for the 165th Street Property.

2010 Cohen Flip Sale No. 3

500.   From in or about May 2010 to in or about September 2010, Cohen, Buy-a-Home, and Buckley conspired to orchestrate the flip sale of a house on

Olmstead Avenue in the Bronx (the "Olmstead Avenue Property") at an inflated price, by fraudulently obtaining a HUD-insured mortgage loan.

501.    In or about May 2010, Cohen, through YFH, acquired the Olmstead Avenue Property for approximately $207,000.  Cohen then had IDU Renovations, Buckley's construction business, install new fixtures and appliances and make superficial repairs at that property to create the impression that it had been fully renovated.  In fact, however, Buckley failed to make certain fundamental repairs to the Olmstead Avenue Property, such as to repair the basement to prevent flooding.

502.    In August 2010, Cohen, through Buy-a-Home, found an inexperienced home-buyer for the Olmstead Avenue Property ("2010 Buyer 3").  To induce that buyer to purchase the home from him at an inflated price, and to enhance the buyer's credit history, Cohen paid $3,000 to reduce 2010 Buyer 3's personal debts.

503.    On or about September 29, 2010, Cohen sold the Olmstead Avenue Property for $460,000, *i.e.*, more than twice what he had paid for that home in May, to 2010 Buyer 3, who obtained a HUD-insured mortgage loan from First Residential in the amount of $453,887.    At the closing, Cohen executed a false HUD-1 settlement statement indicating that no inducement to purchase had been made or promised in connection with the sale, whereas, in fact, Cohen had paid $3,000 to reduce the personal debts of 2010 Buyer No. 3.

504.    Further, to obtain the HUD-insured mortgage loan, Buckley issued an appraisal that misstated the condition of the Olmstead Avenue Property and inflated its value.  Among other things, Buckley falsely certified to HUD that he had no personal interest in either the Olmstead Avenue Property or any participant

in the sale, whereas, in fact, Cohen paid Buckley's business, IDU Renovations, $60,000 in connection with the sale.   In addition, Buckley's appraisal for the Olmstead Avenue Property also ignored the insufficient repairs to the basement and falsely certified that it was based on suitably comparable sales comparisons.

505.   While Cohen and Buckley, through their fraudulent devices, each earned tens of thousands of dollars in connection with the sale of the Olmstead Avenue Property, their fraudulent scheme, which caused HUD to provide mortgage insurance for that property at an inflated value, has exposed HUD to the risk of substantial loss.

2010 Cohen Flip Sale No. 4

506.   From in or about February 2010 to in or about August 2010, Cohen, Buy-a-Home, and Buckley conspired to orchestrate the flip sale of a house on East 167th Street in the Bronx (the "East 167th Street Property") at an inflated price, by fraudulently obtaining a HUD-insured mortgage loan.

507.   In or about February 2010, Cohen, through YFH, acquired the East 165th Street Property for approximately $210,000.   Cohen then had Felix Soto, one of his agents, install new fixtures and appliances and make superficial repairs at that property to create the impression that it had been fully renovated.   In fact, however, Soto failed to make certain fundamental repairs, such as to address a serious vermin infestation or properly repair the home's foundation.

508.   In July 2010, Cohen, through Buy-a-Home, found an inexperienced home-buyer for the East 167th Street Property ("2010 Buyer 4").   After determining that 2010 Buyer 4's income was insufficient to obtain a HUD-insured mortgage

loan, Cohen had the buyer enlist her mother to seek the loan as a co-occupant of the home, even though the mother of 2010 Buyer 4 told Cohen that she had no intention of residing at that property.

509.   On or about August 13, 2010, Cohen sold the East 167th Street Property for $345,000, *i.e.*, more than 50% above what he had paid for the home in May, to 2010 Buyer 4, who obtained a HUD-insured mortgage loan from First Residential in the amount of $340,415.  In connection with that sale, Cohen caused the mother of 2010 Buyer 4 to falsely seek a HUD-insured mortgage loan as a borrower, even though she had no intention of residing at the property.

510.   Further, to obtain the HUD-insured mortgage loan, Cohen and Buckley, through A Plus, obtained from Peter Sarafian an appraisal that misstated the condition of the East 167th Street Property and inflated its value.  Among other things, Sarafian's appraisal understated the costs of repairs that were needed for conditions affecting the East 167th Street Property, such as the vermin infestation, and falsely certified that it was based on suitably comparable sales comparisons.

511.   While Cohen and Buckley, through their fraudulent devices, together earned tens of thousands of dollars in connection with the sale of the Olmstead Avenue Property, their fraudulent scheme, which caused HUD to provide mortgage insurance for that property at an inflated value, has exposed HUD to the risk of substantial loss.

Cohen's and Buckley's Conduct Since December 2010

512.   In December 2010, the United States sought and obtained a temporary restraining order, and then a preliminary injunction (the "Injunction"), against

144

Cohen and Buy-a-Home.  In the absence of such injunctive relief, Cohen, together with Buckley, would have consummated numerous other flip sales in December 2010 and early 2011 (attached as Exhibit 6 is a copy of a November 15, 2010 e-mail from Cohen, identifying eleven more flip sales to be consummated in December 2010 and January and February 2011).

513.   In 2011, and notwithstanding the imposition of the Injunction against Cohen, Cohen and Buckley continued to attempt to orchestrate flip sales using HUD-insured mortgage loans.  Specifically, Cohen, through three businesses controlled by his wife Marcia Kaufman, acquired approximately a dozen residential properties in early 2011.  Buckley, in turn, contracted with Cohen to provide superficial renovations on several of the properties, so that Cohen could then try to resell these homes at inflated prices to inexperienced buyers who would seek HUD-insured mortgage loans.  In December 2011, Cohen was held in contempt by the Court on account of his willful violation of the Injunction in 2011.

514.   Moreover, even after the United States put Cohen on notice in June 2011 that he had violated the Injunction by participating in residential real estate sales transactions involving HUD-insured financing, Cohen resorted to yet another mortgage fraud scheme using Fixing Houses, Inc. – a business controlled by his long-time contractor Louis Astuto – as a conduit.  Specifically, from October to December 2011, and through Fixing Houses, Cohen attempted to orchestrate additional fraudulent flip sales targeting inexperienced home-buyers eligible for HUD-insured loans.  Put simply, absent permanent injunctive relief against Cohen

and Buckley, they can be expected to continue their fraudulent schemes to profit from flip sales, at the expense of HUD and inexperienced home-buyers.

## FIRST CLAIM FOR RELIEF

**FOR CIVIL PENALTIES UNDER FIRREA IN CONNECTION WITH HUD LOAN NO. 1**
(Against Cohen, the Cohen Entities, the Cambridge Defendants, CFG, Buckley,
Buckley Consulting, and Micheline)

515.   Allegations in paragraphs 1–514 are realleged and incorporated herein by reference.

516.   For purposes of fraudulently obtaining HUD mortgage insurance for HUD Loan No. 1, which was used to finance the flip sale of the 116th Street Property, the Cambridge Defendants, CFG, Buckley, Buckley Consulting (formerly Premier), and Micheline unlawfully, willfully, and knowingly created false and fraudulent records, prepared a false and inflated appraisal, made false certifications, and submitted or intended to be submitted such false and fraudulent records, appraisals, and certifications to HUD and to FHA, in violation of 18 U.S.C. §§ 1006 and 1014.

517.   In connection with orchestrating the flip sale of the 116th Street Property, at an inflated price, Cohen and the Cohen Entities unlawfully, willfully, and knowingly combined, conspired, and agreed with the Cambridge Defendants, CFG, Buckley, Buckley Consulting, and Micheline to violate 18 U.S.C. §§ 1006 and 1014.  Specifically, it was a part and an object of the conspiracy that the Cambridge Defendants, Buckley, Buckley Consulting, and Micheline would unlawfully, willfully, and knowingly create false and fraudulent records, prepare false and inflated appraisals, make false certifications, and submit such false and fraudulent

records, appraisals, and certifications to HUD and to FHA.   Moreover, in furtherance of the conspiracy and to effect the illegal objects thereof, the Cambridge Defendants, Buckley, Buckley Consulting, and Micheline committed numerous overt acts, including, among other acts, the creation of false records omitting the payment that Cohen made to Buyers 1-A and 1-B to induce them to purchase, the preparation of an inflated appraisal for the 116th Street Property, the making of false certifications regarding HUD Loan No. 1, and the submission of such false records, appraisal, and certifications to HUD and FHA.

518.   Further, for purposes of obtaining financing for the fraudulent flip sale of the 116th Street Property and for continuing their mortgage fraud conspiracy, Cohen, the Cohen Entities, the Cambridge Defendants, CFG, Buckley, Buckley Consulting, and Micheline unlawfully, willfully, and knowingly executed a scheme and artifice to defraud, using interstate mail carriers and interstate wire, in violation of 18 U.S.C. §§ 1341 and 1343.   Specifically, Cohen, the Cohen Entities, the Cambridge Defendants, CFG, Buckley, Buckley Consulting, and Micheline fraudulently induced or intended to induce Citi to purchase HUD Loan No. 1 from Cambridge by sending to Countrywide false, fraudulent and misleading records, appraisal, and certifications, using interstate mail carriers and interstate wire. Further, as HUD Loan No. 1 defaulted within months of its being purchased by Citi, this scheme to defraud has affected Countrywide Bank, a financial institution.

519.   Accordingly, each of Cohen, the Cohen Entities, the Cambridge Defendants, CFG, Buckley, Buckley Consulting, and Micheline is liable for civil penalties to the maximum amount authorized under 12 U.S.C. § 1833a.

## SECOND CLAIM FOR RELIEF

**FOR CIVIL PENALTIES UNDER FIRREA IN CONNECTION WITH HUD LOAN NO. 2**
(Against Cohen, the Cohen Entities, and the Cambridge Defendants)

520.   Allegations in paragraphs 1-519 are realleged and incorporated herein by reference.

521.   For purposes of fraudulently obtaining HUD mortgage insurance for HUD Loan No. 2, which was used to finance the flip sale of Newark Avenue Property A, the Cambridge Defendants unlawfully, willfully, and knowingly created false and fraudulent records, made false certifications, and submitted such false and fraudulent records and certifications to HUD and to FHA, in violation of 18 U.S.C. §§ 1006 and 1014.

522.   In connection with orchestrating the flip sale of Newark Avenue Property A at an inflated price, Cohen and the Cohen Entities unlawfully, willfully, and knowingly combined, conspired, and agreed with the Cambridge Defendants to violate 18 U.S.C. §§ 1006 and 1014.  Specifically, it was a part and an object of the conspiracy that the Cambridge Defendants would unlawfully, willfully, and knowingly create false and fraudulent records, make false certifications, and submit such false and fraudulent records and certifications to HUD and to FHA.  Moreover, in furtherance of the conspiracy and to effect the illegal objects thereof, the Cambridge Defendants committed numerous overt acts, including, among other acts, the creation of false records inflating Buyer 2-A's income and omitting the payment that Cohen made to Buyers 2-A and 2-B to induce them to purchase, the

making of false certifications regarding HUD Loan No. 2, and the submission of such false records and certifications to HUD and FHA.

523.   Further, for purposes of obtaining financing for the fraudulent flip sale of Newark Avenue A and for continuing their mortgage fraud conspiracy, Cohen, the Cohen Entities, and the Cambridge Defendants unlawfully, willfully, and knowingly executed a scheme and artifice to defraud, using interstate mail carriers and interstate wire, in violation of 18 U.S.C. §§ 1341 and 1343.  Specifically, Cohen, the Cohen Entities, and the Cambridge Defendants fraudulently induced Citi to purchase HUD Loan No. 2 from Cambridge by sending to Citi false, fraudulent and misleading records and certifications, using interstate mail carrier and interstate wire.  Further, as HUD Loan No. 2 defaulted within months of its being purchased by Citi, this scheme to defraud has affected Citibank, a financial institution.

524.   Accordingly, each of Cohen, the Cohen Entities, and the Cambridge Defendants is liable for civil penalties to the maximum amount authorized under 12 U.S.C. § 1833a.

## THIRD CLAIM FOR RELIEF

### FOR CIVIL PENALTIES UNDER FIRREA IN CONNECTION WITH HUD LOAN NO. 3
(Against Cohen, the Cohen Entities, the Cambridge Defendants,
Buckley Consulting, and Buckley)

525.   Allegations in paragraphs 1-524 are realleged and incorporated herein by reference.

526.   For purposes of fraudulently obtaining HUD mortgage insurance for HUD Loan No. 3, which was used to finance the flip sale of the York Avenue Property, the Cambridge Defendants, Buckley Consulting (formerly Premier), and

Buckley unlawfully, willfully, and knowingly created false and fraudulent records, prepared a false and inflated appraisal, made false certifications, and submitted such false and fraudulent records, appraisals, and certifications to HUD and to FHA, in violation of 18 U.S.C. §§ 1006 and 1014.

527.   In connection with orchestrating the flip sale of the York Avenue Property at an inflated price, Cohen and the Cohen Entities unlawfully, willfully, and knowingly combined, conspired, and agreed with the Cambridge Defendants, Buckley Consulting, and Buckley to violate 18 U.S.C. §§ 1006 and 1014. Specifically, it was a part and an object of the conspiracy that the Cambridge Defendants, Buckley Consulting, and Buckley would unlawfully, willfully, and knowingly create false and fraudulent records, prepare false and inflated appraisals, make false certifications, and submit such false and fraudulent records, appraisals, and certifications to HUD and to FHA.  Moreover, in furtherance of the conspiracy and to effect the illegal objects thereof, the Cambridge Defendants, Buckley Consulting, and Buckley committed numerous overt acts, including, among other acts, the creation of false records omitting the payment that Cohen had made to Buyers 3-A and 3-B to induce them to purchase, the preparation of an inflated appraisal for the York Avenue Property, the making of false certifications regarding HUD Loan No. 3, and the submission of such false records, appraisal, and certifications to HUD and FHA.

528.   Further, for purposes of obtaining financing for the fraudulent flip sale of the York Avenue Property and for continuing their mortgage fraud conspiracy, Cohen, the Cohen Entities, the Cambridge Defendants, Buckley Consulting, and

Buckley unlawfully, willfully, and knowingly executed a scheme and artifice to defraud, using interstate mail carriers and interstate wire, in violation of 18 U.S.C. §§ 1341 and 1343.   Specifically, Cohen, the Cohen Entities, the Cambridge Defendants, Buckley Consulting, and Buckley fraudulently induced Countrywide to purchase HUD Loan No. 3 from Cambridge by sending to Countrywide false, fraudulent and misleading records, appraisal, and certifications, using interstate mail carriers and interstate wire.   Further, as HUD Loan No. 3 defaulted within months of its being purchased by Countrywide, this scheme to defraud has affected Countrywide Bank, a financial institution.

529.   Accordingly, each of Cohen, the Cohen Entities, the Cambridge Defendants, Buckley Consulting, and Buckley is liable for civil penalties to the maximum amount authorized under 12 U.S.C. § 1833a.

## FOURTH CLAIM FOR RELIEF

**FOR CIVIL PENALTIES UNDER FIRREA IN CONNECTION WITH HUD LOAN NO. 4**
(Against Cohen, the Cohen Entities, the Cambridge Defendants, and Goldberg)

530.   Allegations in paragraphs 1-529 are realleged and incorporated herein by reference.

531.   For purposes of fraudulently obtaining HUD mortgage insurance for HUD Loan No. 4, which was used to finance the flip sale of the Beach 46th Street Property, the Cambridge Defendants and Goldberg unlawfully, willfully, and knowingly created false and fraudulent records, prepared a false and inflated appraisal, made false certifications, and submitted such false and fraudulent

records, appraisals, and certifications to HUD and to FHA, in violation of 18 U.S.C. §§ 1006 and 1014.

532.    In connection with orchestrating the flip sale of the Beach 46th Street Property at an inflated price, Cohen and the Cohen Entities unlawfully, willfully, and knowingly combined, conspired, and agreed with the Cambridge Defendants and Goldberg to violate 18 U.S.C. §§ 1006 and 1014.  Specifically, it was a part and an object of the conspiracy that the Cambridge Defendants and Goldberg would unlawfully, willfully, and knowingly create false and fraudulent records, prepare false and inflated appraisals, make false certifications, and submit such false and fraudulent records, appraisals, and certifications to HUD and to FHA.  Moreover, in furtherance of the conspiracy and to effect the illegal objects thereof, the Cambridge Defendants and Goldberg committed numerous overt acts, including, among other acts, the creation of false records inflating the incomes of Buyers 4-A and 4-B, the preparation of an inflated appraisal for the Beach 46th Street Property, the making of false certifications regarding HUD Loan No. 4, and the submission of such false records, appraisal, and certifications to HUD and FHA.

533.    Further, for purposes of obtaining financing for the fraudulent flip sale of the Beach 46th Street Property and for continuing their mortgage fraud conspiracy, Cohen, the Cohen Entities, the Cambridge Defendants, and Goldberg unlawfully, willfully, and knowingly executed a scheme and artifice to defraud, using interstate mail carriers and interstate wire, in violation of 18 U.S.C. §§ 1341 and 1343.  Specifically, Cohen, the Cohen Entities, the Cambridge Defendants, and Goldberg fraudulently induced Citi to purchase HUD Loan No. 4 from Cambridge

by sending to Citi false, fraudulent and misleading records, appraisal, and certifications, using interstate mail carriers and interstate wire.  Further, as HUD Loan No. 4 defaulted within months of its being purchased by Citi, this scheme to defraud has affected Citibank, a financial institution.

534.    Accordingly, each of Cohen, the Cohen Entities, the Cambridge Defendants and Goldberg is liable for civil penalties to the maximum amount authorized under 12 U.S.C. § 1833a.

## FIFTH CLAIM FOR RELIEF

### FOR CIVIL PENALTIES UNDER FIRREA IN CONNECTION WITH HUD LOAN NO. 5
(Against Cohen, the Cohen Entities, the Cambridge Defendants and Goldberg)

535.    Allegations in paragraphs 1-534 are realleged and incorporated herein by reference.

536.    For purposes of fraudulently obtaining HUD mortgage insurance for HUD Loan No. 5, which was used to finance the flip sale of the Nicholas Avenue Property, the Cambridge Defendants and Goldberg unlawfully, willfully, and knowingly created false and fraudulent records, prepared a false and inflated appraisal, made false certifications, and submitted such false and fraudulent records, appraisals, and certifications to HUD and to FHA, in violation of 18 U.S.C. §§ 1006 and 1014.

537.    In connection with orchestrating the flip sale of the Nicholas Avenue Property at an inflated price, Cohen and the Cohen Entities unlawfully, willfully, and knowingly combined, conspired, and agreed with the Cambridge Defendants and Goldberg to violate 18 U.S.C. §§ 1006 and 1014.  Specifically, it was a part and

an object of the conspiracy that the Cambridge Defendants and Goldberg would unlawfully, willfully, and knowingly create false and fraudulent records, prepare false and inflated appraisals, make false certifications, and submit such false and fraudulent records, appraisals, and certifications to HUD and to FHA.  Moreover, in furtherance of the conspiracy and to effect the illegal objects thereof, the Cambridge Defendants and Goldberg committed numerous overt acts, including, among other acts, the creation of false records omitting the payment that Cohen had made to Buyers 5-A and 5-B to induce them to purchase, the preparation of an inflated appraisal for the Nicholas Avenue Property, the making of false certifications regarding HUD Loan No. 5, and the submission of such false records, appraisal, and certifications to HUD and FHA.

538.    Further, for purposes of obtaining financing for the fraudulent flip sale of the Nicholas Avenue Property and for continuing their mortgage fraud conspiracy, Cohen, the Cohen Entities, the Cambridge Defendants, and Goldberg unlawfully, willfully, and knowingly executed a scheme and artifice to defraud, using interstate mail carriers and interstate wire, in violation of 18 U.S.C. §§ 1341 and 1343.  Specifically, Cohen, the Cohen Entities, the Cambridge Defendants, and Goldberg fraudulently induced Citi to purchase HUD Loan No. 5 from Cambridge by sending to Citi false, fraudulent and misleading records, appraisal, and certifications, using interstate mail carriers and interstate wire.  Further, as HUD Loan No. 5 defaulted within months of its being purchased by Citi, this scheme to defraud has affected Citibank, a financial institution.

539.   Accordingly, each of Cohen, the Cohen Entities, the Cambridge Defendants, and Goldberg is liable for civil penalties to the maximum amount authorized under 12 U.S.C. § 1833a.

## SIXTH CLAIM FOR RELIEF

### FOR CIVIL PENALTIES UNDER FIRREA IN CONNECTION WITH HUD LOAN NO. 6
(Against Cohen, the Cohen Entities, the Cambridge Defendants, CFG,
Buckley Consulting, and Buckley)

540.   Allegations in paragraphs 1-539 are realleged and incorporated herein by reference.

541.   For purposes of fraudulently obtaining HUD mortgage insurance for HUD Loan No. 6, which was used to finance the flip sale of the Alaska Street Property, the Cambridge Defendants, CFG, Buckley Consulting (formerly Premier), and Buckley unlawfully, willfully, and knowingly created false and fraudulent records, prepared a false and inflated appraisal, made false certifications, and submitted such false and fraudulent records, appraisals, and certifications to HUD and to FHA, in violation of 18 U.S.C. §§ 1006 and 1014.

542.   In connection with orchestrating the flip sale of the Alaska Street Property at an inflated price, Cohen and the Cohen Entities unlawfully, willfully, and knowingly combined, conspired, and agreed with the Cambridge Defendants, CFG, Buckley Consulting, and Buckley to violate 18 U.S.C. §§ 1006 and 1014. Specifically, it was a part and an object of the conspiracy that the Cambridge Defendants, Buckley Consulting, and Buckley would unlawfully, willfully, and knowingly create false and fraudulent records, prepare false and inflated appraisals, make false certifications, and submit such false and fraudulent records,

appraisals, and certifications to HUD and to FHA.  Moreover, in furtherance of the conspiracy and to effect the illegal objects thereof, the Cambridge Defendants, Buckley Consulting, and Buckley committed numerous overt acts, including, among other acts, the creation of false records omitting the payment that Cohen had made to Buyers 6-A and 6-B to induce them to purchase, the preparation of an inflated appraisal for the Alaska Street Property, the making of false certifications regarding HUD Loan No. 6, and the submission of such false records, appraisal, and certifications to HUD and FHA.

543.   Further, for purposes of obtaining financing for the fraudulent flip sale of the Alaska Street Property and for continuing their mortgage fraud conspiracy, Cohen, the Cohen Entities, the Cambridge Defendants, CFG, Buckley Consulting, and Buckley unlawfully, willfully, and knowingly executed a scheme and artifice to defraud, using interstate mail carriers and interstate wire, in violation of 18 U.S.C. §§ 1341 and 1343.   Specifically, Cohen, the Cohen Entities, the Cambridge Defendants, CFG, Buckley Consulting, and Buckley fraudulently induced Citi to purchase HUD Loan No. 6 from Cambridge by sending to Citi false, fraudulent and misleading records, appraisal, and certifications, using interstate mail carriers and interstate wire.   Further, as HUD Loan No. 6 defaulted within months of its being purchased by Citi, this scheme to defraud has affected Citibank, a financial institution.

544.   Accordingly, each of Cohen, the Cohen Entities, the Cambridge Defendants, CFG, Buckley Consulting, and Buckley is liable for civil penalties to the maximum amount authorized under 12 U.S.C. § 1833a.

## SEVENTH CLAIM FOR RELIEF

### FOR CIVIL PENALTIES UNDER FIRREA IN CONNECTION WITH HUD LOAN NO. 7
(Against Cohen, the Cohen Entities, the Cambridge Defendants, and Goldberg)

545.   Allegations in paragraphs 1-544 are realleged and incorporated herein by reference.

546.   For purposes of fraudulently obtaining HUD mortgage insurance for HUD Loan No. 7, which was used to finance the flip sale of Newark Avenue Property B, the Cambridge Defendants and Goldberg unlawfully, willfully, and knowingly created false and fraudulent records, prepared a false and inflated appraisal, made false certifications, and submitted such false and fraudulent records, appraisals, and certifications to HUD and to FHA, in violation of 18 U.S.C. §§ 1006 and 1014.

547.   In connection with orchestrating the flip sale of Newark Avenue Property B at an inflated price, Cohen and the Cohen Entities unlawfully, willfully, and knowingly combined, conspired, and agreed with the Cambridge Defendants and Goldberg to violate 18 U.S.C. §§ 1006 and 1014.  Specifically, it was a part and an object of the conspiracy that the Cambridge Defendants and Goldberg would unlawfully, willfully, and knowingly create false and fraudulent records, prepare false and inflated appraisals, make false certifications, and submit such false and fraudulent records, appraisals, and certifications to HUD and to FHA.  Moreover, in furtherance of the conspiracy and to effect the illegal objects thereof, the Cambridge Defendants and Goldberg committed numerous overt acts, including, among other acts, the creation of false records omitting the payment that Cohen had made to

Buyers 7-A and 7-B to induce them to purchase, the preparation of an inflated appraisal for Newark Avenue Property B, the making of false certifications regarding HUD Loan No. 7, and the submission of such false records, appraisal, and certifications to HUD and FHA.

548.   Further, for purposes of obtaining financing for the fraudulent flip sale of Newark Avenue Property B and for continuing their mortgage fraud conspiracy, Cohen, the Cohen Entities, the Cambridge Defendants, and Goldberg unlawfully, willfully, and knowingly executed a scheme and artifice to defraud, using interstate mail carriers and interstate wire, in violation of 18 U.S.C. §§ 1341 and 1343. Specifically, Cohen, the Cohen Entities, the Cambridge Defendants, and Goldberg fraudulently induced Citi to purchase HUD Loan No. 7 from Cambridge by sending to Citi false, fraudulent and misleading records, appraisal, and certifications, using interstate mail carriers and interstate wire.  Further, as HUD Loan No. 7 defaulted within months of its being purchased by Citi, this scheme to defraud has affected Citibank, a financial institution.

549.   Accordingly, each of Cohen, the Cohen Entities, the Cambridge Defendants, and Goldberg is liable for civil penalties to the maximum amount authorized under 12 U.S.C. § 1833a.

## EIGHTH CLAIM FOR RELIEF

### FOR CIVIL PENALTIES UNDER FIRREA IN CONNECTION WITH HUD LOAN NO. 8
(Against Cohen, the Cohen Entities, the Cambridge Defendants,
Buckley Consulting, and Buckley)

550.   Allegations in paragraphs 1-549 are realleged and incorporated herein by reference.

551.   For purposes of fraudulently obtaining HUD mortgage insurance for HUD Loan No. 8, which was used to finance the flip sale of Newark Avenue Property C, the Cambridge Defendants, Buckley Consulting (formerly Premier), and Buckley unlawfully, willfully, and knowingly created false and fraudulent records, prepared a false and inflated appraisal, made false certifications, and submitted such false and fraudulent records, appraisals, and certifications to HUD and to FHA, in violation of 18 U.S.C. §§ 1006 and 1014.

552.   In connection with orchestrating the flip sale of the East Tremont Avenue Property at an inflated price, Cohen and the Cohen Entities unlawfully, willfully, and knowingly combined, conspired, and agreed with the Cambridge Defendants, Buckley Consulting, and Buckley to violate 18 U.S.C. §§ 1006 and 1014.  Specifically, it was a part and an object of the conspiracy that the Cambridge Defendants, Buckley Consulting, and Buckley would unlawfully, willfully, and knowingly create false and fraudulent records, prepare false and inflated appraisals, make false certifications, and submit such false and fraudulent records, appraisals, and certifications to HUD and to FHA.  Moreover, in furtherance of the conspiracy and to effect the illegal objects thereof, the Cambridge Defendants, Buckley Consulting, and Buckley committed numerous overt acts, including, among other acts, the preparation of an inflated appraisal for Newark Avenue Property C, the making of false certifications regarding HUD Loan No. 8, and the submission of such false records, appraisal, and certifications to HUD and FHA.

553.   Further, for purposes of obtaining financing for the fraudulent flip sale of Newark Avenue Property C and for continuing their mortgage fraud conspiracy,

Cohen, the Cohen Entities, the Cambridge Defendants, Buckley Consulting, and Buckley unlawfully, willfully, and knowingly executed a scheme and artifice to defraud, using interstate mail carriers and interstate wire, in violation of 18 U.S.C. §§ 1341 and 1343.   Specifically, Cohen, the Cohen Entities, the Cambridge Defendants, Buckley Consulting, and Buckley fraudulently induced Citi to purchase HUD Loan No. 8 from Cambridge by sending to Citi false, fraudulent and misleading records, appraisal, and certifications, using interstate mail carriers and interstate wire.   Further, as HUD Loan No. 8 defaulted within months of its being purchased by Citi, this scheme to defraud has affected Citibank, a financial institution.

554.   Accordingly, each of Cohen, the Cohen Entities, the Cambridge Defendants, Buckley Consulting, and Buckley is liable for civil penalties to the maximum amount authorized under 12 U.S.C. § 1833a.

## NINTH CLAIM FOR RELIEF

**FOR CIVIL PENALTIES UNDER FIRREA IN CONNECTION WITH HUD LOAN NO. 9**
(Against Cohen, the Cohen Entities, the Cambridge Defendants, and Goldberg)

555.   Allegations in paragraphs 1-554 are realleged and incorporated herein by reference.

556.   For purposes of fraudulently obtaining HUD mortgage insurance for HUD Loan No. 9, which was used to finance the flip sale of the East Tremont Avenue Property, the Cambridge Defendants and Goldberg unlawfully, willfully, and knowingly created false and fraudulent records, prepared a false and inflated appraisal, made false certifications, and submitted such false and fraudulent

records, appraisals, and certifications to HUD and to FHA, in violation of 18 U.S.C. §§ 1006 and 1014.

557.   In connection with orchestrating the flip sale of the East Tremont Avenue Property at an inflated price, Cohen and the Cohen Entities unlawfully, willfully, and knowingly combined, conspired, and agreed with the Cambridge Defendants and Goldberg to violate 18 U.S.C. §§ 1006 and 1014.  Specifically, it was a part and an object of the conspiracy that the Cambridge Defendants and Goldberg would unlawfully, willfully, and knowingly create false and fraudulent records, prepare false and inflated appraisals, make false certifications, and submit such false and fraudulent records, appraisals, and certifications to HUD and to FHA. Moreover, in furtherance of the conspiracy and to effect the illegal objects thereof, the Cambridge Defendants and Goldberg committed numerous overt acts, including, among other acts, the creation of false records omitting the payment that Cohen had made to Buyers 9-A, 9-B, and 9-C to induce them to purchase, the preparation of an inflated appraisal for the East Tremont Avenue Property, the making of false certifications regarding HUD Loan No. 9, and the submission of such false records, appraisal, and certifications to HUD and FHA.

558.   Further, for purposes of obtaining financing for the fraudulent flip sale of the East Tremont Avenue Property and for continuing their mortgage fraud conspiracy, Cohen, the Cohen Entities, the Cambridge Defendants, and Goldberg unlawfully, willfully, and knowingly executed a scheme and artifice to defraud, using interstate mail carriers and interstate wire, in violation of 18 U.S.C. §§ 1341 and 1343.  Specifically, Cohen, the Cohen Entities, the Cambridge Defendants, and

Goldberg fraudulently induced Citi to purchase HUD Loan No. 9 from Cambridge by sending to Citi false, fraudulent and misleading records, appraisal, and certifications, using interstate mail carriers and interstate wire.  Further, as HUD Loan No. 9 defaulted within months of its being purchased by Citi, this scheme to defraud has affected Citibank, a financial institution.

559.   Accordingly, each of Cohen, the Cohen Entities, the Cambridge Defendants, and Goldberg is liable for civil penalties to the maximum amount authorized under 12 U.S.C. § 1833a.

## TENTH CLAIM FOR RELIEF

### FOR CIVIL PENALTIES UNDER FIRREA IN CONNECTION WITH HUD LOAN NO. 10
(Against Cohen, the Cohen Entities, and the Cambridge Defendants)

560.   Allegations in paragraphs 1-559 are realleged and incorporated herein by reference.

561.   For purposes of fraudulently obtaining HUD mortgage insurance for HUD Loan No. 10, which was used to finance the flip sale of the Barkley Avenue Property, the Cambridge Defendants unlawfully, willfully, and knowingly created false and fraudulent records, made false certifications, and submitted such false and fraudulent records and certifications to HUD and to FHA, in violation of 18 U.S.C. §§ 1006 and 1014.

562.   In connection with orchestrating the flip sale of the Barkley Avenue Property at an inflated price, Cohen and the Cohen Entities unlawfully, willfully, and knowingly combined, conspired, and agreed with the Cambridge Defendants to violate 18 U.S.C. §§ 1006 and 1014.  Specifically, it was a part and an object of the

162

conspiracy that the Cambridge Defendants would unlawfully, willfully, and knowingly create false and fraudulent records, make false certifications, and submit such false and fraudulent records and certifications to HUD and to FHA.  Moreover, in furtherance of the conspiracy and to effect the illegal objects thereof, the Cambridge Defendants committed numerous overt acts, including, among other acts, the creation of false records omitting the inducements to purchase that Cohen had provided to Buyers 10-A and 10-B – namely, paying off their personal debts and promising to make mortgage payments on their behalves, the making of false certifications regarding HUD Loan No. 10, and the submission of such false records and certifications to HUD and FHA.

563.   Further, for purposes of obtaining financing for the fraudulent flip sale of the Barkley Avenue Property and for continuing their mortgage fraud conspiracy, Cohen, the Cohen Entities and the Cambridge Defendants unlawfully, willfully, and knowingly executed a scheme and artifice to defraud, using interstate mail carriers and interstate wire, in violation of 18 U.S.C. §§ 1341 and 1343.  Specifically, Cohen, the Cohen Entities, and the Cambridge Defendants fraudulently induced Citi to purchase HUD Loan No. 10 from Cambridge by sending to Citi false, fraudulent and misleading records and certifications, using interstate mail carriers and interstate wire.  Further, as HUD Loan No. 10 defaulted within months of its being purchased by Citi, this scheme to defraud has affected Citibank, a financial institution.

564.   Accordingly, each of Cohen, the Cohen Entities and the Cambridge Defendants is liable for civil penalties to the maximum amount authorized under 12 U.S.C. § 1833a.

## ELEVENTH CLAIM FOR RELIEF

**FOR CIVIL PENALTIES UNDER FIRREA IN CONNECTION WITH HUD LOAN NO. 11**
(Against Cohen, the Cohen Entities, the Cambridge Defendants, and Goldberg)

565.   Allegations in paragraphs 1-564 are realleged and incorporated herein by reference.

566.   For purposes of fraudulently obtaining HUD mortgage insurance for HUD Loan No. 11, which was used to finance the flip sale of Newark Avenue Property D, the Cambridge Defendants and Goldberg unlawfully, willfully, and knowingly created false and fraudulent records, made false certifications, issued an inflated appraisal, and submitted such false and fraudulent records, certifications, and appraisal to HUD and to FHA, in violation of 18 U.S.C. §§ 1006 and 1014.

567.   In connection with orchestrating the flip sale of Newark Avenue Property D at an inflated price, Cohen and the Cohen Entities unlawfully, willfully, and knowingly combined, conspired, and agreed with the Cambridge Defendants and Goldberg to violate 18 U.S.C. §§ 1006 and 1014.  Specifically, it was a part and an object of the conspiracy that the Cambridge Defendants and Goldberg would unlawfully, willfully, and knowingly create false and fraudulent records, make false certifications, issue an inflated appraisal, and submit such false and fraudulent records, certifications, and appraisal to HUD and to FHA.  Moreover, in furtherance of the conspiracy and to effect the illegal objects thereof, the Cambridge Defendants

164

and Goldberg committed numerous overt acts, including, among other acts, the creation of false records omitting the payment that Cohen had made to Buyers 11-A and 11-B to induce them purchase, the making of false certifications regarding HUD Loan No. 11, the issuance of an inflated appraisal, and the submission of such false records, certifications, and appraisal to HUD and FHA.

568.    Further, for purposes of obtaining financing for the fraudulent flip sale of Newark Avenue Property D and for continuing their mortgage fraud conspiracy, Cohen, the Cohen Entities, the Cambridge Defendants, and Goldberg unlawfully, willfully, and knowingly executed a scheme and artifice to defraud, using interstate mail carriers and interstate wire, in violation of 18 U.S.C. §§ 1341 and 1343. Specifically, Cohen, the Cohen Entities, the Cambridge Defendants, and Goldberg fraudulently induced Citi to purchase HUD Loan No. 11 from Cambridge by sending to Citi false, fraudulent and misleading records, certifications, and appraisal using interstate mail carriers and interstate wire.  Further, as HUD Loan No. 11 defaulted within months of its being purchased by Citi, this scheme to defraud has affected Citibank, a financial institution.

569.    Accordingly, each of Cohen, the Cohen Entities, the Cambridge Defendants, and Goldberg is liable for civil penalties to the maximum amount authorized under 12 U.S.C. § 1833a.

## TWELFTH CLAIM FOR RELIEF

**FOR CIVIL PENALTIES UNDER FIRREA IN CONNECTION WITH HUD LOAN NO. 12**
(Against Cohen, the Cohen Entities, and the Cambridge Defendants, and Goldberg)

570.    Allegations in paragraphs 1-569 are realleged and incorporated herein by reference.

571.    For purposes of fraudulently obtaining HUD mortgage insurance for HUD Loan No. 12, which was used to finance the flip sale of the South 3rd Avenue Property, the Cambridge Defendants and Goldberg unlawfully, willfully, and knowingly created false and fraudulent records, prepared a false and inflated appraisal, made false certifications, and submitted such false and fraudulent records, appraisals, and certifications to HUD and to FHA, in violation of 18 U.S.C. §§ 1006 and 1014.

572.    In connection with orchestrating the flip sale of the South 3rd Avenue Property at an inflated price, Cohen and the Cohen Entities unlawfully, willfully, and knowingly combined, conspired, and agreed with the Cambridge Defendants and Goldberg to violate 18 U.S.C. §§ 1006 and 1014.  Specifically, it was a part and an object of the conspiracy that the Cambridge Defendants and Goldberg would unlawfully, willfully, and knowingly create false and fraudulent records, prepare false and inflated appraisals, make false certifications, and submit such false and fraudulent records, appraisals, and certifications to HUD and to FHA.  Moreover, in furtherance of the conspiracy and to effect the illegal objects thereof, the Cambridge Defendants and Goldberg committed numerous overt acts, including, among other acts, the creation of false records omitting the funds that Cohen had provided to

induce Buyers 12-A and 12-B to purchase, the preparation of an inflated appraisal for the South 3rd Avenue Property, the making of false certifications regarding HUD Loan No. 12, and the submission of such false records, appraisal, and certifications to HUD and FHA.

573.   Further, for purposes of obtaining financing for the fraudulent flip sale of the South 3rd Avenue Property and for continuing their mortgage fraud conspiracy, Cohen, the Cohen Entities, the Cambridge Defendants, and Goldberg unlawfully, willfully, and knowingly executed a scheme and artifice to defraud, using interstate mail carriers and interstate wire, in violation of 18 U.S.C. §§ 1341 and 1343.  Specifically, Cohen, the Cohen Entities, the Cambridge Defendants, and Goldberg fraudulently induced Countrywide to purchase HUD Loan No. 12 from Cambridge by sending to Countrywide false, fraudulent and misleading records, appraisal, and certifications, using interstate mail carriers and interstate wire. Further, as HUD Loan No. 12 defaulted within months of its being purchased by Citi, this scheme to defraud has affected Countrywide Bank, a financial institution.

574.   Accordingly, each of Cohen, the Cohen Entities, the Cambridge Defendants, and Goldberg is liable for civil penalties to the maximum amount authorized under 12 U.S.C. § 1833a.

## THIRTEENTH CLAIM FOR RELIEF

### FOR CIVIL PENALTIES UNDER FIRREA IN CONNECTION WITH HUD LOAN NO. 13
(Against Cohen, the Cohen Entities, the Cambridge Defendants, and Micheline)

575.   Allegations in paragraphs 1-574 are realleged and incorporated herein by reference.

576.   For purposes of fraudulently obtaining HUD mortgage insurance for HUD Loan No. 13, which was used to finance the flip sale of the Nebraska Avenue Property, the Cambridge Defendants and Micheline unlawfully, willfully, and knowingly created false and fraudulent records, prepared a false and inflated appraisal, made false certifications, and submitted such false and fraudulent records, appraisals, and certifications to HUD and to FHA, in violation of 18 U.S.C. §§ 1006 and 1014.

577.   In connection with orchestrating the flip sale of the Nebraska Avenue Property at an inflated price, Cohen and the Cohen Entities unlawfully, willfully, and knowingly combined, conspired, and agreed with the Cambridge Defendants and Micheline to violate 18 U.S.C. §§ 1006 and 1014.  Specifically, it was a part and an object of the conspiracy that the Cambridge Defendants and Micheline would unlawfully, willfully, and knowingly create false and fraudulent records, prepare false and inflated appraisals, make false certifications, and submit such false and fraudulent records, appraisals, and certifications to HUD and to FHA.  Moreover, in furtherance of the conspiracy and to effect the illegal objects thereof, the Cambridge Defendants and Micheline committed numerous overt acts, including, among other acts, the creation of false records disguising the funds that Cohen provided to induce Buyers 13-A, 13-B, and 13-C to purchase, the preparation of an inflated appraisal for the Nebraska Avenue Property, the making of false certifications regarding HUD Loan No. 13, and the submission of such false records, appraisal, and certifications to HUD and FHA.

578.   Further, for purposes of obtaining financing for the fraudulent flip sale of the Nebraska Avenue Property and for continuing their mortgage fraud conspiracy, Cohen, the Cohen Entities, the Cambridge Defendants, and Micheline unlawfully, willfully, and knowingly executed a scheme and artifice to defraud, using interstate mail carriers and interstate wire, in violation of 18 U.S.C. §§ 1341 and 1343.  Specifically, Cohen, the Cohen Entities, the Cambridge Defendants, and Micheline fraudulently induced Countrywide to purchase HUD Loan No. 13 from Cambridge by sending to Countrywide false, fraudulent and misleading records, appraisal, and certifications, using interstate mail carriers and interstate wire. Further, as HUD Loan No. 13 defaulted within months of its being purchased by Countrywide, this scheme to defraud has affected Countrywide Bank, a financial institution.

579.   Accordingly, each of Cohen, the Cohen Entities, the Cambridge Defendants, and Micheline is liable for civil penalties to the maximum amount authorized under 12 U.S.C. § 1833a.

### FOURTEENTH CLAIM FOR RELIEF

**FOR CIVIL PENALTIES UNDER FIRREA IN CONNECTION WITH HUD LOAN NO. 14**
(Against Cohen, the Cohen Entities, the Cambridge Defendants and Goldberg)

580.   Allegations in paragraphs 1-579 are realleged and incorporated herein by reference.

581.   For purposes of fraudulently obtaining HUD mortgage insurance for HUD Loan No. 14, which was used to finance the flip sale of the South 8th Avenue Property, the Cambridge Defendants and Goldberg unlawfully, willfully, and

knowingly created false and fraudulent records, prepared a false and inflated appraisal, made false certifications, and submitted such false and fraudulent records, appraisals, and certifications to HUD and to FHA, in violation of 18 U.S.C. §§ 1006 and 1014.

582.    In connection with orchestrating the flip sale of the South 8th Avenue Property at an inflated price, Cohen and the Cohen Entities unlawfully, willfully, and knowingly combined, conspired, and agreed with the Cambridge Defendants and Goldberg to violate 18 U.S.C. §§ 1006 and 1014.  Specifically, it was a part and an object of the conspiracy that the Cambridge Defendants and Goldberg would unlawfully, willfully, and knowingly create false and fraudulent records, prepare false and inflated appraisals, make false certifications, and submit such false and fraudulent records, appraisals, and certifications to HUD and to FHA.  Moreover, in furtherance of the conspiracy and to effect the illegal objects thereof, the Cambridge Defendants and Goldberg committed numerous overt acts, including, among other acts, the preparation of an inflated appraisal for the South 8th Avenue Property, the making of false certifications regarding HUD Loan No. 14, and the submission of such false records, appraisal, and certifications to HUD and FHA.

583.    Further, for purposes of obtaining financing for the fraudulent flip sale of the South 8th Avenue Property and for continuing their mortgage fraud conspiracy, Cohen, the Cohen Entities, the Cambridge Defendants, and Goldberg unlawfully, willfully, and knowingly executed a scheme and artifice to defraud, using interstate mail carriers and interstate wire, in violation of 18 U.S.C. §§ 1341 and 1343.  Specifically, Cohen, the Cohen Entities, the Cambridge Defendants, and

Goldberg fraudulently induced Citi to purchase HUD Loan No. 314 from Cambridge by sending to Citi false, fraudulent and misleading records, appraisal, and certifications, using interstate mail carriers and interstate wire.  Further, as HUD Loan No. 14 defaulted within months of its being purchased by Citi, this scheme to defraud has affected Citibank, a financial institution.

584.    Accordingly, each of Cohen, the Cohen Entities, the Cambridge Defendants, and Goldberg is liable for civil penalties to the maximum amount authorized under 12 U.S.C. § 1833a.

## FIFTEENTH CLAIM FOR RELIEF

### FOR CIVIL PENALTIES UNDER FIRREA IN CONNECTION WITH HUD LOAN NO. 15
(Against Cohen, the Cohen Entities, the Cambridge Defendants, and Micheline)

585.    Allegations in paragraphs 1-584 are realleged and incorporated herein by reference.

586.    For purposes of fraudulently obtaining HUD mortgage insurance for HUD Loan No. 15, which was used to finance the flip sale of the Tompkins Place Property, the Cambridge Defendants and Micheline unlawfully, willfully, and knowingly created false and fraudulent records, prepared an inflated appraisal, made false certifications, and submitted such false and fraudulent records, appraisals, and certifications to HUD and to FHA, in violation of 18 U.S.C. §§ 1006 and 1014.

587.    In connection with orchestrating the flip sale of the Tompkins Place Property at an inflated price, Cohen and the Cohen Entities unlawfully, willfully, and knowingly combined, conspired, and agreed with the Cambridge Defendants

and Micheline to violate 18 U.S.C. §§ 1006 and 1014.  Specifically, it was a part and an object of the conspiracy that the Cambridge Defendants and Micheline would unlawfully, willfully, and knowingly create false and fraudulent records, prepare false and inflated appraisals, make false certifications, and submit such false and fraudulent records, appraisals, and certifications to HUD and to FHA.  Moreover, in furtherance of the conspiracy and to effect the illegal objects thereof, the Cambridge Defendants and Micheline committed numerous overt acts, including, among other acts, the creation of false records claiming that Buyers 15-A and 15-B both intended to use the Tompkins Place Property as their primary residence, the preparation of an inflated appraisal for the Tompkins Place Property, the making of false certifications regarding HUD Loan No. 15, and the submission of such false records, appraisal, and certifications to HUD and FHA.

588.   Further, for purposes of obtaining financing for the fraudulent flip sale of the Tompkins Place Property and for continuing their mortgage fraud conspiracy, Cohen, the Cohen Entities, the Cambridge Defendants, and Micheline unlawfully, willfully, and knowingly executed a scheme and artifice to defraud, using interstate mail carriers and interstate wire, in violation of 18 U.S.C. §§ 1341 and 1343. Specifically, Cohen, the Cohen Entities, the Cambridge Defendants, and Micheline fraudulently induced Countrywide to purchase HUD Loan No. 15 from Cambridge by sending to Countrywide false, fraudulent and misleading records, appraisal, and certifications, using interstate mail carriers and interstate wire.  Further, as HUD Loan No. 15 defaulted within months of its being purchased by Countrywide, this scheme to defraud has affected Countrywide Bank, a financial institution.

589.   Accordingly, each of Cohen, the Cohen Entities, the Cambridge Defendants, and Micheline is liable for civil penalties to the maximum amount authorized under 12 U.S.C. § 1833a.

### SIXTEENTH CLAIM FOR RELIEF

**FOR TREBLE DAMAGES AND CIVIL PENALTIES UNDER THE FCA
IN CONNECTION WITH HUD LOAN NO. 16**
(Against Cohen, the Cohen Entities, the Cambridge Defendants, and Micheline)

590.   Allegations in paragraphs 1-589 are realleged and incorporated herein by reference.

591.   The United States seeks treble damages and civil penalties against Cohen, the Cohen Entities, the Cambridge Defendants, and Micheline because they fraudulently obtained HUD insurance for HUD Loan No. 16 for the sale of the 155th Street Property to Buyer 16, in violation of 31 U.S.C. § 3729(1)(A)–(C).

592.   Specifically, as set forth above, *see supra* at ¶¶ 438 – 458, Cohen, the Cohen Entities, the Cambridge Defendants, and Micheline knowingly, or with reckless disregard for the truth, caused a false claim for mortgage insurance coverage for HUD Loan No. 16 to be presented to an officer, employee, or agent of the United States, namely HUD, in violation of 31 U.S.C. § 3729(1)(A).

593.   Further, Cohen, the Cohen Entities, the Cambridge Defendants, and Micheline knowingly, or with reckless disregard for the truth, caused false records and false statements to be made or used to get a false claim for mortgage insurance coverage for HUD Loan No. 16 paid by HUD, in violation of 31 U.S.C. § 3729(1)(B).

594.   In addition, and in violation of 31 U.S.C. § 3729(1)(C), Cohen, the Cohen Entities, the Cambridge Defendants, and Micheline conspired to cause a

false claim mortgage insurance coverage for HUD Loan No. 16 to be presented to HUD, or to cause false records and false statements to be made or used to get a false claim for mortgage insurance coverage for HUD Loan No. 16 paid by HUD.

595.    By reason of the fraudulent conduct of Cohen, the Cohen Entities, the Cambridge Defendants, and Micheline in connection with obtaining HUD insurance for HUD Loan No. 16, the United States has sustained $262,101 in damages to date, and such further damages in an amount to be determined at trial.

## SEVENTEENTH CLAIM FOR RELIEF

### FOR TREBLE DAMAGES AND CIVIL PENALTIES UNDER THE FCA IN CONNECTION WITH HUD LOAN NO. 17
(Against Cohen, the Cohen Entities, the Cambridge Defendants, Buckley Consulting and Buckley)

596.    Allegations in paragraphs 1-595 are realleged and incorporated herein by reference.

597.    The United States seeks treble damages and civil penalties against Cohen, the Cohen Entities, the Cambridge Defendants, Buckley Consulting (formerly Premier), and Buckley because they fraudulently obtained HUD insurance for HUD Loan No. 17 for the sale of the Beach 88th Street Property to Buyers 17-A, 17-B, and 17-C, in violation of 31 U.S.C. § 3729(1)(A)–(C).

598.    Specifically, as set forth above, *see supra* at ¶¶ 459–480, Cohen, the Cohen Entities, the Cambridge Defendants, Buckley Consulting, and Buckley knowingly, or with reckless disregard for the truth, caused a false claim for mortgage insurance coverage for HUD Loan No. 17 to be presented to an officer,

employee, or agent of the United States, namely HUD, in violation of 31 U.S.C. § 3729(1)(A).

599.   Further, Cohen, the Cohen Entities, the Cambridge Defendants, Buckley Consulting, and Buckley knowingly, or with reckless disregard for the truth, caused false records and false statements to be made or used to get a false claim for mortgage insurance coverage for HUD Loan No. 17 paid by HUD, in violation of 31 U.S.C. § 3729(1)(B).

600.   In addition, and in violation of 31 U.S.C. § 3729(1)(C), Cohen, the Cohen Entities, the Cambridge Defendants, Buckley Consulting, and Buckley conspired to cause a false claim mortgage insurance coverage for HUD Loan No. 17 to be presented to HUD, or to cause false records and false statements to be made or used to get a false claim for mortgage insurance coverage for HUD Loan No. 17 paid by HUD.

601.   By reason of the fraudulent conduct of Cohen, the Cohen Entities, the Cambridge Defendants, Buckley Consulting, and Buckley in connection with obtaining HUD insurance for HUD Loan No. 17, the United States has sustained $482,470 in damages to date, and such further damages in an amount to be determined at trial.

## EIGHTEENTH CLAIM FOR RELIEF

### FOR AN INJUNCTION UNDER THE FRAUD INJUNCTION STATUTE
(Against Cohen and Buckley)

602.   Allegations in paragraphs 1-601 are realleged and incorporated herein by reference.

603.   Cohen and Buckley knowingly and intentionally devised, and participated in, schemes to defraud the United States, specifically HUD, of money and property, by abusing the HUD mortgage insurance program; and to commit frauds that affected home-buyers, financial institutions, and HUD.

604.   For the purpose of executing their schemes to defraud, Cohen and Buckley sent or delivered, or caused to be sent or delivered, to HUD and to financial institutions false and misleading statements and information in Loan Applications, HUD-1 Settlement Statements, MCAW forms, and appraisal reports, and other documents, by interstate mail carriers and interstate wire, in violations of 18 U.S.C. §§ 1341 and 1343.

605.   As set forth above, *see supra* at ¶¶ 481–514, Cohen and Buckley have been, and can be expected to continue, devising, and participating in, schemes to defraud HUD by fraudulently obtaining HUD mortgage insurance for sales of residential properties at inflated valuations, and to commit mail and wire fraud that affect home-buyers, financial institutions, and HUD.  Specifically, in 2010, Cohen and Buckley orchestrated more than thirty-five such fraudulent flip sales.  In connection with those frauds, Cohen and Buckley sent, or caused to be sent, false statements and information to HUD and to financial institutions, by interstate mail carriers and interstate wire, in violation of 18 U.S.C. §§ 1341 and 1343.

606.   Further, in 2011, and notwithstanding the entry of an injunction against Cohen in December 2010, Cohen and Buckley continued to attempt to orchestrate fraudulent flip sales using HUD-insured mortgage loans.  Accordingly, it is highly probable that Cohen and Buckley will continue to devise schemes to

commit fraud on HUD and financial institutions, using interstate mail carriers and interstate wire, in violation of 18 U.S.C. §§ 1341 and 1343.

607.  Cohen's and Buckley's ongoing mortgage fraud scheme poses the prospect of a continuing and substantial injury to the United States, its citizens, its financial institutions, and the secondary marketplace for mortgage loans.

608.  Accordingly, Cohen's and Buckley's ongoing fraudulent conduct should be enjoined pursuant to 18 U.S.C. § 1345.

WHEREFORE, the United States prays for judgment against defendants as follows:

(a)  With respect to each claim for civil penalties under FIRREA (Claims Nos. 1–15), a judgment imposing civil penalties against each defendant charged under each claim, up to the maximum amount of $1,000,000 allowed by law;

(b)  With respect to the FCA claim arising from HUD's payment of a mortgage insurance claim for HUD Loan No. 16 (Claim No. 16), a judgment against Cohen, the Cohen Entities, the Cambridge Defendants, and Micheline, holding them jointly and severally liable to the United States for the amount of $786,303, plus such appropriate civil penalties to be determined by the Court;

(c)  With respect to the FCA claim arising from a claim on HUD for mortgage insurance coverage for the default of HUD Loan No. 17 (Claim No. 17), a judgment against Cohen, the Cohen Entities, the Cambridge Defendants, Buckley Consulting, and Buckley, holding them jointly and severally liable to the United States for the amount of $1,447,410, plus such appropriate civil penalties to be determined by the Court;

177

(d)   With respect to the Fraud Injunction Claim (Claim No. 18), the entry of a preliminary injunction and a permanent injunction against Cohen and Buckley:

     i.   Enjoining Cohen and Buckley, and any of their employees, agents, assigns, or any persons acting on their behalf, from (1) participating in any real estate transaction that involves any request or application for mortgage insurance from HUD or FHA; and (2) advertising, marketing to the public, otherwise soliciting business that involve the origination of any federally-insured home mortgage loans;

     ii.   Ordering Cohen and Buckley to identify to the United States, within seven (7) days of the entry of the preliminary injunction, all business entities in which any of them holds a greater than 10% interest or over which either exercises any control;

     iii.   Ordering Cohen and Buckley to notify the United States within three (3) days of any of them having acquired a greater than 10% interest in a business or having acquired any control over a business;

     iv.   Directing Cohen and Buckley, and any of their employees, agents, assigns, or any persons acting on their behalf, to notify the United States within 48 hours of the following events:  (1) the execution of an agreement for the purchase of a residential property in any real estate transaction in which any of them participates in any capacity; (2) the making of an application to obtain a mortgage loan to finance the purchase of a residential property, or to refinance a residential

property, in connection with a real estate transaction in which any of them participates in any capacity; (3) the disbursement of a mortgage loan in connection with a residential real estate transaction in which any of them participates in any capacity; and (4) the default by one or more buyers on a mortgage loan originated in connection with a residential real estate transaction in which any of them participates in any capacity;

v.   Directing each of Cohen and Buckley to submit, within ten days after the end of quarter following the entry of the preliminary and permanent injunction, sworn statements to the United States that set forth, for the preceding quarter, the following information: (i) Cohen's or Buckley's total income for that quarter, including, but not limited to, any income derived from any business in which Cohen or Buckley has any ownership interest or control; (ii) the sources of Cohen's or Buckley's income during that quarter; and (iii) all business entities or real estate properties in which Cohen or Buckley held any interest during the quarter;

vi.   Ordering Cohen and Buckley to show a copy of the preliminary injunction and, if extant, the permanent injunction to all their employees, agents, and any other persons acting on their behalf, as well as to all prospective home-buyers to whom Cohen or Buckley seeks to sell a property; and

vii.   Ordering Cohen and Buckley to file with the Court, and serve upon

the United States, a written report, within fourteen (14) days of the entry of the preliminary and the permanent injunction, in which report each shall set forth, under oath, the manner of its compliance with each provision of each injunction.

(e)   With respect to the FIRREA Claims and the FCA Claims (Claims Nos. 1- 17), a preliminary injunction and a permanent injunction against the Cambridge Defendants:

i.   Enjoining the Cambridge Defendants, and any of their employees, agents, assigns, or any persons acting on their behalf, from (1) obtaining mortgage insurance fraudulently from HUD; (2)  using the mail or write transmissions, or causing the use of the mail or wire transmissions, to defraud HUD or to execute a scheme to defraud that affects a financial institution; (3) destroying, altering, disposing of or in any other fashion failing to maintain business, financial, accounting, real estate and legal records; (4) originating, processing, or preparing any application for mortgage insurance from HUD; and (5) advertising, marketing to the public, or otherwise soliciting business to originate, or otherwise handle, any federally-insured home mortgage loans;

ii.   Ordering the Cambridge Defendants to identify to the United States, within seven (7) days of the entry of the preliminary injunction, all business entities in which any of them holds a greater than 10% interest or over which any exercises any control;

     iii.    Ordering the Cambridge Defendants to notify the United States within three (3) days of any of them having acquired a greater than 10% interest in a business or having acquired any control over a business; and

     iv.    Ordering the Cambridge Defendants to file with the Court, and serve upon the United States, a written report, within fourteen (14) days of the entry of the preliminary and the permanent injunction, in which report each shall set forth, under oath, the manner of its compliance with each provision of each injunction.

(f)    With respect to the FIRREA Claims and the FCA Claims, a preliminary injunction and a permanent injunction against Goldberg and Micheline:

     i.    Enjoining Goldberg and Micheline, and any of their employees, agents, assigns, or any persons acting on their behalf, from (1) preparing, reviewing, approving or submitting appraisal reports in connection with a real estate sale or refinancing to be financed through a HUD-insured mortgage loan; (2) advertising, marketing to the public, or otherwise soliciting business to provide appraisal services in connection with any federally-insured home mortgage loans; and (3) destroying, altering, disposing of or in any other fashion failing to maintain business, financial, accounting, real estate and legal records;

     ii.    Ordering Goldberg and Micheline to identify to the United States, within seven (7) days of the entry of the preliminary injunction, all

business entities in which any of them holds a greater than 10% interest or over which any exercises any control;

iii. Ordering Goldberg and Micheline to notify the United States within three (3) days of any of them having acquired a greater than 10% interest in a business or having acquired any control over a business; and

iv. Ordering Goldberg and Micheline to file with the Court, and serve upon the United States, a written report, within fourteen (14) days of the entry of the preliminary and the permanent injunction, in which report each shall set forth, under oath, the manner of its compliance with each provision of each injunction.

(g)   For costs of suit;

(h)   For reasonable attorneys fees; and,

(i)   For such further relief that the Court deems just.

Dated: February 15, 2012
       New York, New York

PREET BHAHARA
United States Attorney
Southern District of New York

By: _____
    LI YU
    CRISTINE IRVIN PHILLIPS
    Assistant United States Attorneys
    *Attorneys for Plaintiff the United States*

# EXHIBIT 1

**Erin Davis**

| | |
|---|---|
| **From:** | Erin Davis |
| **Sent:** | Wednesday, April 25, 2007 1:15 PM |
| **To:** | 'Wendy Perkins' |
| **Subject:** | RE: Morales |

Hi Ms. Wendy,

I want to help you.  Mitch will be there shortly and hopefully we can get this all resolved.  I am so soory that you are stressed over this.  I appreciate everything you have done.

**From:** Wendy Perkins [mailto:WPerkins@HomeCap.com]
**Sent:** Wednesday, April 25, 2007 12:48 PM
**To:** Erin Davis
**Cc:** Jackie Derrell
**Subject:** Morales

Hi Erin,

As per our conversation yesterday regarding the certified bank check in the amount of $3,363.00 from Northfork bank. Did you get a chance to speak with Mitch regarding this error.

1. The First check in the amount of $9,000.00 from WAMU savings account # 936-30818850 came from the borrowers Dad. The additional $3,363.00 must come out of   this account as well.

2. I need an additional gift letter completed and signed reflecting the $3,363.00 came from the WAMU savings account # 936-30818850 which is the Dad's account. Please prepare a letter from the Dad stating that he did not realize he needed to give his son a gift totalling 12,363.00 and this is why he took out an additional gift of $3,363.00. I need this letter in my loan file because of the different dates of the withdrawals from the Dads Savings account.

3. I need you to confirm with me how you would like to retrieve the incorrect bank certified check for $3,363.00 from North Fork, is Mitch going to pick this up? Please Make him hurry up.... **(LOL)** as I need to get this file QC'd and shipped out.

E I already reworked the loan to show that Leonardo's accounts are being paid off and not Jannettes, it worked out I told Leonardo that He and Jannette will have to come in to resign the 1003's reflecting this. He said no problem. I also prepared a letter of explanation for Jannette stating that she is disputing the WFNB Express act # 518189000538 from 10/01 with a balance of $579.00 she has to sign this letter. (This change is do to her credit now not being paid) I needed to make the DTI work and stay the same as the 1st approval.

Call Me when you get this.

Thanks

Wendy

1

BAH 00244

# EXHIBIT 2



REMEMBER:
*Sign everywhere you see this "Check."* ™

## Uniform Residential Loan Application

This application is designed to be completed by the applicant(s) with the Lender's assistance. Applicants should complete this form as "Borrower" or "Co-Borrower," as applicable. Co-Borrower information must also be provided (and the appropriate box checked) when ☐ the income or assets of a person other than the Borrower (including the Borrower's spouse) will be used as a basis for loan qualification or ☐ the income or assets of the Borrower's spouse or other person who has community property rights pursuant to state law will not be used as a basis for loan qualification, but his or her liabilities must be considered because the spouse or other person has community property rights pursuant to applicable law and Borrower resides in a community property state, the security property is located in a community property state, or the Borrower is relying on other property located in a community property state as a basis for repayment of the loan.

If this is an application for joint credit, Borrower and Co-Borrower each agree that we intend to apply for joint credit (sign below):

_____        _____
Borrower                                        Co-Borrower

### I. TYPE OF MORTGAGE AND TERMS OF LOAN

| Mortgage Applied for: | ☐ VA  ☒ FHA | ☐ Conventional  ☐ Other (explain): ☐ USDA/Rural Housing Service | Agency Case Number | Lender Case Number |
|---|---|---|---|---|
| Amount $ 35/cu. | Interest Rate 6M % | No. of Months 360 | Amortization Type: ☒ Fixed Rate  ☐ GPM | ☐ Other (explain) ☐ ARM (type): |

### II. PROPERTY INFORMATION AND PURPOSE OF LOAN

| Subject Property Address (street, city, state & ZIP) 37 Newark Av. Staten Island NY | No. of Units 1 |
|---|---|
| Legal Description of Subject Property (attach description if necessary) | Year Built |

| Purpose of Loan | ☒ Purchase  ☐ Construction  ☐ Other (explain): ☐ Refinance  ☐ Construction-Permanent | Property will be: ☐ Primary Residence  ☐ Secondary Residence  ☐ Investment |
|---|---|---|

**Complete this line if construction or construction-permanent loan.**

| Year Lot Acquired | Original Cost $ | Amount Existing Liens $ | (a) Present Value of Lot $ | (b) Cost of Improvements $ | Total (a+b) $ |
|---|---|---|---|---|---|

**Complete this line if this is a refinance loan.**

| Year Acquired | Original Cost $ | Amount Existing Liens $ | Purpose of Refinance | Describe Improvements ☐ made  ☐ to be made |
|---|---|---|---|---|
| | | | | Cost $ |

| Title will be held in what Name(s) Lando + Jent Miralli | Manner in which Title will be held civil, | Estate will be held in ☒ Fee Simple ☐ Leasehold (show expiration date) |
|---|---|---|
| Source of Down Payment, Settlement Charges, and/or Subordinate Financing (explain) savings Nevovciant + Seller concession | | |

### III. BORROWER INFORMATION

| Borrower | Co-Borrower |
|---|---|

| Borrower's Name (include Jr. or Sr. if applicable) Lando Miralli | Co-Borrower's Name (include Jr. or Sr. if applicable) Jent Miralli |
|---|---|

| Social Security Number 051-64-715? | Home Phone (incl. area code) ?r | DOB (mm/dd/yyyy) 5/15/yr | Yrs. School 16 | Social Security Number 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 | Home Phone (incl. area code) ?? | DOB (mm/dd/yyyy) 3/14/5u | Yrs. School 16 |
|---|---|---|---|---|---|---|---|

| ☒ Married  ☐ Unmarried (include single, divorced, widowed) ☐ Separated | Dependents (not listed by Co-Borrower) no. 2  ages 16, 2en. | ☐ Married  ☒ Unmarried (include single, divorced, widowed) ☐ Separated | Dependents (not listed by Borrower) no.  ages |
|---|---|---|---|

| Present Address (street, city, state, ZIP) ☐ Own ☒ Rent ?r Yrs 72-19 19 Av. Brallen NY 11204. | Present Address (street, city, state, ZIP) ☐ Own ☐ Rent Yrs 324 56 St Brcklen NY |
|---|---|
| Mailing Address, if different from Present Address | Mailing Address, if different from Present Address |

**If residing at present address for less than two years, complete the following:**

| Former Address (street, city, state, ZIP) ☐ Own ☒ Rent temporary 324 56 St Brcklen NY | Former Address (street, city, state, ZIP) ☐ Own ☐ Rent __ No Yrs |
|---|---|

### IV. EMPLOYMENT INFORMATION

| Borrower | | Co-Borrower | |
|---|---|---|---|

| Name & Address of Employer ☐ Self Employed HAVAS North America Euro RSCG NY inc. 350 NY NY 10014. | Yrs. on this job ?r Yrs employed in this line of work/profession | Name & Address of Employer ☐ Self Employed Numorion Chrytion Phone. 1250 C?th Brcklen NY 11214. | Yrs. on this job 15 Yrs employed in this line of work/profession |
|---|---|---|---|
| Position/Title/Type of Business Fnc IITrs | Business Phone (incl. area code) 212-YY6-2473 | Position/Title/Type of Business Sckcl / cwnerr | Business Phone (incl. area code) 71Y-232-2322 |

**If employed in current position for less than two years or if currently employed in more than one position, complete the following:**

| Name & Address of Employer ☐ Self Employed | Dates (from – to) | Name & Address of Employer ☐ Self Employed | Dates (from – to) |
|---|---|---|---|
| | Monthly Income $ | | Monthly Income $ |
| Position/Title/Type of Business | Business Phone (incl. area code) | Position/Title/Type of Business | Business Phone (incl. area code) |

| Name & Address of Employer ☐ Self Employed | Dates (from – to) | Name & Address of Employer ☐ Self Employed | Dates (from – to) |
|---|---|---|---|
| | Monthly Income $ | | Monthly Income $ |
| Position/Title/Type of Business | Business Phone (incl. area code) | Position/Title/Type of Business | Business Phone (incl. area code) |

Freddie Mac Form 65  7/05
**Residential Loan Application**
RA 05 LEG Rev. 3/06

Page 1 of 4

FC62903

Fannie Mae Form 1003  7/05



## V. MONTHLY INCOME AND COMBINED HOUSING EXPENSE INFORMATION

| Gross Monthly Income | Borrower | Co-Borrower | Total | Combined Monthly Housing Expense | Present | Proposed |
|---|---|---|---|---|---|---|
| Base Empl. Income* | $ 3333 | $ | $ 6454 | Rent | $ 1366 | |
| Overtime | | | | First Mortgage (P&I) | | 2247 |
| Bonuses | | | | Other Financing (P&I) | | |
| Commissions | | | | Hazard Insurance | | 75 |
| Dividends/Interest | | | | Real Estate Taxes | | 86 |
| Net Rental Income | | | | Mortgage Insurance | | 152 |
| Other (before completing, see the notice in "describe other income," below) | | | | Homeowner Assn. Dues | | |
| | | | | Other: | | |
| **Total** | $ 3333 | $ 3171 | $ 6451 | **Total** | $ 1366 | $ 252 |

* Self Employed Borrower(s) may be required to provide additional documentation such as tax returns and financial statements.

**Describe Other Income**   *Notice:* Alimony, child support, or separate maintenance income need not be revealed if the Borrower (B) or Co-Borrower (C) does not choose to have it considered for repaying this loan.

| B/C | | Monthly Amount |
|---|---|---|
| | | $ |
| | | |
| | | |

## VI. ASSETS AND LIABILITIES

This Statement and any applicable supporting schedules may be completed jointly by both married and unmarried Co-Borrowers if their assets and liabilities are sufficiently joined so that the Statement can be meaningfully and fairly presented on a combined basis; otherwise, separate Statements and Schedules are required. If the Co-Borrower section was completed about a non-applicant spouse or other person, this Statement and supporting schedules must be completed about that spouse or other person also.

Completed ☐ Jointly ☐ Not Jointly

| ASSETS | Cash or Market Value | Liabilities and Pledged Assets. List the creditor's name, address, and account number for all outstanding debts, including automobile loans, revolving charge accounts, real estate loans, alimony, child support, stock pledges, etc. Use continuation sheet if necessary. Indicate by (*) those liabilities, which will be satisfied upon sale of real estate owned or upon refinancing of the subject property. | | |
|---|---|---|---|---|
| Description | | | | |
| Cash deposit toward Purchase held by: | $ | | | |
| *List checking and savings accounts below* | | LIABILITIES | Monthly Payment & Months Left to Pay | Unpaid Balance |
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company | $ Payment/Months | $ |
| Cmmy/C | | Tyy\/ | 132 | 7142 |
| | | (EM)). | | |
| Acct. no. | $ 1266 | Acct. no. | 5r | 1451 |
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company | $ Payment/Months | $ |
| 690  Sclle  Cncrnc | | PC Ret. | 52 | 1759 |
| | | Chvr. | | |
| Acct. no. | $ | Acct. no. | 26 | 796 |
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company | $ Payment/Months | $ |
| 290  Nchmnhlrnt | | Zw/r). | 20 | 776 |
| | | Mcv | | |
| Acct. no. | $ | Acct. no. | 7 | 133 |
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company | $ Payment/Months | $ |
| | | / Gyh/Un. -Tcbe prc | 11 | 56 |
| | | HFC | | |
| Acct. no. | $ | Acct. no. | 264 | 1C6L) |
| Stocks & Bonds (Company name/ number & description) | $ | Name and address of Company | $ Payment/Months | $ |
| | | Uiyally\\/) -Tcbepcd | 295 | 4c76 |
| | | HSJC | | |
| Life insurance net cash value | $ | Name and address of Company | $ Payment/Months | $ |
| | | HSJC | 56 | 1472 |
| Face amount  $ | | HSJC. | 69 | 1646 |
| **Subtotal Liquid Assets** | $ | HSJC. | 61. | 145 |
| Real estate owned (enter market value from schedule of real estate owned) | $ | Ayroe (Rt) -Tcbepcd | 44 | 1692 |
| Vested interest in retirement fund | $ | Acct. no. | | |
| Net worth of business(es) owned (attach financial statement) | $ | | | |
| Automobiles owned (make and year) | $ | Alimony/Child Support/Separate Maintenance Payments Owed to: | $ | |
| Other Assets (itemize) | $ | Job-Related Expense (child care, union dues, etc.) | $ | |
| Plcnd Thn. | 34vw | | | |
| | | Total Monthly Payments | $ | |
| **Total Assets a.** | $ | Net Worth (a minus b) | $ | **Total Liabilities b.** | $ |

FC62904

## VI. ASSETS AND LIABILITIES (cont'd)

**Schedule of Real Estate Owned** (If additional properties are owned, use continuation sheet.)

| Property Address (enter S if sold, PS if pending sale or R if rental being held for income) | Type of Property | Present Market Value | Amount of Mortgages & Liens | Gross Rental Income | Mortgage Payments | Insurance, Maintenance, Taxes & Misc | Net Rental Income |
|---|---|---|---|---|---|---|---|
| | | $ | $ | $ | $ | $ | $ |
| | | | | | | | |
| | | | | | | | |
| | Totals | $ | $ | $ | $ | $ | $ |

**List any additional names under which credit has previously been received and indicate appropriate creditor name(s) and account number(s):**

| Alternate Name | Creditor Name | Account Number |
|---|---|---|

## VII. DETAILS OF TRANSACTION

| | |
|---|---|
| a. Purchase price | $ |
| b. Alterations, improvements, repairs | |
| c. Land (if acquired separately) | |
| d. Refinance (incl. debts to be paid off) | |
| e. Estimated prepaid items | |
| f. Estimated closing costs | |
| g. PMI, MIP, Funding Fee | |
| h. Discount (if Borrower will pay) | |
| i. Total costs (add items a through h) | |
| j. Subordinate financing | |
| k. Borrower's closing costs paid by Seller | |
| l. Other Credits (explain) | |
| m. Loan amount (exclude PMI, MIP, Funding Fee financed) | 351,900 |
| n. PMI, MIP, Funding Fee financed | 552 |
| o. Loan amount (add m & n) | X 4 4 5 2 |
| p. Cash from/to Borrower (subtract j, k, l & o from i) | |

## VIII. DECLARATIONS

| If you answer "Yes" to any questions a through i, please use continuation sheet for explanation. | Borrower Yes | Borrower No | Co-Borrower Yes | Co-Borrower No |
|---|---|---|---|---|
| a. Are there any judgments against you? | ☐ | ☑ | ☐ | ☑ |
| b. Have you been declared bankrupt within the past 7 years? | ☐ | ☑ | ☐ | ☑ |
| c. Have you had property foreclosed upon or given title or deed in lieu thereof in the last 7 years? | ☐ | ☑ | ☐ | ☑ |
| d. Are you a party to a lawsuit? | ☐ | ☑ | ☐ | ☑ |
| e. Have you directly or indirectly been obligated on any loan which resulted in foreclosure, transfer of title in lieu of foreclosure, or judgment? | ☐ | ☑ | ☐ | ☑ |
| f. Are you presently delinquent or in default on any Federal debt or any other loan, mortgage, financial obligation, bond, or loan guarantee? | ☐ | ☑ | ☐ | ☑ |
| g. Are you obligated to pay alimony, child support, or separate maintenance? | ☐ | ☑ | ☐ | ☑ |
| h. Is any part of the down payment borrowed? | ☐ | ☑ | ☐ | ☑ |
| i. Are you a co-maker or endorser on a note? | ☐ | ☑ | ☐ | ☑ |
| j. Are you a U.S. citizen? | ☑ | ☐ | ☑ | ☐ |
| k. Are you a permanent resident alien? | ☐ | ☑ | ☐ | ☑ |
| l. Do you intend to occupy the property as your primary residence? If "Yes," complete question m below. | ☑ | ☐ | ☑ | ☐ |
| m. Have you had an ownership interest in a property in the last three years? | ☐ | ☑ | ☐ | ☑ |

## IX. ACKNOWLEDGEMENT AND AGREEMENT

Each of the undersigned specifically represents to Lender and to Lender's actual or potential agents, brokers, processors, attorneys, insurers, servicers, successors and assigns and agrees and acknowledges that: (1) the information provided in this application is true and correct as of the date set forth opposite my signature and that any intentional or negligent misrepresentation of this information contained in this application may result in civil liability, including monetary damages, to any person who may suffer any loss due to reliance upon any misrepresentation that I have made on this application, and/or in criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Sec. 1001, et seq.; (2) the loan requested pursuant to this application (the "Loan") will be secured by a mortgage or deed of trust on the property described in this application; (3) the property will not be used for any illegal or prohibited purpose or use; (4) all statements made in this application are made for the purpose of obtaining a residential mortgage loan; (5) the property will be occupied as indicated in this application; (6) the Lender, its servicers, successors or assigns may retain the original and/or an electronic record of this application, whether or not the Loan is approved; (7) the Lender and its agents, brokers, insurers, servicers, successors, and assigns may continuously rely on the information contained in the application, and I am obligated to amend and/or supplement the information provided in this application if any of the material facts that I have represented herein should change prior to closing of the Loan; (8) in the event that my payments on the Loan become delinquent, the Lender, its servicers, successors or assigns may, in addition to any other rights and remedies that it may have relating to such delinquency, report my name and account information to one or more consumer reporting agencies; (9) ownership of the Loan and/or administration of the Loan account may be transferred with such notice as may be required by law; (10) neither Lender nor its agents, brokers, insurers, servicers, successors or assigns has made any representation or warranty, express or implied, to me regarding the property or the condition or value of the property; and (11) my transmission of this application as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or my facsimile transmission of this application containing a facsimile of my signature, shall be as effective, enforceable and valid as if a paper version of this application were delivered containing my original written signature.

**Acknowledgement.** Each of the undersigned hereby acknowledges that any owner of the Loan, its servicers, successors and assigns, may verify or reverify any information contained in this application or obtain any information or data relating to the Loan, for any legitimate business purpose through any source, including a source named in this application or a consumer reporting agency.

| Borrower's Signature | Date | Co-Borrower's Signature | Date |
|---|---|---|---|
| X _Leonard Clark_ | 3/27/07 | X _Jeanette Moaba_ | 3/27/07 |

## X. INFORMATION FOR GOVERNMENT MONITORING PURPOSES

The following information is requested by the Federal Government for certain types of loans related to a dwelling in order to monitor the lender's compliance with equal credit opportunity, fair housing and home mortgage disclosure laws. You are not required to furnish this information, but are encouraged to do so. The law provides that a lender may not discriminate either on the basis of this information, or on whether you choose to furnish it. If you furnish the information, please provide both ethnicity and race. For race, you may check more than one designation. If you do not furnish ethnicity, race, or sex, under Federal regulations, this lender is required to note the information on the basis of visual observation and surname if you have made this application in person. If you do not wish to furnish the information, please check the box below. (Lender must review the above material to assure that the disclosures satisfy all requirements to which the lender is subject under applicable state law for the particular type of loan applied for.)

**BORROWER** ☐ I do not wish to furnish this information

Ethnicity: ☑ Hispanic or Latino   ☐ Not Hispanic or Latino

Race: ☐ American Indian or Alaska Native   ☐ Asian   ☐ Black or African American   ☐ Native Hawaiian or Other Pacific Islander   ☑ White

Sex: ☐ Female   ☑ Male

**CO-BORROWER** ☐ I do not wish to furnish this information

Ethnicity: ☐ Hispanic or Latino   ☐ Not Hispanic or Latino

Race: ☐ American Indian or Alaska Native   ☐ Asian   ☐ Black or African American   ☐ Native Hawaiian or Other Pacific Islander   ☑ White

Sex: ☑ Female   ☐ Male

| To be Completed by Interviewer | Interviewer's Name (print or type) | Name and Address of Interviewer's Employer |
|---|---|---|
| This application was taken by: ☐ Face-to-face interview ☑ Mail ☐ Telephone ☐ Internet | _Syn Lindu_ <br> Interviewer's Signature ___ Date ___ <br> Interviewer's Phone Number (incl. area code) _516-479-577_ | CAMBRIDGE HOME CAPITAL, LLC 7 CUTTERMILL ROAD, SUITE 408 GREAT NECK, N.Y. 11021 <br> RECEIVED MAR 30 2007 |

Freddie Mac Form 65  7/05
**Residential Loan Application**
RA 05A LEG  Rev. 3/06
Page 3 of 4
Fannie Mae Form 1003  7/05
FC62905

**CONTINUATION SHEET/RESIDENTIAL LOAN APPLICATION**

| Use this continuation sheet if you need more space to complete the Residential Loan Application. Mark **B** for Borrower or **C** for Co-Borrower. | Borrower: | Agency Case Number: |
|---|---|---|
| | Co-Borrower: | Lender Case Number: |

*[handwritten notes]*

Unpaid Une.  — To be paid
+ upgrads.
Emerge 15/152  — To be paid

I/We fully understand that it is a Federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements concerning any of the above facts as applicable under the provisions of Title 18, United States Code, Section 1001, et seq.

| Borrower's Signature | Date | Co-Borrower's Signature | Date |
|---|---|---|---|
| X | | X | |

**FC62906**

CAMBRIDGE HOME CAPITAL LLC

# Uniform Residential Loan Application

This application is designed to be completed by the applicant(s) with the Lender's assistance. Applicants should complete this form as "Borrower" or "Co-Borrower", as applicable. Co-Borrower information must also be provided (and the appropriate box checked) when [X] the income or assets of a person other than the Borrower (including the Borrower's spouse) will be used as a basis for loan qualification or [ ] the income or assets of the Borrower's spouse or other person who has community property rights pursuant to state law will not be used as a basis for loan qualification, but his or her liabilities must be considered because the spouse or other person has community property rights pursuant to applicable law and Borrower resides in a community property state, the security property is located in a community property state, or the Borrower is relying on other property located in a community property state as a basis for repayment of the loan.
If this is an application for joint credit, Borrower and Co-Borrower each agree that we intend to apply for joint credit (sign below):

_Leonardo Morales_ (signature)

Borrower _____  Co-Borrower _____

## I. TYPE OF MORTGAGE AND TERMS OF LOAN

| Mortgage Applied for: | [ ] VA  [X] FHA | [ ] Conventional  [ ] USDA/Rural Housing Service | [ ] Other: (explain) | Agency Case Number 374-4600200 | Lender Case Number 03076514 |
|---|---|---|---|---|---|

| Amount $ 364250.00 | Interest Rate 6.250 % | No. of Months 360 | Amortization Type: | [X] Fixed Rate  [ ] GPM | [ ] Other (explain): [ ] ARM (type): |
|---|---|---|---|---|---|

## II. PROPERTY INFORMATION AND PURPOSE OF LOAN

| Subject Property Address (street, city, state & ZIP) 37 NEWARK AVENUE, STATEN ISLAND, RICHMOND NY 10302 | No. of Units 1 |
|---|---|

| Legal Description of Subject Property (attach description if necessary) DISTRICT: SECTION: BLOCK: LOT: | Year Built |
|---|---|

| Purpose of Loan: [X] Purchase  [ ] Construction  [ ] Other (explain): [ ] Refinance  [ ] Construction-Permanent | Property will be: [X] Primary Residence  [ ] Secondary Residence  [ ] Investment |
|---|---|

**Complete this line if construction or construction-permanent loan.**

| Year Lot Acquired | Original Cost $ | Amount Existing Liens $ | (a) Present Value of Lot $ | (b) Cost of Improvements $ | Total (a + b) $ |
|---|---|---|---|---|---|

**Complete this line if this is a refinance loan.**

| Year Acquired | Original Cost $ | Amount Existing Liens $ | Purpose of Refinance | Describe Improvements [ ] made [ ] to be made  Cost: $ |
|---|---|---|---|---|

| Title will be held in what Name(s) LEONARDO AND JANNETTE MORALES | Manner in which Title will be held Joint Tenancy | Estate will be held in: [X] Fee Simple |
|---|---|---|

| Source of Down Payment, Settlement Charges and/or Subordinate Financing (explain) SAVINGS, NEHIEMIAH, AND SELLERS CONCESSION | [ ] Leasehold (show expiration date) |
|---|---|

## III. BORROWER INFORMATION

| Borrower | Co-Borrower |
|---|---|
| Borrower's Name (include Jr. or Sr. if applicable) LEONARDO MORALES | Co-Borrower's Name (include Jr. or Sr. if applicable) |

| Social Security Number 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 | Home Phone (incl. area code) 718-234-1432 | DOB (MM/DD/YYYY) 05/15/1978 | Yrs. School 16 | Social Security Number | Home Phone (incl. area code) | DOB (MM/DD/YYYY) | Yrs. School |
|---|---|---|---|---|---|---|---|

| [X] Married  [ ] Unmarried (include single, divorced, widowed)  [ ] Separated | Dependents (not listed by Co-Borrower) no. 2  ages 16, 20MTHS | [ ] Married  [ ] Unmarried (include single, divorced, widowed)  [ ] Separated | Dependents (not listed by Borrower) no.  ages |
|---|---|---|---|

| Present Address (street, city, state, ZIP) [ ] Own [X] Rent No. Yrs 1YR 10M 72-19 19TH AVENUE BROOKLYN, NY 11204 | Present Address (street, city, state, ZIP) [ ] Own [ ] Rent No. Yrs |
|---|---|

| Mailing Address, if different from Present Address | Mailing Address, if different from Present Address |
|---|---|

**If residing at present address for less than two years, complete the following:**

| Former Address (street, city, state, ZIP) [ ] Own [X] Rent No. Yrs: 4YRS W 324 56TH STREET BROOKLYN, NY 11220 | Former Address (street, city, state, ZIP) [ ] Own [ ] Rent No. Yrs: |
|---|---|

## IV. EMPLOYMENT INFORMATION

| Borrower | Co-Borrower |
|---|---|
| Name & Address of Employer [ ] Self Employed HAVAS NORTH AMERICA ATTN: HUMAN RESOURCES 359 HUDSON STREET NEW YORK, NY 10014 | Yrs. on this job 8Y2M  Yrs. employed in this line of work/profession | Name & Address of Employer [ ] Self Employed | Yrs. on this job  Yrs. employed in this line of work/profession |

| Position/Title/Type of Business FACILITIES operations | Business Phone (incl. area code) 212-886-3967 | Position/Title/Type of Business | Business Phone (incl. area code) |
|---|---|---|---|

**If employed in current position for less than two years or if currently employed in more than one position, complete the following:**

| Name & Address of Employer [ ] Self Employed | Dates (from - to)  Monthly Income $ | Name & Address of Employer [ ] Self Employed | Dates (from - to)  Monthly Income $ |
|---|---|---|---|
| Position/Title/Type of Business | Business Phone (incl. area code) | Position/Title/Type of Business | Business Phone (incl. area code) |
| Name & Address of Employer [ ] Self Employed | Dates (from - to)  Monthly Income $ | Name & Address of Employer [ ] Self Employed | Dates (from - to)  Monthly Income $ |
| Position/Title/Type of Business | Business Phone (incl. area code) | Position/Title/Type of Business | Business Phone (incl. area code) |

Freddie Mac Form 65 07/05
1003PG1 10/05
Page 1 of 4
Printed by The Loan Handler from Ellie Mae, Inc. - www.elliemae.com
Fannie Mae Form 1003 07/05

FC62892

## V. MONTHLY INCOME AND COMBINED HOUSING EXPENSE INFORMATION

| Gross Monthly Income | Borrower | Co-Borrower | Total | Combined Monthly Housing Expense | Present | Proposed |
|---|---|---|---|---|---|---|
| Base Empl. Income * | $ 3625.70 | $ | $ 3625.70 | Rent | $ 1300.00 | |
| Overtime | | | | First Mortgage (P&I) | | $ 2242.75 |
| Bonuses | | | | Other Financing (P&I) | | |
| Commissions | | | | Hazard Insurance | | 96.33 |
| Dividends/Interest | | | | Real Estate Taxes | | 125.00 |
| Net Rental Income | | | | Mortgage Insurance | | 148.73 |
| Other (before completing see the notice in "describe other income," below) | | | | Homeowner Assn. Dues | | |
| | | | | Other: | | |
| Total | $ 3625.70 | $ | $ 3625.70 | Total | $ 1300.00 | $ 2612.81 |

\* **Self Employed Borrower(s)** may be required to provide additional documentation such as tax returns and financial statements.

| B/C | Describe Other Income  *Notice:* Alimony, child support, or separate maintenance income need not be revealed if the Borrower (B) or Co-Borrower (C) does not choose to have it considered for repaying this loan. | Monthly Amount |
|---|---|---|
| | | $ |
| | | |
| | | |

## VI. ASSETS AND LIABILITIES

This Statement and any applicable supporting schedules may be completed jointly by both married and unmarried Co-Borrowers if their assets and liabilities are sufficiently joined so that the Statement can be meaningfully and fairly presented on a combined basis; otherwise, separate Statements and Schedules are required. If the Co-Borrower section was completed about a non-applicant spouse or other person, this Statement and supporting schedules must be completed about that spouse or other person also.     Completed [ ] Jointly [X] Not Jointly

| Description  ASSETS | Cash or Market Value | Liabilities and Pledged Assets. List the creditor's name, address and account number for all outstanding debts, including automobile loans, revolving charge accounts, real estate loans, alimony, child support, stock pledges, etc. Use continuation sheet, if necessary. Indicate by (*) those liabilities, which will be satisfied upon sale of real estate owned or upon refinancing of the subject property. | | |
|---|---|---|---|---|
| Cash deposit toward purchase held by:  **SELLER'S ATTORNEY** | $ | **LIABILITIES** | Monthly Payment & Months Left to Pay | Unpaid Balance |
| *List checking and savings accounts below* | | Name and address of Company | $ Payment/Months | $ |
| Name and address of Bank, S&L, or Credit Union  **COMMERCE BANK** | | TARGET | *132.00 37 | *4882.00 |
| | | Acct. no.  435237670435 | | |
| Acct. no. **7920782666** | $ 1246.21 | Name and address of Company  GEMB/PCR | $ Payment/Months  *58.00 34 | $  *1954.00 |
| Name and address of Bank, S&L, or Credit Union | | Acct. no.  601917032577 | | |
| Acct. no. | $ | Name and address of Company  PC RICH/GEMB | $ Payment/Months  *52.00 34 | $  *1739.00 |
| Name and address of Bank, S&L, or Credit Union | | Acct. no.  601917032217 | | |
| Acct. no. | $ | Name and address of Company  CHASE | $ Payment/Months  *20.00 40 | $  *796.00 |
| Name and address of Bank, S&L, or Credit Union | | Acct. no.  182000000918 | | |
| Acct. no. | $ | Name and address of Company  ZALES / CBSD | $ Payment/Months  *20.00 24 | $  *476.00 |
| | | Acct. no.  603525110558 | | |
| Stocks & Bonds (Company name/number & description) | $  $ | Name and address of Company  MACYS | $ Payment/Months  *7.00 20 | $  *137.00 |
| Life Insurance net cash value | $ | Acct. no.  485960 | | |
| Face amount: $ | | Name and address of Company  See Sch Of Liabilities | $ Payment/Months  15.00 | $  808.00 |
| **Subtotal Liquid Assets** | $ 1246.21 | | | |
| Real estate owned (enter market value from schedule of real estate owned) | $ | | | |
| Vested interest in retirement fund | $ | Acct. no. | | |
| Net worth of business(es) owned (attach financial statement) | $ | Alimony/Child Support/Separate Maintenance Payments Owed to: | $ | |
| Automobiles owned (make and year) | $ | | | |
| Other Assets (itemize) | $ | Job-Related Expense (child care, union dues, etc.) | $ | |
| | | **Total Monthly Payments** | $ 304.00 | |
| **Total Assets a.** | $ 1246.21 | Net Worth (a minus b) | $ -9545.79 | **Total Liabilities b.** | $ 10792.00 |

Freddie Mac 65 07/05
1003PG2 10/05

Printed by The Loan Handler from Ellie Mae, Inc. • www.elliemae.com

Fannie Mae Form 1003 07/05

**LEONARDO    MORALES**

**FC62893**

## VI. ASSETS AND LIABILITIES (cont.)

**Schedule of Real Estate Owned** (If additional properties are owned, use continuation sheet.)

| Property Address (enter S if sold, PS if pending sale or R if rental being held for income) | Type of Property | Present Market Value | Amount of Mortgages & Liens | Gross Rental Income | Mortgage Payments | Insurance, Maintenance, Taxes & Misc. | Net Rental Income |
|---|---|---|---|---|---|---|---|
| | | $ | $ | $ | $ | $ | $ |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | Totals | $ | $ | $ | $ | $ | $ |

**List any additional names under which credit has previously been received and indicate appropriate creditor name(s) and account number(s):**

| Alternate Name | Creditor Name | Account Number |
|---|---|---|
| | | |
| | | |

## VII. DETAILS OF TRANSACTION

| | | |
|---|---|---|
| a. | Purchase price | $ 370000.00 |
| b. | Alterations, improvements, repairs | |
| c. | Land (if acquired separately) | |
| d. | Refinance (incl. debts to be paid off) | |
| e. | Estimated prepaid items | 2852.13 |
| f. | Estimated closing costs | 22336.08 |
| g. | PMI, MIP, Funding Fee | 33.50 |
| h. | Discount (if Borrower will pay) | |
| i. | Total costs (add items a through h) | 395221.71 |
| j. | Subordinate financing | |
| k. | Borrower's closing costs paid by Seller | 18746.69 |
| l. | Other Credits (explain) NEHIEMIAH | 11225.00 |
| | down payment | 1000.00 |
| m. | Loan amount (exclude PMI, MIP, Funding Fee financed) | 358900.00 |
| n. | PMI, MIP, Funding Fee financed   1.5 | 5350.00 |
| o. | Loan amount (add m & n) | 364250.00 |
| p. | Cash from / to Borrower (subtract j, k, l & o from i) | 0.02 |

## VIII. DECLARATIONS

If you answer "Yes" to any questions a through i, please use continuation sheet for explanation.

| | | Borrower Yes | Borrower No | Co-Borrower Yes | Co-Borrower No |
|---|---|---|---|---|---|
| a. | Are there any outstanding judgments against you? | | X | | |
| b. | Have you been declared bankrupt within the past 7 years? | X | | | |
| c. | Have you had property foreclosed upon or given title or deed in lieu thereof in the last 7 years? | | X | | |
| d. | Are you a party to a lawsuit? | | X | | |
| e. | Have you directly or indirectly been obligated on any loan which resulted in foreclosure, transfer of title in lieu of foreclosure, or judgment? (This would include such loans as home mortgage loans, SBA loans, home improvement loans, educational loans, manufactured (mobile) home loans, any mortgage, financial obligation, bond, or loan guarantee. If "Yes," provide details, including date, name and address of Lender, FHA or VA case number, if any, and reasons for the action.) | | X | | |
| f. | Are you presently delinquent or in default on any Federal debt or any other loan, mortgage, financial obligation, bond, or loan guarantee? If "Yes," give details as described in the preceding question. | | X | | |
| g. | Are you obligated to pay alimony, child support, or separate maintenance? | | X | | |
| h. | Is any part of the down payment borrowed? | | X | | |
| i. | Are you a co-maker or endorser on a note? | | X | | |
| j. | Are you a U.S. citizen? | X | | | |
| k. | Are you a permanent resident alien? | | X | | |
| l. | Do you intend to occupy the property as your primary residence? If "Yes," complete question m below. | X | | | |
| m. | Have you had an ownership interest in a property in the last three years? | | X | | |
| | (1) What type of property did you own — principal residence (PR), second home (SH), or investment property (IP)? | | | | |
| | (2) How did you hold title to the home — solely by yourself (S), jointly with your spouse (SP), or jointly with another person (O)? | | | | |

## IX. ACKNOWLEDGMENT AND AGREEMENT

Each of the undersigned specifically represents to Lender and to Lender's actual or potential agents, brokers, processors, attorneys, insurers, servicers, successors and assigns and agrees and acknowledges that: (1) the information provided in this application is true and correct as of the date set forth opposite my signature and that any intentional or negligent misrepresentation of this information contained in this application may result in civil liability, including monetary damages, to any person who may suffer any loss due to reliance upon any misrepresentation that I have made on this application, and/or in criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Sec. 1001, et seq.; (2) the loan requested pursuant to this application (the "Loan") will be secured by a mortgage or deed of trust on the property described in this application; (3) the property will not be used for any illegal or prohibited purpose or use; (4) all statements made in this application are made for the purpose of obtaining a residential mortgage loan; (5) the property will be occupied as indicated in this application; (6) the Lender, its servicers, successors or assigns may retain the original and/or electronic record of this application, whether or not the Loan is approved; (7) the Lender and its agents, brokers, insurers, servicers, successors and assigns may continuously rely on the information contained in the application, and I am obligated to amend and/or supplement the information provided in this application if any of the material facts that I have represented herein should change prior to closing of the Loan; (8) in the event that my payments on the Loan become delinquent, the Lender, its servicers, successors or assigns may, in addition to any other rights and remedies that it may have relating to such delinquency, report my name and account information to one or more consumer credit reporting agencies; (9) ownership of the Loan and/or administration of the Loan account may be transferred with such notice as may be required by law; (10) neither Lender nor its agents, brokers, insurers, servicers, successors or assigns has made any representation or warranty, express or implied, to me regarding the property or the condition or value of the property; and (11) my transmission of this application as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or my facsimile transmission of this application containing a facsimile of my signature, shall be as effective, enforceable and valid as if a paper version of this application were delivered containing my original written signature.

**Acknowledgement.** Each of the undersigned hereby acknowledges that any owner of the Loan, its servicers, successors and assigns, may verify or reverify any information contained in this application or obtain any information or data relating to the Loan, for any legitimate business purpose through any source, including a source named in this application or a consumer reporting agency.

| Borrower's Signature | Date | Co-Borrower's Signature | Date |
|---|---|---|---|
| *Leonard Morales* | 4/18/07 | X | |

## X. INFORMATION FOR GOVERNMENT MONITORING PURPOSES

The following information is requested by the Federal Government for certain types of loans related to a dwelling in order to monitor the lender's compliance with equal credit opportunity, fair housing and home mortgage disclosure laws. You are not required to furnish this information, but are encouraged to do so. The law provides that a lender may not discriminate either on the basis of this information, or on whether you choose to furnish it. If you furnish the information, please provide both ethnicity and race. For race, you may check more than one designation. If you do not furnish ethnicity, race, or sex, under Federal regulations, this lender is required to note the information on the basis of visual observation and surname if you have made this application in person. If you do not wish to furnish the information, please check the box below. (Lender must review the above material to assure that the disclosures satisfy all requirements to which the lender is subject under applicable state law for the particular type of loan applied for.)

| **BORROWER** ☐ I do not wish to furnish this information. | **CO-BORROWER** ☐ I do not wish to furnish this information. |
|---|---|
| **Ethnicity:** [X] Hispanic or Latino ☐ Not Hispanic or Latino | **Ethnicity:** [X] Hispanic or Latino ☐ Not Hispanic or Latino |
| **Race:** ☐ American Indian or Alaska Native ☐ Asian ☐ Black or African American / ☐ Native Hawaiian or Other Pacific Islander [X] White | **Race:** ☐ American Indian or Alaska Native ☐ Asian ☐ Black or African American / ☐ Native Hawaiian or Other Pacific Islander ☐ White |
| **Sex:** ☐ Female [X] Male | **Sex:** ☐ Female ☐ Male |

**To be Completed by Interviewer**

This application was taken by:
[X] Face-to-face interview
☐ Mail
☐ Telephone
☐ Internet

| Interviewer's Name (print or type) SETH LAPIDUS | Name and Address of Interviewer's Employer |
|---|---|
| Interviewer's Signature | CAMBRIDGE HOME CAPITAL LLC |
| Date 4/18/07 | 80 CUTTERMILL ROAD, STE #408 |
| Interviewer's Phone Number (incl. area code) 516-829-5700 | GREAT NECK, NY 11021 |

Freddie Mac 65 07/05
1003FG3 10/05
LEONARDO MORALES

Page 3 of 4
Printed by The Loan Handler from Ellie Mae, Inc. — www.elliemae.com

Fannie Mae Form 1003 07/05

FC62894

## Continuation Sheet/Residential Loan Application

| Use this continuation sheet if you need more space to complete the Residential Loan Application. Mark B for Borrower or C for Co-Borrower. | Borrower:<br>**LEONARDO MORALES** | Agency Case Number:<br>374-4600200 |
|---|---|---|
| | Co-Borrower: | Lender Case Number:<br>03076514 |

### LIABILITIES ADDENDUM

| Creditor's Name<br>Address/City/State/Zipcode | Account Number | Payment | Months Left<br>To Pay | Balance |
|---|---|---|---|---|
| CAPTITAL ONE BANK | 51780523 | *15.00 | 4 | *59.00 |
| AFNI COLLECTION ACCOUNT | 101174 | 0.00 | 0 | *749.00 |
| | TOTAL: | 15.00 | | 808.00 |

I/We fully understand that it is a Federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements concerning any of the above facts as applicable under the provisions of Title 18, United States Code, Section 1001, et seq.

| Borrower's Signature | Date | Co-Borrower's Signature | Date |
|---|---|---|---|
| X _Leonard Morales_ | 4/9/07 | X | |

Freddie Mac Form 65 07/05
1003PG4 10/05

Page 4 of 4

Fannie Mae Form 1003 07/05

Printed by The Loan Handler from Ellie Mae, Inc. ~ www.elliemae.com

**FC62895**

# EXHIBIT 3

Post Closing Agreement
94-51 116th Street
Richmond Hill, NY 11419

JUNE 14, 2007

This agreement made between Mitchell Cohen and Clarence Moore and Michelle Johnson is made to induce Clarence Moore and Michelle Johnson to close on the purchase of the above referenced Premises. Accordingly, Mitchell Cohen agrees to perform the following work within the next 7 days to the satisfaction of Mr. Moore and Ms. Johnson:

1) Replace Kitchen
2) Sand and refinish wood floors
3) Clean out attic
4) Remove washing Machine and Television
5) Repair window left front of house
6) Repair leader from roof.
7) Refurbish bathroom and replace missing shower Knob.

This agreement shall be personally guaranteed by Mark Wolf, Esq.

Agreed:

Clarence Moore                    Michelle Johnson

Mitchell Cohen                    Mark Wolf, Esq.

BAH 01449

# EXHIBIT 4

1261

BUY A HOME LLC

SB-701/214

DATE _6/15/07_

PAY TO THE ORDER OF _Clarence Moore_ | $ _6500_

_Sixty Cinq thousand_ _____ DOLLARS

**North Fork** Bank
www.northforkbank.com

FOR _995 116 St_

⑈001261⑈ ⑆021407912⑆ 2064⑈04158⑈1⑈

BAH 01448

# EXHIBIT 5



**REMEMBER:**
*Sign everywhere you see this "Check."* ™

## Uniform Residential Loan Application

This application is designed to be completed by the applicant(s) with the Lender's assistance. Applicants should complete this form as "Borrower" or "Co-Borrower," as applicable. Co-Borrower information must also be provided (and the appropriate box checked) when □the income or assets of a person other than the Borrower (including the Borrower's spouse) will be used as a basis for loan qualification or □the income or assets of the Borrower's spouse or other person who has community property rights pursuant to state law will not be used as a basis for loan qualification, but his or her liabilities must be considered because the spouse or other person has community property rights pursuant to applicable law and Borrower resides in a community property state, the security property is located in a community property state, or the Borrower is relying on other property located in a community property state as a basis for repayment of the loan.

If this is an application for joint credit, Borrower and Co-Borrower each agree that we intend to apply for joint credit (sign below):

_____   _____
Borrower                     Co-Borrower

### I. TYPE OF MORTGAGE AND TERMS OF LOAN

| Mortgage Applied for: | □ VA<br>☑ FHA | □ Conventional<br>□ USDA/Rural Housing Service | □ Other (explain): | Agency Case Number | Lender Case Number |
|---|---|---|---|---|---|

| Amount<br>$ 360,750 | Interest Rate<br>5.90 % | No. of Months<br>360 | Amortization Type: | □ Fixed Rate<br>□ GPM | □ Other (explain):<br>□ ARM (type): |
|---|---|---|---|---|---|

### II. PROPERTY INFORMATION AND PURPOSE OF LOAN

| Subject Property Address (street, city, state & ZIP) 116 N 14th St. South Ozone Park NY | No. of Units 1 |
|---|---|

| Legal Description of Subject Property (attach description if necessary) | Year Built |
|---|---|

| Purpose of Loan | ☑ Purchase<br>□ Refinance | □ Construction<br>□ Construction-Permanent | □ Other (explain): | Property will be:<br>☑ Primary Residence | □ Secondary Residence | □ Investment |
|---|---|---|---|---|---|---|

**Complete this line if construction or construction-permanent loan.**

| Year Lot Acquired | Original Cost<br>$ | Amount Existing Liens<br>$ | (a) Present Value of Lot<br>$ | (b) Cost of Improvements<br>$ | Total (a+b)<br>$ |
|---|---|---|---|---|---|

**Complete this line if this is a refinance loan.**

| Year Acquired | Original Cost<br>$ | Amount Existing Liens<br>$ | Purpose of Refinance | Describe Improvements  □ made   □ to be made<br>Cost: $ |
|---|---|---|---|---|

| Title will be held in what Name(s) Haymawatie Sudeen + Shenn Tirath+ Indra Tirath | Manner in which Title will be held jointly | Estate will be held in:<br>☑ Fee Simple<br>□ Leasehold (show expiration date) |
|---|---|---|

| Source of Down Payment, Settlement Charges, and/or Subordinate Financing (explain) Savings + Nihemath + Seller Concession | | |
|---|---|---|

### III. BORROWER INFORMATION

| Borrower | Co-Borrower |
|---|---|

| Borrower's Name (include Jr. or Sr. if applicable) Haymawatie Sudeen | Co-Borrower's Name (include Jr. or Sr. if applicable) Shen Tirath |
|---|---|

| Social Security Number 14-94-5262 | Home Phone (incl. area code) 607-041- | DOB (mm/dd/yyyy) 10/15/59 | Yrs. School | Social Security Number 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 | Home Phone (incl. area code) 212 364-742- | DOB (mm/dd/yyyy) 16/21/70 | Yrs. School |
|---|---|---|---|---|---|---|---|

| □ Married  ☑ Unmarried (include single, divorced, widowed)  □ Separated | Dependents (not listed by Co-Borrower)<br>no | □ Married  ☑ Unmarried (include single, divorced, widowed)  □ Separated | Dependents (not listed by Borrower)<br>no   ages |
|---|---|---|---|

| Present Address (street, city, state, ZIP)  □ Own  ☑ Rent  No. Yrs.<br>95-28 115 St. Richmond Hill NY 11419 | Present Address (street, city, state, ZIP)  □ Own  □ Rent  No. Yrs. 6 mo<br>122 E 105 St. #24  NY NY 1029 |
|---|---|

| Mailing Address, if different from Present Address | Mailing Address, if different from Present Address |
|---|---|

**If residing at present address for less than two years, complete the following:**

| Former Address (street, city, state, ZIP)  □ Own  □ Rent  No. Yrs. | Former Address (street, city, state, ZIP)  □ Own  □ Rent  No. Yrs. |
|---|---|

### IV. EMPLOYMENT INFORMATION

| Borrower | Co-Borrower |
|---|---|

| Name & Address of Employer  □ Self Employed<br>ASCTES<br>160 Schenks Ave<br>Brooklyn NY 11339 | Yrs. on this job<br>1 yr<br>Yrs. employed in this line of work/profession | Name & Address of Employer  □ Self Employed<br>Cushman Associates<br>355 Madison Ave #1920<br>NY NY 10017 | Yrs. on this job<br>16<br>Yrs. employed in this line of work/profession |
|---|---|---|---|

| Position/Title/Type of Business<br>Teacher aide | Business Phone (incl. area code)<br>212-511-571 | Position/Title/Type of Business<br>Concierge/Agt | Business Phone (incl. area code)<br>212-969-066 |
|---|---|---|---|

**If employed in current position for less than two years or if currently employed in more than one position, complete the following:**

| Name & Address of Employer  □ Self Employed | Dates (from – to) | Name & Address of Employer  □ Self Employed | Dates (from – to) |
|---|---|---|---|
| | Monthly Income<br>$ | | Monthly Income<br>$ |

| Position/Title/Type of Business | Business Phone (incl. area code) | Position/Title/Type of Business | Business Phone (incl. area code) |
|---|---|---|---|

| Name & Address of Employer  □ Self Employed | Dates (from – to) | Name & Address of Employer  □ Self Employed | Dates (from – to) |
|---|---|---|---|
| | Monthly Income<br>$ | | Monthly Income<br>$ |

| Position/Title/Type of Business | Business Phone (incl. area code) | Position/Title/Type of Business | Business Phone (incl. area code) |
|---|---|---|---|

CONFIDENTIAL CAMBRIDGE 5.28.10  015192

## V. MONTHLY INCOME AND COMBINED HOUSING EXPENSE INFORMATION

| Gross Monthly Income | Borrower | Co-Borrower | Total | Combined Monthly Housing Expense | Present | Proposed |
|---|---|---|---|---|---|---|
| Base Empl. Income* | $ 173. | $ 313.. | $ 4mb | Rent | $ yee | |
| Overtime | | | | First Mortgage (P&I) | | |
| Bonuses | | | | Other Financing (P&I) | | |
| Commissions | | | | Hazard Insurance | | |
| Dividends/Interest | | | | Real Estate Taxes | | |
| Net Rental Income | | | | Mortgage Insurance | | |
| Other (before completing, see the notice in "describe other income," below) | | | | Homeowner Assn. Dues | | |
| | | | | Other: | | |
| Total | $ 1733 | $ 3113 | $ 4m6 | Total | $ | $ |

* Self Employed Borrower(s) may be required to provide additional documentation such as tax returns and financial statements.

**Describe Other Income**   *Notice:* Alimony, child support, or separate maintenance income need not be revealed if the Borrower (B) or Co-Borrower (C) does not choose to have it considered for repaying this loan.

| B/C | | Monthly Amount |
|---|---|---|
| | | $ |

## VI. ASSETS AND LIABILITIES

This Statement and any applicable supporting schedules may be completed jointly by both married and unmarried Co-Borrowers if their assets and liabilities are sufficiently joined so that the Statement can be meaningfully and fairly presented on a combined basis; otherwise, separate Statements and Schedules are required. If the Co-Borrower section was completed about a non-applicant spouse or other person, this Statement and supporting schedules must be completed about that spouse or other person also.

Completed ☐ Jointly ☐ Not Jointly

| ASSETS Description | Cash or Market Value | Liabilities and Pledged Assets. | Monthly Payment & Months Left to Pay | Unpaid Balance |
|---|---|---|---|---|
| Cash deposit toward Purchase held by: | $ | | | |
| List checking and savings accounts below | | LIABILITIES | | |
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company HUSC Contd Use | $ Payment/Months 15 15 | $ 331  26c. |
| Acct. no. | $ | Acct. no. | | |
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company | $ Payment/Months | $ |
| Acct. no. | $ | Acct. no. | | |
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company | $ Payment/Months | $ |
| Acct. no. | $ | Acct. no. | | |
| Name and address of Bank, S&L, or Credit Union Guu Silv (Nmm | | Name and address of Company | $ Payment/Months | $ |
| Acct. no. | $ | Acct. no. | | |
| Stocks & Bonds (Company name/ number & description) | $ | Name and address of Company | $ Payment/Months | $ |
| | | Acct. no. | | |
| Life insurance net cash value Face amount: $ | $ | Name and address of Company | $ Payment/Months | $ |
| Subtotal Liquid Assets | $ | | | |
| Real estate owned (enter market value from schedule of real estate owned) | $ | | | |
| Vested interest in retirement fund | $ | | | |
| Net worth of business(es) owned (attach financial statement) | $ | Acct. no. | | |
| Automobiles owned (make and year) | $ | Alimony/Child Support/Separate Maintenance Payments Owed to: | $ | |
| Other Assets (itemize) Howjhm | $ 4ccc. | Job-Related Expense (child care, union dues, etc.) | $ | |
| | | Total Monthly Payments | $ | |
| Total Assets a. | $ | Net Worth (a minus b) | $ | Total Liabilities b. $ |



CONFIDENTIAL CAMBRIDGE 5.28.10_015193

## VI. ASSETS AND LIABILITIES (cont'd)

**Schedule of Real Estate Owned** (If additional properties are owned, use continuation sheet )

| Property Address (enter S if sold, PS if pending sale or R if rental being held for income) | Type of Property | Present Market Value | Amount of Mortgages & Liens | Gross Rental Income | Mortgage Payments | Insurance, Maintenance, Taxes & Misc. | Net Rental Income |
|---|---|---|---|---|---|---|---|
| | | $ | $ | $ | $ | $ | $ |
| | | | | | | | |
| | | | | | | | |
| Totals | | $ | $ | $ | $ | $ | $ |

List any additional names under which credit has previously been received and indicate appropriate creditor name(s) and account number(s):

| Alternate Name | Creditor Name | Account Number |
|---|---|---|
| | | |

## VII. DETAILS OF TRANSACTION

| | |
|---|---|
| a. Purchase price | $ 371,xxx |
| b. Alterations, improvements, repairs | |
| c. Land (if acquired separately) | |
| d. Refinance (incl. debts to be paid off) | |
| e. Estimated prepaid items | |
| f. Estimated closing costs | |
| g. PMI, MIP, Funding Fee | |
| h. Discount (if Borrower will pay) | |
| i. Total costs (add items a through h) | |
| j. Subordinate financing | |
| k. Borrower's closing costs paid by Seller | |
| l. Other Credits (explain) | |
| m. Loan amount (exclude PMI, MIP, Funding Fee financed) | 365,xxx |
| n. PMI, MIP, Funding Fee financed | 544 |
| o. Loan amount (add m & n) | 365,xxx |
| p. Cash from/to Borrower (subtract j, k, l & o from i) | |

## VIII. DECLARATIONS

| If you answer "Yes" to any questions a through i, please use continuation sheet for explanation. | Borrower Yes | Borrower No | Co-Borrower Yes | Co-Borrower No |
|---|---|---|---|---|
| a. Are there any judgments against you? | ☐ | ☑ | ☐ | ☐ |
| b. Have you been declared bankrupt within the past 7 years? | ☐ | ☑ | ☐ | ☐ |
| c. Have you had property foreclosed upon or given title or deed in lieu thereof in the last 7 years? | ☐ | ☑ | ☐ | ☐ |
| d. Are you a party to a lawsuit? | ☐ | ☑ | ☐ | ☐ |
| e. Have you directly or indirectly been obligated on any loan which resulted in foreclosure, transfer of title in lieu of foreclosure, or judgment? (This would include such loans as home mortgage loans, SBA loans, home improvement loans, educational loans, manufactured (mobile) home loans, any mortgage, financial obligation, bond, or loan guarantee. If "Yes," provide details, including date, name, and address of Lender, FHA or VA case number, if any, and reasons for the action.) | ☐ | ☑ | ☐ | ☐ |
| f. Are you presently delinquent or in default on any Federal debt or any other loan, mortgage, financial obligation, bond, or loan guarantee? If "Yes," give details as described in the preceding question. | ☐ | ☑ | ☐ | ☐ |
| g. Are you obligated to pay alimony, child support, or separate maintenance? | ☐ | ☑ | ☐ | ☐ |
| h. Is any part of the down payment borrowed? | ☐ | ☑ | ☐ | ☐ |
| i. Are you a co-maker or endorser on a note? | ☐ | ☑ | ☐ | ☐ |
| j. Are you a U.S. citizen? | ☐ | ☐ | ☐ | ☐ |
| k. Are you a permanent resident alien? | ☐ | ☐ | ☐ | ☐ |
| l. Do you intend to occupy the property as your primary residence? If "Yes," complete question m below | ☑ | ☐ | ☑ | ☐ |
| m. Have you had an ownership interest in a property in the last three years? | ☐ | ☑ | ☐ | ☑ |
| (1) What type of property did you own – principal residence (PR), second home (SH), or investment property (IP)? | | | | |
| (2) How did you hold title to the home – solely by yourself (S), jointly with your spouse (SP), or jointly with another person (O)? | | | | |

## IX. ACKNOWLEDGEMENT AND AGREEMENT

Each of the undersigned specifically represents to Lender and to Lender's actual or potential agents, brokers, processors, attorneys, insurers, servicers, successors and assigns and agrees and acknowledges that: (1) the information provided in this application is true and correct as of the date set forth opposite my signature and that any intentional or negligent misrepresentation of this information contained in this application may result in civil liability, including monetary damages, to any person who may suffer any loss due to reliance upon any misrepresentation that I have made on this application, and/or in criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Sec. 1001, et seq., (2) the loan requested pursuant to this application (the "Loan") will be secured by a mortgage or deed of trust on the property described in this application; (3) the property will not be used for any illegal or prohibited purpose or use, (4) all statements made in this application are made for the purpose of obtaining a residential mortgage loan, (5) the property will be occupied as indicated in this application; (6) the Lender, its servicers, successors or assigns may retain the original and/or an electronic record of this application, whether or not the Loan is approved; (7) the Lender and its agents, brokers, insurers, servicers, successors, and assigns may continuously rely on the information contained in the application, and I am obligated to amend and/or supplement the information provided in this application if any of the material facts that I have represented herein should change prior to closing of the Loan; (8) in the event that my payments on the Loan become delinquent, the Lender, its servicers, successors or assigns may, in addition to any other rights and remedies that it may have relating to such delinquency, report my name and account information to one or more consumer reporting agencies; (9) ownership of the Loan and/or administration of the Loan account may be transferred with such notice as may be required by law; (10) neither Lender nor its agents, brokers, insurers, servicers, successors or assigns has made any representation or warranty, express or implied, to me regarding the property or the condition or value of the property, and (11) my transmission of this application as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or my facsimile transmission of this application containing a facsimile of my signature, shall be as effective, enforceable and valid as if a paper version of this application were delivered containing my original written signature.

**Acknowledgement.** Each of the undersigned hereby acknowledges that any owner of the Loan, its servicers, successors and assigns, may verify or reverify any information contained in this application or obtain any information or data relating to the Loan, for any legitimate business purpose through any source, including a source named in this application or a consumer reporting agency.

| Borrower's Signature X | Date 4/13/07 | Co-Borrower's Signature X | Date 4/13/07 |
|---|---|---|---|

## X. INFORMATION FOR GOVERNMENT MONITORING PURPOSES

The following information is requested by the Federal Government for certain types of loans related to a dwelling in order to monitor the lender's compliance with equal credit opportunity, fair housing and home mortgage disclosure laws. You are not required to furnish this information, but are encouraged to do so. The law provides that a lender may not discriminate either on the basis of this information, or on whether you choose to furnish it. If you furnish the information, please provide both ethnicity and race. For race, you may check more than one designation. If you do not furnish ethnicity, race, or sex, under Federal regulations, this lender is required to note the information on the basis of visual observation and surname if you have made this application in person. If you do not wish to furnish the information, please check the box below. (Lender must review the above material to assure that the disclosures satisfy all requirements to which the lender is subject under applicable state law for the particular type of loan applied for.)

**BORROWER** ☐ I do not wish to furnish this information

| Ethnicity: | ☐ Hispanic or Latino | ☑ Not Hispanic or Latino |
|---|---|---|
| Race: | ☐ American Indian or Alaska Native  ☐ Asian  ☐ Black or African American | |
| | ☐ Native Hawaiian or Other Pacific Islander  ☐ White | |

Sex: ☐ Female  ☑ Male

**CO-BORROWER** ☐ I do not wish to furnish this information

| Ethnicity: | ☐ Hispanic or Latino | ☑ Not Hispanic or Latino |
|---|---|---|
| Race: | ☐ American Indian or Alaska Native  ☐ Asian  ☐ Black or African American | |
| | ☐ Native Hawaiian or Other Pacific Islander  ☐ White | |

Sex: ☑ Female  ☐ Male

| To be Completed by Interviewer | Interviewer's Name (print or type) | |
|---|---|---|
| This application was taken by: ☐ Face-to-face interview ☐ Mail ☐ Telephone ☐ Internet | Interviewer's Signature | Date |
| | Interviewer's Phone Number | **CAMBRIDGE HOME CAPITAL, LLC** 80 CUTTERMILL ROAD, SUITE 405 GREAT NECK, N.Y. 11021 |

RECEIVED APR 13 2007

CONFIDENTIAL CAMBRIDGE 5.28.10  015194

**CONTINUATION SHEET/RESIDENTIAL LOAN APPLICATION**

| Use this continuation sheet if you need more space to complete the Residential Loan Application. Mark B for Borrower or C for Co-Borrower. | Borrower: | | Agency Case Number: | |
|---|---|---|---|---|
| | Co-Borrower. | | Lender Case Number | |

I/We fully understand that it is a Federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements concerning any of the above facts as applicable under the provisions of Title 18, United States Code, Section 1001, et seq.

| Borrower's Signature | Date | Co-Borrower's Signature | Date |
|---|---|---|---|
| X | | X | |

CONFIDENTIAL CAMBRIDGE 5.28.10  015195

CAMBRIDGE HOME CAPITAL LLC

# Uniform Residential Loan Application

This application is designed to be completed by the applicant(s) with the Lender's assistance. Applicants should complete this form as "Borrower" or "Co-Borrower", as applicable. Co-Borrower information must also be provided (and the appropriate box checked) when [X] the income or assets of a person other than the Borrower (including the Borrower's spouse) will be used as a basis for loan qualification or [ ] the income or assets of the Borrower's spouse or other person who has community property rights pursuant to state law will not be used as a basis for loan qualification, but his or her liabilities must be considered because the spouse or other person has community property rights pursuant to applicable law and Borrower resides in a community property state, the security property is located in a community property state, or the Borrower is relying on other property located in a community property state as a basis for repayment of the loan.

If this is an application for joint credit, Borrower and Co-Borrower each agree that we intend to apply for joint credit (sign below):

Borrower _____   Co-Borrower _____

## I. TYPE OF MORTGAGE AND TERMS OF LOAN

| Mortgage Applied for: | [ ] VA  [ ] Conventional  [ ] Other: (explain) | Agency Case Number | Lender Case Number |
|---|---|---|---|
| | [X] FHA  [ ] USDA/Rural Housing Service | 374-460391-6-703 | 04076532 |

| Amount | Interest Rate | No. of Months | Amortization Type: | [X] Fixed Rate | [ ] Other (explain): |
|---|---|---|---|---|---|
| $ 461750.00 | 6.000 % | 360 | | [ ] GPM | [ ] ARM (type): |

## II. PROPERTY INFORMATION AND PURPOSE OF LOAN

| Subject Property Address (street, city, state & ZIP) | No. of Units |
|---|---|
| 424 BEACH 46TH STREET, FAR ROCKAWAY, QUEENS NY 11691 | 2 |

| Legal Description of Subject Property (attach description if necessary) | Year Built |
|---|---|
| DISTRICT: SECTION: BLOCK: 15968 LOT: 12 | |

| Purpose of Loan | [X] Purchase  [ ] Construction  [ ] Other (explain): | Property will be: |
|---|---|---|
| | [ ] Refinance  [ ] Construction-Permanent | [X] Primary Residence  [ ] Secondary Residence  [ ] Investment |

**Complete this line if construction or construction-permanent loan.**

| Year Lot Acquired | Original Cost | Amount Existing Liens | (a) Present Value of Lot | (b) Cost of Improvements | Total (a + b) |
|---|---|---|---|---|---|
| | $ | $ | $ | $ | $ |

**Complete this line if a refinance loan.**

| Year Acquired | Original Cost | Amount Existing Liens | Purpose of Refinance | Describe Improvements [ ] made [ ] to be made |
|---|---|---|---|---|
| | $ | $ | | Cost: $ |

| Title will be held in what Name(s) | Manner in which Title will be held | Estate will be held in: |
|---|---|---|
| HAYMAWATIE SOODEEN, SHARON FRENCH & IND JOINLTY | | [X] Fee Simple |
| Source of Down Payment, Settlement Charges and/or Subordinate Financing (explain) | | [ ] Leasehold (show expiration date) |
| SAVINGS,NEHIEMAH & SELLER CONCESSION | | |

## III. BORROWER INFORMATION

| Borrower | Co-Borrower |
|---|---|
| Borrower's Name (include Jr. or Sr. if applicable) | Co-Borrower's Name (include Jr. or Sr. if applicable) |
| HAYMAWATIE   SOODEEN | SHARON   FRENCH |

| Social Security Number | Home Phone (incl. area code) | DOB (MM/DD/YYYY) | Yrs. School | Social Security Number | Home Phone (incl. area code) | DOB (MM/DD/YYYY) | Yrs. School |
|---|---|---|---|---|---|---|---|
| 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 | 718-607-0443 | 10/25/1959 | 12 | 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 | | | |

| [ ] Married [X] Unmarried (include single, divorced, widowed) [ ] Separated | Dependents (not listed by Co-Borrower) no. ___ ages ___ | [ ] Married [ ] Unmarried (include single, divorced, widowed) [ ] Separated | Dependents (not listed by Borrower) no. ___ ages ___ |
|---|---|---|---|

| Present Address (street, city, state, ZIP) [ ] Own [X] Rent No. Yrs: 14 | Present Address (street, city, state, ZIP) [ ] Own [ ] Rent No. Yrs. |
|---|---|
| 95-28 115TH STREET SOUTH RICHMOND HILL, NY 11419 | |

| Mailing Address, if different from Present Address | Mailing Address, if different from Present Address |
|---|---|
| | |

**If residing at present address for less than two years, complete the following:**

| Former Address (street, city, state, ZIP) [ ] Own [ ] Rent No. Yrs: | Former Address (street, city, state, ZIP) [ ] Own [ ] Rent No. Yrs. |
|---|---|
| | |

## IV. EMPLOYMENT INFORMATION

| Borrower | | Co-Borrower | |
|---|---|---|---|
| Name & Address of Employer [ ] Self Employed | Yrs. on this job 2 weeks | Name & Address of Employer [ ] Self Employed | Yrs. on this job |
| Scarlett IBIS Restauraunt ATTN: HUMAN RESOURCES 180-05 Jamaica Avenue Jamaica, NY 11432 | Yrs. employed in this line of work/profession 10 | | Yrs. employed in this line of work/profession |
| Position/Title/Type of Business Head chef | Business Phone (incl. area code) 718-526-0165 | Position/Title/Type of Business | Business Phone (incl. area code) |

**If employed in current position for less than two years or if currently employed in more than one position, complete the following:**

| Name & Address of Employer [ ] Self Employed | Dates (from - to) | Name & Address of Employer [ ] Self Employed | Dates (from - to) |
|---|---|---|---|
| Pentagon Protection 160 Schroeders Avenue Brooklyn, NY 11239 | Monthly Income $ | | Monthly Income $ |
| Position/Title/Type of Business | Business Phone (incl. area code) 212-534-8543 | Position/Title/Type of Business | Business Phone (incl. area code) |

| Name & Address of Employer [ ] Self Employed | Dates (from - to) | Name & Address of Employer [ ] Self Employed | Dates (from - to) |
|---|---|---|---|
| | Monthly Income $ | | Monthly Income $ |
| Position/Title/Type of Business | Business Phone (incl. area code) | Position/Title/Type of Business | Business Phone (incl. area code) |

CONFIDENTIAL CAMBRIDGE 5.28.10  015180

CAMBRIDGE HOME CAPITAL LLC

| V. MONTHLY INCOME AND COMBINED HOUSING EXPENSE INFORMATION | | | | | | |
|---|---|---|---|---|---|---|
| Gross Monthly Income | Borrower | Co-Borrower | Total | Combined Monthly Housing Expense | Present | Proposed |
| Base Empl. Income * | $ 2600.00 | $ | $ 2600.00 | Rent | $ 800.00 | |
| Overtime | | | | First Mortgage (P&I) | | $ 2768.42 |
| Bonuses | | | | Other Financing (P&I) | | |
| Commissions | | | | Hazard Insurance | | 225.00 |
| Dividends/Interest | | | | Real Estate Taxes | | |
| Net Rental Income | | | | Mortgage Insurance | | 188.50 |
| Other (before completing see the notice in "describe other income," below) | 1062.50 | | 1062.50 | Homeowner Assn. Dues | | |
| | | | | Other | | 103.67 |
| Total | $ 3662.50 | $ | $ 3662.50 | Total | $ 800.00 | $ 3285.59 |

\* Self Employed Borrower(s) may be required to provide additional documentation such as tax returns and financial statements.

| B/C | Describe Other Income   Notice: Alimony, child support, or separate maintenance income need not be revealed if the Borrower (B) or Co-Borrower (C) does not choose to have it considered for repaying this loan. | Monthly Amount |
|---|---|---|
| B | Gross rental income from subject property is $1250 X 85% | $ 1062.50 |

## VI. ASSETS AND LIABILITIES

This Statement and any applicable supporting schedules may be completed jointly by both married and unmarried Co-Borrowers if their assets and liabilities are sufficiently joined so that the Statement can be meaningfully and fairly presented on a combined basis; otherwise, separate Statements and Schedules are required. If the Co-Borrower section was completed about a non-applicant spouse or other person, this Statement and supporting schedules must be completed about that spouse or other person also.

Completed   [X] Jointly   [ ] Not Jointly

| ASSETS Description | Cash or Market Value | Liabilities and Pledged Assets. List the creditor's name, address and account number for all outstanding debts, including automobile loans, revolving charge accounts, real estate loans, alimony, child support, stock pledges, etc. Use continuation sheet, if necessary. Indicate by (*) those liabilities, which will be satisfied upon sale of real estate owned or upon refinancing of the subject property. | | |
|---|---|---|---|---|
| Cash deposit toward purchase held by: | $ | LIABILITIES | Monthly Payment & Months Left to Pay | Unpaid Balance |
| SELLER'S ATTORNEY | 1000.00 | Name and address of Company | $ Payment/Months | $ |
| List checking and savings accounts below | | HSBC NV | | |
| Name and address of Bank, S&L, or Credit Union | | | 15.00 | 331.00 |
| | | | 23 | |
| | | Acct. no.   52153188 | | |
| Acct. no. | $ | Name and address of Company | $ Payment/Months | $ |
| Name and address of Bank, S&L, or Credit Union | | CAPITAL ONE BANK | | |
| | | | 15.00 | 290.00 |
| | | | 20 | |
| | | Acct. no.   48623626 | | |
| Acct. no. | $ | Name and address of Company | $ Payment/Months | $ |
| Name and address of Bank, S&L, or Credit Union | | | | |
| | | Acct. no. | | |
| Acct. no. | $ | Name and address of Company | $ Payment/Months | $ |
| Name and address of Bank, S&L, or Credit Union | | | | |
| | | Acct. no. | | |
| | | Name and address of Company | $ Payment/Months | $ |
| Acct. no. | $ | | | |
| Stocks & Bonds (Company name/number & description) | $ | | | |
| | | Acct. no. | | |
| | | Name and address of Company | $ Payment/Months | $ |
| Life Insurance net cash value | $ | | | |
| Face amount: $ | | Acct. no. | | |
| Subtotal Liquid Assets | 1000.00 | Name and address of Company | $ Payment/Months | $ |
| Real estate owned (enter market value from schedule of real estate owned) | $ | | | |
| Vested interest in retirement fund | $ | | | |
| Net worth of business(es) owned (attach financial statement) | $ | Acct. no. | | |
| Automobiles owned (make and year) | $ | Alimony/Child Support/Separate Maintenance Payments Owed to: | $ | |
| Other Assets (itemize) PERSONAL ITEMIZE | $ 40000.00 | Job-Related Expense (child care, union dues, etc.) | $ | |
| | | Total Monthly Payments | $ 30.00 | |
| Total Assets a. | $ 41000.00 | Net Worth (a minus b) $ 40379.00 | Total Liabilities b. | $ 621.00 |

HAYMAWATIE   SOODEEN

CONFIDENTIAL CAMBRIDGE 5.28.10   015181

## CAMBRIDGE HOME CAPITAL LLC

### VI. ASSETS AND LIABILITIES (cont.)

**Schedule of Real Estate Owned** (if additional properties are owned, use continuation sheet.)

| Property Address (enter S if sold, PS if pending sale or R if rental being held for income) | Type of Property | Present Market Value | Amount of Mortgages & Liens | Gross Rental Income | Mortgage Payments | Insurance, Maintenance, Taxes & Misc. | Net Rental Income |
|---|---|---|---|---|---|---|---|
| | | $ | $ | $ | $ | $ | $ |
| | | | | | | | |
| Totals | | $ | $ | $ | $ | $ | $ |

**List any additional names under which credit has previously been received and indicate appropriate creditor name(s) and account number(s):**

| Alternate Name | Creditor Name | Account Number |
|---|---|---|
| | | |

### VII. DETAILS OF TRANSACTION

| | | |
|---|---|---|
| a. Purchase price | $ | 469000.00 |
| b. Alterations, improvements, repairs | | |
| c. Land (if acquired separately) | | |
| d. Refinance (incl. debts to be paid off) | | |
| e. Estimated prepaid items | | 7463.81 |
| f. Estimated closing costs | | 21440.68 |
| g. PMI, MIP, Funding Fee | | 3.95 |
| h. Discount (if Borrower will pay) | | |
| i. Total costs (add items a through h) | | 497908.44 |
| j. Subordinate financing | | |
| k. Borrower's closing costs paid by Seller | | 19086.46 |
| l. Other Credits (explain) | | |
| NEHIEMAH GIFT | | 14070.00 |
| DOWN PAYMENT | | (1000.00) |
| m. Loan amount (exclude PMI, MIP, Funding Fee financed) | | 454930.00 |
| n. PMI, MIP, Funding Fee financed   1.5 | | 6820.00 |
| o. Loan amount (add m & n) | | 461750.00 |
| p. Cash from / to Borrower (subtract j, k, l & o from i) | | 3001.98 |

### VIII. DECLARATIONS

If you answer "Yes" to any questions a through i, please use continuation sheet for explanation.

| | | Borrower Yes | Borrower No | Co-Borrower Yes | Co-Borrower No |
|---|---|---|---|---|---|
| a. | Are there any outstanding judgments against you? | | X | | X |
| b. | Have you been declared bankrupt within the past 7 years? | | X | | X |
| c. | Have you had property foreclosed upon or given title or deed in lieu thereof in the last 7 years? | | X | | X |
| d. | Are you a party to a lawsuit? | | X | | X |
| e. | Have you directly or indirectly been obligated on any loan which resulted in foreclosure, transfer of title in lieu of foreclosure, or judgment? (This would include such loans as home mortgage loans, SBA loans, home improvement loans, educational loans, manufactured (mobile) home loans, any mortgage, financial obligation, bond, or loan guarantee. If "Yes," provide details, including date, name and address of Lender, FHA or VA case number, if any, and reasons for the action.) | | X | | X |
| f. | Are you presently delinquent or in default on any Federal debt or any other loan, mortgage, financial obligation, bond, or loan guarantee? If "Yes," give details as described in the preceding question. | | X | | X |
| g. | Are you obligated to pay alimony, child support, or separate maintenance? | | X | | X |
| h. | Is any part of the down payment borrowed? | | X | | X |
| i. | Are you a co-maker or endorser on a note? | | X | | X |
| j. | Are you a U.S. citizen? | X | | X | |
| k. | Are you a permanent resident alien? | | X | | X |
| l. | Do you intend to occupy the property as your primary residence? If "Yes," complete question m below. | X | | X | |
| m. | Have you had an ownership interest in a property in the last three years? | | X | | X |
| | (1) What type of property did you own — principal residence (PR), second home (SH), or investment property (IP)? | | | | |
| | (2) How did you hold title to the home — solely by yourself (S), jointly with your spouse (SP), or jointly with another person (O)? | | | | |

### IX. ACKNOWLEDGMENT AND AGREEMENT

Each of the undersigned specifically represents to Lender and to Lender's actual or potential agents, brokers, processors, attorneys, insurers, servicers, successors and assigns and agrees and acknowledges that: (1) the information provided in this application is true and correct as of the date set forth opposite my signature and that any intentional or negligent misrepresentation of this information contained in this application may result in civil liability, including monetary damages, to any person who may suffer any loss due to reliance upon any misrepresentation that I have made on this application, and/or in criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Sec. 1001, et seq.; (2) the loan requested pursuant to this application (the "Loan") will be secured by a mortgage or deed of trust on the property described in this application; (3) the property will not be used for any illegal or prohibited purpose or use; (4) all statements made in this application are made for the purpose of obtaining a residential mortgage loan; (5) the property will be occupied as indicated in this application; (6) the Lender, its servicers, successors or assigns may retain the original and/or an electronic record of this application, whether or not the Loan is approved; (7) the Lender and its agents, brokers, insurers, servicers, successors and assigns may continuously rely on the information contained in the application, and I am obligated to amend and/or supplement the information provided in this application if any of the material facts that I have represented herein should change prior to closing of the Loan; (8) in the event that my payments on the Loan become delinquent, the Lender, its servicers, successors or assigns may, in addition to any other rights and remedies that it may have relating to such delinquency, report my name and account information to one or more consumer credit reporting agencies; (9) ownership of the Loan and/or administration of the Loan account may be transferred with such notice as may be required by law; (10) neither Lender nor its agents, brokers, insurers, servicers, successors or assigns has made any representation or warranty, express or implied, to me regarding the property or the condition or value of the property; and (11) my transmission of this application as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or my facsimile transmission of this application containing a facsimile of my signature, shall be as effective, enforceable and valid as if a paper version of this application were delivered containing my original written signature.

**Acknowledgement.** Each of the undersigned hereby acknowledges that any owner of the Loan, its servicers, successors and assigns, may verify or reverify any information contained in this application or obtain any information or data relating to the Loan, for any legitimate business purpose through any source, including a source named in this application or a consumer reporting agency.

| Borrower's Signature | Date | Co-Borrower's Signature | Date |
|---|---|---|---|
| X Haymawatie Soodeen | 4/30/07 | X | |

### X. INFORMATION FOR GOVERNMENT MONITORING PURPOSES

The following information is requested by the Federal Government for certain types of loans related to a dwelling in order to monitor the lender's compliance with equal credit opportunity, fair housing and home mortgage disclosure laws. You are not required to furnish this information, but are encouraged to do so. The law provides that a lender may not discriminate either on the basis of this information, or on whether you choose to furnish it. If you furnish the information, please provide both ethnicity and race. For race, you may check more than one designation. If you do not furnish ethnicity, race, or sex, under Federal regulations, this lender is required to note the information on the basis of visual observation and surname if you have made this application in person. If you do not wish to furnish the information, please check the box below. (Lender must review the above material to assure that the disclosures satisfy all requirements to which the lender is subject under applicable state law for the particular type of loan applied for.)

| BORROWER | [ ] I do not wish to furnish this information. | CO-BORROWER | [ ] I do not wish to furnish this information |
|---|---|---|---|
| **Ethnicity** | [ ] Hispanic or Latino   [X] Not Hispanic or Latino | **Ethnicity** | [ ] Hispanic or Latino   [ ] Not Hispanic or Latino |
| **Race** | [ ] American Indian or Alaska Native   [ ] Asian   [ ] Black or African American   [ ] Native Hawaiian or Other Pacific Islander   [X] White | **Race** | [ ] American Indian or Alaska Native   [ ] Asian   [ ] Black or African American   [ ] Native Hawaiian or Other Pacific Islander   [ ] White |
| **Sex** | [X] Female   [ ] Male | **Sex** | [ ] Female   [ ] Male |

| To be Completed by Interviewer | Interviewer's Name (print or type) | Name and Address of Interviewer's Employer |
|---|---|---|
| This application was taken by: | SETH LAPIDUS | CAMBRIDGE HOME CAPITAL LLC |
| [X] Face-to-face interview | Interviewer's Signature          Date | 80 CUTTERMILL ROAD, STE #408 |
| [ ] Mail | | GREAT NECK, NY 11021 |
| [ ] Telephone | Interviewer's Phone Number (incl. area code) | |
| [ ] Internet | 516-829-5700 | |

HAYMAWATIE SOODEEN

CONFIDENTIAL CAMBRIDGE 5.28.10  015182

## Continuation Sheet/Residential Loan Application

| Use this continuation sheet if you need more space to complete the Residential Loan Application. Mark B for Borrower or C for Co-Borrower. | Borrower: HAYMAWATIE SOODEEN | Agency Case Number. 374-460391-6-703 |
|---|---|---|
| | Co-Borrower: SHARON FRENCH | Lender Case Number 04076532 |

### EMPLOYMENT ADDENDUM

SCARLETT IBIS RESTAURANT

180-05 JAMAICA AVENUE
JAMAICA, NY 11432

718-526-0165

Borrower
Hired:                    Term'd:
Position/Title:

Gross Monthly Income:

I/We fully understand that it is a Federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements concerning any of the above facts as applicable under the provisions of Title 18, United States Code, Section 1001, et seq.

| Borrower's Signature | | Date | Co-Borrower's Signature | | Date |
|---|---|---|---|---|---|
| X Haymawatie Soodeen | | 3/03/17 | X | | |

Freddie Mac Form 65 07/05
1003PG4 10/05

Page 4 of 4

Fannie Mae Form 1003 07/05

Printed by The Loan Handler from Ellie Mae, Inc. - www.elliemae.com

# EXHIBIT 6



# Cambridge Home Capital, LLC

80 Cuttermill Road, Suite 408, Great Neck, NY 11021 • 516-829-5700 • fax 516-829-5777

## FAX COVER SHEET

DATE: _5/24/07_

TO: _GOLDBERG_

FAX#: _516-535-3932_

RE: _____

FROM: _Jackie Dewell_

This transmission consists of _____ pages, including this cover page. If you have not received the entire transmission in a satisfactory manner, please call (516) 829-5700.

_Contract of Sale on_
_31 NEWARK Ave_

_Please Email Corrections_
_to ASAP. Closing Now_

_Thanks_

THE INFORMATION CONTAINED IN THIS FACSIMILE IS PRIVILEGED AND CONFIDENTIAL INFORMATION ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION, OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY THE SENDER BY TELEPHONE AND RETURN THE MESSAGE TO USE AT THE ADDRESS VIA U.S. POSTAL SERVICE. WE WILL GLADLY REIMBURSE YOU FOR YOUR EXPENSE.

LICENSED MORTGAGE BANKER NYS BANKING DEPARTMENT

JJG08777

JJG REAL ESTATE APPRAISAL SERVICES

FHA #374-4611153

## Small Residential Income Property Appraisal Report
File No. 31-NewarkAVe

The purpose of this summary appraisal report is to provide the lender/client with an accurate, and adequately supported, opinion of the market value of the subject property.

| | | | |
|---|---|---|---|
| Property Address 31 NEWARK AVENUE | City STATEN ISLAND | State NY | Zip Code 10302 |
| Borrower WILLIAMS | Owner of Public Record PEARSAL AVE BUILDERS | | County RICHMOND |

Legal Description SECTION: 5   BLOCK: 1123   LOT: 3

Assessor's Parcel # SAME AS ABOVE LEGAL DESCRIPTION                R.E. Taxes $ UNKNOWN

Neighborhood Name PORT RICHMOND        Map Reference 31-24-L HAG        Census Tract 219.00

Occupant [ ] Owner [ ] Tenant [X] Vacant    Special Assessments $ N/A    [ ] PUD   HOA $ N/A    [ ] per year [ ] per month

Property Rights Appraised [X] Fee Simple [ ] Leasehold [ ] Other (describe)

Assignment Type [X] Purchase Transaction [ ] Refinance Transaction [ ] Other (describe)

Lender/Client CAMBRIDGE HOME CAPITAL, LLC    Address 80 CUTTERMILL ROAD, SUITE 408, GREAT NECK, NY 11201

Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal? [X] Yes [ ] No

Report data source(s) used, offering price(s), and date(s). SEE ATTACHED ADDENDUM.

I [X] did [ ] did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed.
THE SALES CONTRACT WAS NOT MADE AVAILABLE TO THE APPRAISER AT THE TIME OF INSPECTION-SEE ADDENDA.

Contract Price $ 450,000   Date of Contract PENDING   Is the property seller the owner of public record? [X] Yes [ ] No  Data Source(s) SEE ATTACHED

Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the borrower? [X] Yes [ ] No

If Yes, report the total dollar amount and describe the items to be paid. $ UNKNOWN   A SALES CONCESSION IN THE AMOUNT OF 6%, WHICH HAS BEEN INCLUDED IN THE FINAL SALES PRICE OF $450,000 AS NOTED BY THE LENDER. *premium grant $13,500

Note: Race and the racial composition of the neighborhood are not appraisal factors.

| Neighborhood Characteristics | | | 2-4 Unit Housing Trends | | | 2-4 Unit Housing | | | Present Land Use % | |
|---|---|---|---|---|---|---|---|---|---|---|
| Location [X] Urban [ ] Suburban [ ] Rural | | | Property Values [ ] Increasing [X] Stable [ ] Declining | | | PRICE | AGE | One-Unit | 35 % | |
| Built-Up [X] Over 75% [ ] 25-75% [ ] Under 25% | | | Demand/Supply [ ] Shortage [X] In Balance [ ] Over Supply | | | $(000) | (yrs) | 2-4 Unit | 53 % | |
| Growth [ ] Rapid [X] Stable [ ] Slow | | | Marketing Time [ ] Under 3 mths [X] 3-6 mths [ ] Over 6 mths | | | 375 Low | NEW | Multi-Family | 5 % | |
| Neighborhood Boundaries SEE ADDENDA | | | | | | 550 High | 100 | Commercial | 5 % | |
| | | | | | | 450 Pred. | 10 | Other MISC | 2 % | |

Neighborhood Description SEE ADDENDA

Market Conditions (including support for the above conclusions) SEE ADDENDA

| | | | | |
|---|---|---|---|---|
| Dimensions 24 X 100 SUBJECT TO SURVEY | Area 2,400 Sq.Ft. | Shape RECTANGULAR | | View RESIDENTIAL |

Specific Zoning Classification R3-2    Zoning Description GENERAL RESIDENCE DISTRICT

Zoning Compliance [X] Legal [ ] Legal Nonconforming (Grandfathered Use) [ ] No Zoning [ ] Illegal (describe) N/A

Is the highest and best use of the subject property as improved (or as proposed per plans and specifications) the present use? [X] Yes [ ] No  If No, describe. N/A

| Utilities | Public | Other (describe) | | Public | Other (describe) | Off-site Improvements—Type | Public | Private |
|---|---|---|---|---|---|---|---|---|
| Electricity | [X] | 100 AMP C/B | Water | [X] | NYC | Street MACADAM | [X] | |
| Gas | [X] | GAS | Sanitary Sewer | [X] | NYC | Alley NONE | | |

FEMA Special Flood Hazard Area [ ] Yes [X] No   FEMA Flood Zone ZONE X   FEMA Map # 3604870081C   FEMA Map Date NOT AVAILABLE

Are the utilities and off-site improvements typical for the market area? [X] Yes [ ] No  If No, describe. N/A

Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)? [ ] Yes [X] No  If Yes, describe. TYPICAL UTILITY EASEMENT

| GENERAL DESCRIPTION | | FOUNDATION | | EXTERIOR DESCRIPTION | materials/condition | INTERIOR | materials/condition |
|---|---|---|---|---|---|---|---|
| Units [X] Two [ ] Three [ ] Four | [X] Concrete Slab [ ] Crawl Space | Foundation Walls | CONCRETE/NEW | Floors | TILE/HDWD/CRPT |
| [ ] Accessory Unit (describe below) | [ ] Full Basement [ ] Partial Basement | Exterior Walls | VINYL/NEW | Walls | DRYWALL/NEW |
| # of Stories 3   # of bldgs. 1 | Basement Area N/A sq. ft. | Roof Surface | ASPHALT/NEW | Trim/Finish | WD/PAINT/NEW |
| Type [ ] Det. [ ] Att. [X] S-Det./End Unit | Basement Finish N/A % | Gutters & Downspouts ALUMINUM/NEW | | Bath Floor | CERAMIC/NEW |
| [X] Existing [ ] Proposed [ ] Under Const. | [ ] Outside Entry/Exit [ ] Sump Pump | Window Type | DOUBLE/NEW | Bath Wainscot | CERAMIC/NEW |
| Design (Style) SEMI / COLONIAL | [ ] Evidence of [ ] Infestation | Storm Sash/Insulated VINYL/NEW | | Car Storage | |
| Year Built 2007 | [ ] Dampness [ ] Settlement | Screens | ALUMINUM/NEW | [ ] None | |
| Effective Age (Yrs) 0 YEARS | Heating/Cooling | Amenities | | [X] Driveway  # of Cars 2 | |
| Attic [X] None | [ ] FWA [ ] HWBB [ ] Radiant | [ ] Fireplace(s) # | [ ] WoodStove(s) # | Driveway Surface CONCRETE | |
| [ ] Drop Stair [ ] Stairs | [X] Other FHA  Fuel GAS | [X] Patio/Deck CONC [X] Fence CHAIN | | [ ] Garage  # of Cars | |
| [ ] Floor [ ] Scuttle | [X] Central Air Conditioning | [ ] Pool [ ] Porch | | [ ] Carport  # of Cars | |
| [ ] Finished [ ] Heated | [ ] Individual [ ] Other | [ ] Other | | [ ] Att. [ ] Det. [ ] Built-in | |

# of Appliances [ ] Refrigerator 2 [ ] Range/Oven 2 [ ] Dishwasher [ ] Disposal [ ] Microwave [ ] Washer/Dryer [ ] Other (describe) N/A

| | | | | |
|---|---|---|---|---|
| Unit # 1 contains: | 2 Rooms | 0 Bedroom(s) | 1 Bath(s) | 336 Square feet of Gross Living Area |
| Unit # 2 contains: | 7 Rooms | 3 Bedroom(s) | 1.5 Bath(s) | 1,358 Square feet of Gross Living Area |
| Unit # 3 contains: | Rooms | Bedroom(s) | Bath(s) | Square feet of Gross Living Area |
| Unit # 4 contains: | Rooms | Bedroom(s) | Bath(s) | Square feet of Gross Living Area |

Additional features (special energy efficient items, etc.). NONE NOTED

Describe the condition of the property (including needed repairs, deterioration, renovations, remodeling, etc.). SEE ADDENDUM

Freddie Mac Form 72  March 2005                Page 1 of 7                Fannie Mae Form 1025  March 2005

JJG08778

JJG REAL ESTATE APPRAISAL SERVICES

**Small Residential Income Property Appraisal Report**

FHA #374-4611153
File No. 31-NewarkAVe

Are there any physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property? ☐ Yes ☒ No If Yes, describe SEE ATTACHED ADDENDUM.

Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)? ☒ Yes ☐ No If No, describe N/A

Is the property subject to rent control? ☐ Yes ☐ No If Yes, describe

The following properties represent the most current, similar, and proximate comparable rental properties to the subject property. This analysis is intended to support the opinion of the market rent for the subject property.

| FEATURE | SUBJECT | COMPARABLE RENTAL NO. 1 | COMPARABLE RENTAL NO. 2 | COMPARABLE RENTAL NO. 3 |
|---|---|---|---|---|
| Address | 31 NEWARK AVENUE STATEN ISLAND | 7 NICHOLAS AVENUE STATEN ISLAND | 67 VAN PELT AVENUE STATEN ISLAND | 23 WALKER STREET STATEN ISLAND |
| Proximity to Subject | | 0.31 miles NE | 0.60 miles WSW | 0.50 miles SSE |
| Current Monthly Rent | $ VACANT | $ 2,500 | $ 1,200 | $ 1,000 |
| Rent/Gross Bldg. Area | $ 0.00 sq. ft. | $ 1.39 sq. ft. | $ 0.65 sq. ft. | $ 0.76 sq. ft. |
| Rent Control | ☐ Yes ☐ No | ☐ Yes ☒ No | ☐ Yes ☒ No | ☐ Yes ☒ No |
| Data Source(s) | INSPECTION | LOCAL BROKER | LOCAL BROKER | LOCAL BROKER |
| Date of Lease(s) | MONTHLY | MONTH TO MONTH | MONTH TO MONTH | MONTH TO MONTH |
| Location | RESIDENTIAL | RESIDENTIAL | RESIDENTIAL | RESIDENTIAL |
| Actual Age | 0 YRS | 6 YRS | 3 YRS | 97 YRS |
| Condition | VERY GOOD | GOOD | GOOD | AVERAGE |
| Gross Building Area | 1694 sq.ft. | 1,800 Sq.Ft. | 1,836 Sq.Ft. | 1,310 Sq.Ft. |

| Unit Breakdown | Rm Count Tot / Br / Ba | Size Sq. Ft. | Rm Count Tot / Br / Ba | Size Sq. Ft. | Monthly Rent | Rm Count Tot / Br / Ba | Size Sq. Ft. | Monthly Rent | Rm Count Tot / Br / Ba | Size Sq. Ft. | Monthly Rent |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Unit # 1 | 2 / 1 / 1 | 336 | 3 / 1 / 1 | 600 | $ 900 | 5 / 2 / 1 | 918 | $ 1,200 | 4 / 2 / 1 | 704 | $ OWNER |
| Unit # 2 | 7 / 3 / 1.5 | 1,358 | 6 / 3 / 1.5 | 1,200 | $ 1,600 | 5 / 2 / 1 | 918 | $ OWNER | 3 / 1 / 1 | 608 | $ 1,000 |
| Unit # 3 | | | | | $ | | | $ | | | $ |
| Unit # 4 | | | | | $ | | | $ | | | $ |
| Utilities Included | WATER, SEWER GARBAGE | | WATER, SEWER, GARBAGE | | | WATER, SEWER, GARBAGE | | | WATER, SEWER, GARBAGE | | |

Analysis of rental data and support for estimated market rents for the individual subject units reported below (including the adequacy of the comparables, rental concessions, etc.) AFTER CONSIDERING THE DIFFERENCES BETWEEN THE SUBJECT UNITS AND THE COMPARABLE RENTAL DATA, IT IS OUR OPINION THAT THE MARKET RENT FOR THE SUBJECT UNITS IS AS INDICATED BELOW.

Rent Schedule: The appraiser must reconcile the applicable indicated monthly market rents to provide an opinion of the market rent for each unit in the subject property.

| | Leases | | Actual Rents | | | | Opinion Of Market Rent | | |
|---|---|---|---|---|---|---|---|---|---|
| | Lease Date | | Per Unit | | Total | | Per Unit | | Total |
| Unit # | Begin Date | End Date | Unfurnished | Furnished | Total Rents | | Unfurnished | Furnished | Total Rents |
| 1 | VACANT | TENANT | $ 0 | $ | $ 0 | | $ 900 / 800 | $ | $ 900 800 |
| 2 | VACANT | OWNER | 0 | | 0 | | 1,600 | | 1,600 |
| 3 | | | | | | | | | 2,500 |

Comment on lease data THE LEASE INFORMATION WAS CONFIRMED BY THE OWNER.

| | | | | |
|---|---|---|---|---|
| Total Actual Monthly Rents | $ 0 | Total Gross Monthly Rent | $ | 2,400 |
| Other Monthly Income (itemize) | $ | Other Monthly Income (itemize) | $ | |
| Total Actual Monthly Income | $ | Total Estimated Monthly Rent | $ | 2,400 |

Utilities included in estimated rents ☐ Electric ☒ Water ☒ Sewer ☐ Gas ☐ Oil ☐ Cable ☒ Trash collection ☐ Other (describe)

Comments on actual or estimated rents and other monthly income (including personal property) THE RENT FOR THE PROJECTED RENTAL APARTMENTS APPEARS TO BE WITHIN AVERAGE RENTAL RATES FOR THE NEIGHBORHOOD. FORECASTED RENTS FOR SUBJECT UNITS ARE BASED ON CURRENT RENT FIGURES FOR SUBJECT PROPERTY AND COMPARABLE RENTALS.

I ☒ did ☐ did not research the sale or transfer history of the subject property and comparable sales. If not, explain N/A

My research ☒ did ☐ did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.
Data source(s) PUBLIC RECORD, MLS, GEODATA

My research ☒ did ☐ did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale.
Data source(s) PUBLIC RECORD, MLS, GEODATA

Report the results of the research and analysis of the prior sale history of the subject property and comparable sales (report additional prior sales on page 4).

| ITEM | SUBJECT | COMPARABLE SALE NO. 1 | COMPARABLE SALE NO. 2 | COMPARABLE SALE NO. 3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | 12/13/2002 | NO SALES PRIOR | NO SALES PRIOR | NO SALES PRIOR |
| Price of Prior Sale/Transfer | $325,000 | 3 YEARS | 3 YEARS | 3 YEARS |
| Data Source(s) | PUBLIC RECORD | PUBLIC RECORD | PUBLIC RECORD | PUBLIC RECORD |
| Effective Date of Data Source(s) | 5/16/2007 | 5/16/2007 | 5/16/2007 | 5/16/2007 |

Analysis of prior sale history for the subject property and comparable sales SEE ADDENDUM

JJG08779